## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| NATIONAL URBAN LEAGUE, on behalf of itself and its members; COMMON CAUSE, on behalf of itself and its members; LEAGUE OF WOMEN VOTERS OF THE UNITED STATES, on behalf of itself and its members, <br><br> Plaintiffs, <br><br> vs. <br><br> LOUIS DEJOY, in his official capacity as Postmaster General; and the UNITED STATES POSTAL SERVICE, <br><br> Defendants. | CIV. NO. 1:20-cv-2391 <br><br> [CIVIL RIGHTS ACTION] <br><br><br> **COMPLAINT** |

## INTRODUCTION

1.      Defendants Louis DeJoy (the United States Postmaster General) and the United States Postal Service have made sweeping changes to the Postal Service's policies and procedures with the purpose and intent to sabotage mail-in voting in the upcoming 2020 national elections.

2.      In taking these actions, Defendants have violated the United States Constitution's guarantee of free expression and have unconstitutionally burdened the fundamental right to vote. Their actions were taken without observance of procedure required by law, in excess of their statutory authority, and in violation of the statutory duties of the Postal Service.

3.      Defendants' actions will interfere—and are designed to interfere—with the ability of state and local officials to administer fair elections and of voters to exercise their fundamental rights to vote and to use the Postal Service to cast their ballots.

4.      Defendants' actions are especially pernicious because the upcoming national elections will take place in the midst of a once-in-a-century pandemic that is expected to cause a surge in mail-in voting.  While mail-in voting has long been used safely and without any material evidence of fraud, Defendants' actions effectively require members of the voting public to make a choice: exercise your right to vote in a manner that may be dangerous to your health and that of your community or forfeit your right to vote.

5.      The actions themselves evidence Defendants' illicit motivations.   Under the recently installed Postmaster General, Defendant DeJoy, the Postal Service has broken sharply with longstanding policies and has vastly and haphazardly altered operational policies and practices—all in the midst of a global pandemic that is already placing tremendous strain on the Postal Service, and all without observance of legally mandated procedures for changing national Postal Service policy.   These actions include: decommissioning mail sorting machines and removing post office collection boxes en masse; curtailing the ability of postal workers to timely deliver mail by prohibiting overtime and disallowing extra delivery trips; and, in a sudden and inexplicable break with longstanding Postal Service policy, *deprioritizing* the delivery of election mail.  By Defendants' own admission, these changes will cause ballots to go uncounted.  In a closely contested election with a high percentage of voting by mail, the failure to count mail ballots could influence election outcomes.

6.      Statements by the President remove any doubt that these efforts have been undertaken with the purpose of denying the right to vote to voters who use mail-in ballots—and, specifically, voters who intend to vote for his political opponents.  The President has stated, clearly and unequivocally, that these actions were taken to undermine the ability of people to rely on the Postal Service to vote because the President believes that undermining the Postal Service will help

him in upcoming elections.  The President could not have made his views any clearer:  "MAIL-IN VOTING WILL LEAD TO . . . THE END OF OUR GREAT REPUBLICAN PARTY."

7.     No matter Defendants' intentions, the *effect* of Defendants' actions will be to deny the right to vote for voters of every political preference and affiliation.  Defendants' actions risk disenfranchising any voter who needs to use the Postal Service to vote.

8.     Politically motivated tampering with the operation of the Postal Service is unlawful and unconstitutional even in ordinary times.  But here it threatens the most fundamental right in our democracy—the right to vote, on which all other civil and political rights depend.  *Wesberry v. United States*, 376 U.S. 1, 17 (1964).  This Court's immediate intervention is needed to protect the Postal Service's role in the electoral process by ordering relief that will ensure that the Postal Service handles and delivers election mail, including ballots, in a timely manner consistent with its highest operational standards.

9.     The recent steps Defendants have taken to slow or otherwise interfere with the delivery of election mail should be enjoined and ordered reversed to ensure that the Postal Service provides effective mail service in the upcoming election and to prevent the denial or abridgement of the right to vote for tens of thousands or possibly hundreds of thousands of Americans.

10.     Postmaster General DeJoy's August 18, 2018, statement that he is "suspending" certain "initiatives" "until after the election" does nothing to lessen the overwhelming need for swift relief from this Court.  The Postmaster General's statement does not commit to ceasing the implementation of several of the actions Plaintiffs complain of herein.  Nor does it commit to taking any remedial action to undo the effects of actions Defendants have already undertaken to undermine the Postal Service's ability to effectively facilitate voting by mail in the upcoming election.  The Postmaster General has not committed to replacing mail sorting machines and

collection boxes Defendants have already removed; to administering overtime as it was administered before Postmaster General DeJoy began his tenure; to rescinding his directives to Postal Service workers to leave mail behind, cease work immediately when their shifts end, and wait to sort mail until later in the day; or to reversing the policy of not treating all election mail as priority mail.

11.     The Constitution requires the President and the Postmaster General to faithfully execute the laws and to preserve, protect, and defend the Constitution and the rights guaranteed therein.  The constitutional and statutory rights of Americans to vote are among the most sacred of those laws.  Defendants should be taking every effort to facilitate mail-in voting. But, at a minimum, they should not be weaponizing the Postal Service in order to infringe the sacred right to vote.

## SUBJECT MATTER JURISDICTION & VENUE

12.     The Court has subject matter jurisdiction over Plaintiffs' claims under Article III of the Constitution, 28 U.S.C. § 1331, and under 28 U.S.C. § 1346. An actual and justiciable controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief pursuant to 28 U.S.C. §§ 2201-02 and the Court's equitable powers. Plaintiffs have no adequate remedy at law.

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e)(1) because a substantial part of the events and omissions giving rise to this action occurred in this district.

## PARTIES

### *Plaintiffs*

14.     Plaintiff **National Urban League** ("Urban League") is a civil rights organization dedicated to the empowerment of African Americans and others in underserved communities to

achieve their highest true social parity, economic self-reliance, political power, and civil rights. Founded in 1910 and headquartered in New York City, with 90 affiliates serving 300 communities in 36 states and the District of Columbia, the Urban League works to improve the lives of more than two million people annually across the nation through direct service programs, including education, employment training and placement, housing, and health. The Urban League, working with its more than 400,000 members, including more than 4,000 members in Maryland, seeks to advance our civil rights by removing all barriers to equal participation in all aspects of American society, whether political, economic, social, educational, or cultural.

15.     To advance its core mission of political empowerment and equality, the Urban League has initiated a national "Reclaim our Vote" campaign focused on increasing political participation in African-American and other underserved communities in advance of the November 3, 2020, election. This campaign includes voter registration activities, as well as voter education around all aspects of voting, including voting by mail. This campaign includes a national informational initiative using paid and earned media, including print, radio, and television advertisements, social media, and media partnerships with Black Entertainment Television and other companies.

16.     Working locally with its affiliates and community groups, including faith groups, the Urban League is focused on providing information directly to voters about how to vote in 2020. During the ongoing COVID-19 pandemic, which has disproportionately affected the Black and Brown communities it serves, the Urban League has focused much of its voter education efforts on how to vote by mail in order to avoid the health risks of voting in person.

17.     As a result of recent disruptions and delays in mail delivery by the United States Postal Service, the Urban League has needed to redirect significant organizational resources to

addressing concerns about voting by mail, including what voters should do if they never receive their mail-in ballots or receive them too late to return them by the deadline. This diversion of resources has harmed the ability of the Urban League to advance its core mission through other activities, including outreach and voter registration among new voters, and from preparing for a Get Out the Vote campaign set to begin on September 18, 2020, to coincide with National Black Voter Day.

18.     The Urban League has limited organizational resources and must carefully allocate these resources over a long timeline in order to ensure it can carry out its core mission. Defendants' actions mean that the Urban League has curtailed and must continue to curtail other mission-critical activities in order to educate and assist voters and communities about adjusting and responding to disruptions and delays in mail delivery and to ensure that these voters are still able to safely cast their ballots in the November 3, 2020, election.

19.     Plaintiff **Common Cause** is a nonprofit organization organized and existing under the laws of the District of Columbia, with its principal place of business in the District of Columbia. Common Cause is a nonpartisan democracy organization with over 1.2 million members and supporters, 22 state offices, and a presence in all 50 states. It has members in all 50 states and in every congressional district. Since its founding by John Gardner 50 years ago, Common Cause has been dedicated to making government at all levels more representative, open, and responsive to the interests of ordinary people.

20.     As part of its core mission, Common Cause works on a nonpartisan basis to expand and protect equal access to voting for all citizens on multiple fronts, including: (a) lobbying for nonpartisan election reforms, including, but not limited to, allowing no-excuse absentee voting, extending the deadlines for submitting mail-in ballots, ensuring the safety of in-person polling

places during the COVID-19 pandemic, increasing the number of voting locations, and ensuring a fair, nonpartisan redistricting process; (b) working collaboratively with state and local election officials to address and remedy—in advance of the November 2020 general election—election administration problems experienced in the 2020 statewide primary elections; (c) partnering with other community organizations to provide education and training to on-the-ground voting rights activists throughout the country; (d) working with other community organizations to track problems at voting sites on Election Day, field calls from voters who experience burdens in their efforts to exercise their fundamental right to vote, and provide assistance to such voters by lobbying local election officials and/or facilitating their access to counsel; and (e) advocating for nonpartisan election reforms, such as an expansion of early voting, designed to promote racial equity by removing barriers to the franchise disproportionately borne by communities of color.

21.     Common Cause has a relatively small number of employees and a limited budget and relies on its member volunteers for many of its activities.  It has to make hard choices about how to use its limited resources.

22.     As a result of the actions taken by the Postal Service, which threaten to delay delivery of mail-in ballots both to voters and to local election officials, Common Cause has had to and will continue to expend additional resources training or retraining its volunteers about the options available to voters who fear that their mail-in ballots might not arrive in time to be counted. The time and resources spent on such training is diverted from other activities Common Cause would undertake to advance its mission.

23.     By increasing the risk that some voters will be unable to successfully cast their ballots by mail, Defendants' actions harm Common Cause's mission of reducing barriers to voting and impose additional burdens on Common Cause that take time and resources away from

lobbying and advocacy efforts on other issues, including, but not limited to, no-excuse absentee voting, ensuring the safety of in-person polling places, and expanding access to early voting.

24.     In advance of the November 3, 2020, general election, Common Cause anticipates that it will have to devote time and resources to training voters, volunteers, and its members on the effects of Defendants' actions.  Common Cause's staff spends considerable time developing the curriculum and presentation materials for these sessions.  The time and resources spent on updating such training to address the effects of Defendants' actions will be diverted from other activities Common Cause would otherwise undertake to advance its mission.

25.     In short, the time and resources that Common Cause has expended and will continue to expend addressing the effects of Defendants' actions necessarily diverts time and resources away from the organization's other advocacy, education, voter assistance, and lobbying efforts.

26.     Common Cause has approximately 1.2 million members and supporters nationwide.  Many of those members are individuals who regularly vote by mail, either because they choose to do so or because they are not able to vote in person.  Among those are many members who are at particular risk for health reasons during the COVID-19 pandemic and therefore especially need to avoid voting in person.  Defendants' actions are likely to deprive many of those members of their fundamental right to vote, by delaying delivery of their mail-in ballots both to them and then to local election officials.

27.     Plaintiff **League of Women Voters of the United States** (the "LWVUS") is a nonpartisan, community-based organization headquartered in Washington, D.C., that encourages informed and active participation in government and influences public policy through education and advocacy. Founded in 1920 as an outgrowth of the struggle to win voting rights for women,

the LWVUS is active in over 760 communities and every congressional district in the United States and has more than 500,000 members and supporters nationwide. The LWVUS's mission is to empower voters and defend democracy, and it works to promote an open governmental system that is representative, accountable, and responsive. The LWVUS has been a leader in pushing for expanded voter access across the country, meets with more than 1,100 election officials each cycle to discuss election procedures and needs, and works with state and local election officials to educate voters on how to effectively cast a ballot.

28.     For the 2020 election, in furtherance of its mission, the LWVUS developed a robust civic engagement campaign that involved registering particular underrepresented voters and maintaining contact with those voters through targeted get-out-the-vote efforts designed to encourage participation. Specifically, the LWVUS invested several hundred thousand dollars in a get-out-the-vote engagement campaign to encourage the participation of low-income communities, communities of color, non-college youth, unmarried women, and new citizens. The LWVUS planned to engage eligible voters in these communities and register them.  Once they were registered, the LWVUS would use the voters' address information to send 1.7 million timed mailers that provided crucial information relating to the voting process and encouragement to vote in 15 states across the country while also supporting the remaining states in organizing local get-out-the-vote efforts. The focus is to help voters learn and navigate the ever-evolving election process, specifically their early and mail-in voting opportunities. In three of these states the mailers are bilingual, and all include key in-state dates related to early and mail-in voting to encourage voters to act as soon as possible.

29.     The LWVUS was depending on the use of mail to conduct this campaign, especially considering the impact of COVID-19. The LWVUS planned to mail out 1.7 million postcards to

voters whom the organization had previously registered and whom it had engaged via a variety of outreach efforts to boost turnout in these communities for the general election.

30.    The delays in mail delivery by the United States Postal Service have disrupted these plans in several ways.  First, concerned that its mailers will not be timely delivered, the LWVUS is now planning to adjust its campaign to ensure as many mailers as possible reach the designated target voters. It will likely have to have to expend more resources to ensure timely delivery of these mailers. This will require diversion of limited resources from other programs and priorities that the LWVUS is engaged in for the 2020 election. The LWVUS will also likely have to rely on social media for its outreach efforts rather than mailers. However, it is more difficult for the LWVUS to directly connect with voters it had previously registered through social media.

31.    Second, the Postal Service delays have already caused and will continue to cause the LWVUS to divert resources from priorities like the voter registration and targeted outreach campaign in order to educate voters about how to effectively cast mail ballots and utilize alternatives to mail voting. The LWVUS is already expending additional resources in terms of staff and volunteer time educating voters about the deadlines for applying for and submitting mail ballots, providing recommendations to voters on when to engage those processes, and explaining to voters what they can do if and when there are delays in the mailing or receipt of their ballots. With the expected influx of mail voting during the November election, the LWVUS will have to devote even more resources to this task in order to best further its empowerment-focused mission.

32.    The LWVUS is a non-profit with limited resources, and expending additional resources to address emergencies, like the delays caused by Defendants' actions, diverts resources from other priority areas, such as the LWVUS's registration and get-out-the-vote program.

*Defendants*

33.     Defendant **Louis DeJoy**, who is being sued in his official capacity only, is the Postmaster General of the United States.  In that role, DeJoy is the chief executive officer of the United States Postal Service.  He is responsible for the day-to-day operation of the Postal Service.  He exercises nearly all of the powers vested in the Postal Service Board of Governors by delegation pursuant to 39 U.S.C. § 402 and 39 C.F.R. § 3.5.  He thus has the power to direct and establish policies, basic objectives, and long-range goals for the Postal Service as long as they do not conflict with the limitations in the statute governing the Postal Service in Title 39 of the United States Code.  The President has the power to remove the Postmaster General and to supervise and direct his actions.

34.     Defendant **United States Postal Service** is an independent executive agency of the U.S. federal government. The Postal Service's headquarters are located at 475 L'Enfant Plaza SW, Washington, D.C., 20260.  The United States Postal Service is responsible for the timely delivery of election mail sent through the Postal Service.

## FACTUAL ALLEGATIONS

### The Unprecedented Need to Rely on Voting By Mail During the COVID-19 Pandemic

35.     The Postal Service plays a critical role in every election.  State and local election officials rely on the Postal Service to deliver time-sensitive election information to voters, including information about candidates and ballot initiatives.  They also rely on the Postal Service to carry ballot applications and unmarked ballots to voters.  Voters themselves rely just as heavily on the Postal Service to receive time-sensitive election information and ballots and also to carry their marked ballots to local election boards.  This activity—the exercise of the franchise—is core political speech, enabled by the United States Postal Service, one of America's oldest and most

trusted institutions, which has for over two centuries played a vital role in binding the nation together.

36.     Because the nation will conduct its constitutionally and congressionally mandated election during a pandemic, the Postal Service's role will be essential.  Over the past five months, COVID-19 has had an unprecedented impact on every facet of American life.  This highly transmissible and deadly virus has made it risky and difficult for Americans to safely undertake any tasks that involve in-person contact (and for some impossible).  Government offices, schools, and businesses have closed.  Public health officials, along with other federal, state, and local officials, have urged people to limit person-to-person interactions and to avoid large gatherings, in particular crowded indoor gatherings.  Voting in person—which often takes place in crowded indoor polling venues—now poses personal and public health risks, especially for older Americans and those with underlying medical conditions.  The U.S. Centers for Disease Control has accordingly urged election boards to permit alternatives to in-person voting that "minimize exposure between poll workers and voters" and "reduce crowd size at polling locations."

37.     As a result, record numbers of American voters have already chosen to vote by mail in the federal, state, and local primary elections that have occurred since March.  Some state primaries saw more than a tenfold increase since 2016 in the proportion of ballots submitted by mail.  For example:

    a.  Wisconsin's April 2020 primary election saw a 440 percent increase in completed absentee ballots relative to the April 2016 election, with nearly 1 million ballots submitted by mail.

    b.  More than 1.1 million people submitted absentee ballots in the Georgia primaries, five times more ballots than were cast in the 2018 general election.

    c.  In the Nebraska primary election in June, a record 80 percent of ballots were cast by mail, more than three times the usual rate.

    d.   New York's June 2020 primary election saw a tenfold increase in absentee ballot requests relative to 2016, with over 1.7 million people requesting ballots by mail.

    e.   In Washington, D.C., 91,000 voters—15 times the normal number—requested absentee ballots.

    f.   In Pennsylvania, 18 times more voters requested absentee ballots in the 2020 primary than did for the 2016 primary election, with 1.9 million requesting mail-in ballots.

38.    The historic rates of voting by mail in this year's primary elections were facilitated in part by policy changes to accommodate voters' fears of COVID-19 infection.  Almost half of U.S. states increased access to mail-in voting in their 2020 primary elections, with several of the 15 states that did not already permit voters to request absentee ballots without a specific "excuse" adding risk of infection as sufficient justification.

39.    The upcoming general election will see a similarly unprecedented level of voting by mail.  Twenty-seven states and the District of Columbia have expanded voter access to mail ballots for the 2020 general election, with the broad goal of making it easier for people to vote in light of the pandemic.

40.    In nine states and the District of Columbia, every registered voter will be mailed a ballot ahead of the election. California, Nevada, New Jersey, and the District of Columbia have switched to a universal vote-by-mail system in light of the pandemic, whereby all registered voters are proactively mailed ballots in advance of the general election.  Together with the five other states that had already implemented universal vote by mail prior to 2020, approximately 52 million voters will automatically receive ballots in the mail this fall.

41.    In an additional 34 states, voters may now cite the coronavirus as a reason to vote absentee or may cast an absentee ballot without specifying a reason.  Delaware, Massachusetts, and Missouri will no longer require voters to identify a specific reason for requesting a ballot by

mail; and Alabama, Arkansas, Connecticut, New Hampshire, West Virginia, and Kentucky will allow requests based on coronavirus concerns.

42.     All told, at least 180 million individuals—77 percent of all registered voters in the U.S.—will have the option to vote by mail in the November 2020 general election, the most in U.S. history.  Some experts predict that 80 million votes could be submitted by mail this fall, more than twice the number cast by mail in 2016.

43.     The challenges facing the Postal Service will become only more acute and serious as the November general election nears and the Postal Service is tasked with the simultaneous, nationwide processing of unprecedented numbers of mail-in ballots.

## Defendants Have Taken Sudden and Unjustified Transformative Actions to Interfere with the Postal Service's Ability to Handle Mail Ballots

44.     As the nation braces for an election that will involve unprecedented reliance on the Postal Service, Defendants have intentionally undertaken steps that will cause the Postal Service to deny or abridge the right to vote of thousands of Americans by slowing the delivery of mail ballots.

45.     Shortly after taking office in June 2020, Postmaster General DeJoy began to implement major structural and operational changes at the Postal Service.  These Transformative Actions, described in detail below in paragraphs 46-54, have had the cumulative effect of delaying mail delivery in general and specifically impeding access to mail ballots.

46.     For example, Postmaster General DeJoy moved to decommission one out of every ten Postal Service mail sorting machines in the Postal Service's inventory,[1] including one out of

---

[1] Erin Cox et al., *Postal Service Warns 46 States Their Voters Could Be Disenfranchised by Delayed Mail-in Ballots*, WASH. POST (Aug. 14, 2020), https://www.washingtonpost.com/local/md-politics/usps-states-delayed-mail-in-ballots/2020/08/14/64bf3c3c-dcc7-11ea-8051-d5f887d73381_story.html.

every seven Delivery Barcode Sorter (DBCS) machines.[2]  DBCS machines make up the bulk of the Postal Service's mail sorting operation and are used to sort envelope mail, such as letters, postcards, and—critically—ballots.[3]  Delivery Barcode Sorting machines are capable of sorting through 35,000 pieces of mail per hour.[4]  According to Postal Service planning documents issued under Postmaster General DeJoy's watch, the Postal Service planned to remove 671 mail sorting machines, including 502 DBCS machines, by September 30.  Although White House Chief of Staff Mark Meadows disingenuously said in an interview on August 16 that the Postal Service would not decommission *any more* sorting machines before the November election, by the time he made that statement the Postal Service had *already* decommissioned more than 95 percent of the sorting machines that were scheduled to be removed, according to Postal Service planning documents,[5] including a significant number of sorting machines from processing and distribution centers in Baltimore, Gaithersburg, and Capitol Heights.

47.     Postmaster General DeJoy ordered the removal of Postal Service collection mailboxes throughout the country.  Mailboxes have reportedly been removed in at least four states, including New York, Pennsylvania, Oregon, and Montana.[6]  In light of these reports, Montana Senator Jon Tester sent a public letter to Postmaster General DeJoy requesting, among other things,

---

[2] Paul P. Murphy & Curt Devine, *Internal USPS Documents Raise Questions About Effectiveness of Sorting Machines Removal Order*, CNN (last updated Aug. 16, 2020), https://www.cnn.com/2020/08/16/politics/usps-documents-sorting-machine-removal-order/index.html.

[3] Aaron Gordon, *The Post Office Is Deactivating Mail Sorting Machines Ahead of the Election*, Vice (Aug. 13, 2020), https://www.vice.com/en_us/article/n7wk9z/the-post-office-is-deactivating-mail-sorting-machines-ahead-of-the-election.

[4] *Id.*

[5] Murphy & Devine, *supra* note 2.

[6] Jacob Bogage, *Postal Service Will Stop Removing Mailboxes*, Wash. Post (Aug. 14, 2020), https://www.washingtonpost.com/business/2020/08/14/people-are-freaking-out-about-mailbox-removals-postal-service-says-its-routine/.

information on the number of collection boxes removed from Montana.[7]  As of the filing of this Complaint, Postmaster General DeJoy has not responded.

48.     During a "Stand Up Talk," Postmaster General DeJoy ordered the elimination of overtime for Postal Service workers.  Prior to the policy change, according to data from the American Postal Workers Union, almost 20 percent of all work done by Postal Service mail handlers, delivery drivers, and city carriers was done in overtime.[8]  Postal Service employees utilize overtime "to handle surges in mail—including mail-in ballots."[9]  However, the Postal Service informed employees that "[o]vertime will be eliminated" because the Postal Service is "paying too much in [overtime] and it is not cost effective."[10]  With the elimination of overtime, the Postal Service will have significantly reduced capacity to process surges in mail in the weeks leading up to the November election.

49.     During the same "Stand Up Talk," Postmaster General DeJoy also ordered steps to restrict deliveries of mail.  DeJoy directed that "late trips" and "[e]xtra trips" to ensure timely delivery of mail "are no longer authorized or accepted."[11]  Further, the Postal Service directed postal workers to leave mail behind at distribution centers for delivery the following day if collecting it would delay letter carriers from their routes.[12]  Historically postal workers have been

---

[7] Letter from Senator Jon Tester to Postmaster Gen. Louis DeJoy (Aug. 13, 2020), *available at* https://www.tester.senate.gov/files/Letters/2020-08-13%20USPS%20Collection%20Box%20Letter.pdf.

[8] Nicole Goodkind, *Trump-Backed Postmaster General Plans to Slow Mail Delivery*, Fortune (July 24, 2020), https://fortune.com/2020/07/24/usps-mail-delivery-postmaster-general-louis-dejoy-us-postal-service/.

[9] Letter from House Speaker Nancy Pelosi and Senate Minority Leader Charles Schumer to Postmaster Gen. Louis DeJoy, at 5 (Aug. 14, 2020), *available at* https://oversight.house.gov/sites/democrats.oversight.house.gov/files/20200814_Letter_JointPelosiSchumerLofgren KlobucharCBMPeterstoPMGreElectionPrep.pdf.

[10] U.S. Postal Serv., PMGs Expectations and Plan (undated), *available at* https://www.nonprofitmailers.org/leaked-usps-powerpoint-indicates-pmg-dejoy-focus-on-getting-operating-costs-under-control/.

[11] U.S. Postal Serv., Mandatory Stand-Up Talk: All Employees (July 10, 2020), *available at* https://www.washingtonpost.com/context/internal-usps-document-tells-employees-to-leave-mail-at-distribution-centers/175dd1ae-e202-4777-877c-33442338d1cc/.

[12] PMGs Expectations and Plan, *supra* note 10.

instructed not to leave letters behind and to make multiple trips if needed to ensure that mail is delivered on time.[13]  The Postal Service itself explained that "[o]ne aspect of these changes that may be difficult for employees is that – temporarily – we may see mail left behind or mail on the workroom floor or docks . . . which is not typical."[14]

50.    On July 16, 2020, the Postal Service informed the National Association of Letter Carriers about a new initiative called Expedited Street/Afternoon Sortation (ESAS), under which "[c]ity carriers will not sort any mail during the morning operation" but will instead sort delivery in the afternoon "[u]pon return from the street delivery."[15]  The purpose of ESAS, which was scheduled to begin in 384 selected sites on July 25, 2020,[16] is to "reduce[] morning office time to allow carriers to leave for the street earlier."[17]  Postal workers and lawmakers have expressed concerns that the practical effect of this change would further delay mail delivery times.[18]  As Arthur Sackler, manager of the postal industry advocacy group Coalition for a 21st Century Postal Service, explained, "if there's no real time to sort, and no overtime, then there could be a cumulative growing impact."[19]

---

[13] Jacob Bogage, *Postal Service Memos Detail "Difficult" Changes, Including Slower Mail Delivery*, Wash. Post (July 14, 2020), https://www.washingtonpost.com/business/2020/07/14/postal-service-trump-dejoy-delay-mail/.

[14] *Mandatory Stand-Up Talk*, supra note 11.

[15] U.S. Postal Serv., Stand-Up Talk: Expedited to Street/Afternoon Sortation (ESAS)—City Carrier (July 2020), *available at* http://www.nalc3825.com/SUT.ESAS.July.2020.pdf; *see also USPS Announces New ESAS Delivery Initiative Test*, Nat'l Ass'n of Letter Carriers (July 21, 2020), https://www.nalc.org/news/nalc-updates/usps-announces-new-esas-delivery-initiative-test.

[16] USPS announcement, *supra* note 15.

[17] USPS ESAS Stand-Up Talk, *supra* note 15.

[18] *See, e.g.*, Letter from Chairwoman Carolyn B. Maloney, House Comm. on Oversight and Reform, et al., to Postmaster Gen. Louis DeJoy (Aug. 6, 2020), *available at* https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2020-08-06.CBM%20et%20al.%20to%20DeJoy-%20PMG%20re%20Postal%20Standards%20Changes.pdf.

[19] Rachel M. Cohen, *USPS Workers Concerned New Policies Will Pave the Way to Privatization*, Intercept (July 29, 2020), https://theintercept.com/2020/07/29/usps-postal-service-privatization.

51.     Postmaster General DeJoy has also ordered a sweeping overhaul of the Postal Service leadership and organizational structure.  According to the reorganizational memorandum he released on August 7, 2020, nearly two dozen postal executives, many with decades of tenure in the Postal Service, were reassigned or displaced.  According to reporting by the *Washington Post*, "[a]nalysts say the structure centralizes power around DeJoy . . . and de-emphasizes decades of institutional postal knowledge."[20]  At the same time, DeJoy announced a management hiring freeze and voluntary early retirement program for employees not represented by a collective bargaining agreement.[21]

52.     Postmaster General DeJoy also ended the practice of treating all election mail as priority mail.  According to Postal Service delivery standards, First-Class Mail is typically delivered in 2 to 5 days, while Marketing Mail is delivered within 3 to 10 days.  Before Postmaster General DeJoy assumed the position of Postmaster General, it had been the practice of the Postal Service to prioritize the delivery of all election mail to meet First-Class delivery times no matter what class of mail was used to send it.  According to a 2019 report from the Postal Service Office of Inspector General, 95.6 percent of 2018 election mail was delivered within a 1-to-3-day service standard, which is functionally equivalent to the faster First-Class mail standard.[22]  The Postal Service informed congressional leaders on August 11, 2020, that it was ending the practice of

---

[20] Jacob Bogage, *Postal Service Overhauls Leadership as Democrats Press for Investigation of Mail Delays*, Wash. Post (Aug. 7, 2020), https://www.washingtonpost.com/business/2020/08/07/postal-service-investigation-dejoy/.

[21] *Postmaster General Louis DeJoy Modifies Organizational Structure to Support USPS Mission*, U.S. Postal Serv. (Aug. 7, 2020), https://about.usps.com/newsroom/national-releases/2020/0807-pmg-modifies-organizational-structure.htm.

[22] Off. of Inspector Gen., U.S. Postal Serv., Audit Report: Service Performance of Election and Political Mail During the 2018 Midterm and Special Election 1 (Nov. 4, 2019), https://www.uspsoig.gov/sites/default/files/document-library-files/2019/19XG010NO000.pdf.

prioritizing all election mail and to prepare for "slower delivery times" and an "increase[d] . . . risk that voters will not receive their ballots in time to return them by mail."[23]

53.    As reported by multiple press outlets, Postal Service employees and union representatives have expressed serious concerns about the impact of the recent changes on their ability to process and deliver mail in a timely manner:

  a.  A postal employee in Lancaster, New York, said that with the new policies, the facility there is about two days behind normal processing time.  She commented, "[t]he cardinal rule is, 'don't delay the mail,' and we're in a 180-degree switch where we're delaying mail every day."

  b.  On the issue of the removal of DBCS machines, Iowa Postal Workers Union President Kimberly Karol was quoted saying, "I'm not sure you're going to find an answer for why [the machines being removed] makes sense, because we haven't figured that out either."

  c.  As a Postal Service employee at a distribution facility in Buffalo explained, "[l]ook at it this way: Your local grocery store was forced to cut 1/3 of its cash-out lines, but management expected the same productivity, quality, and speed for the customer."  The same employee said their facility was set to lose six out of 21 mail sorting machines and concluded that maintaining the same productivity, quality, and speed is "just never going to happen."

  d.  In Erie, PA, two of six delivery bar code sorters have been "unplugged" and "shutter[ed]."  Referencing the election, a mail carrier who worked for 37 years until he retired in 2015 described this change as happening at "the worst possible time," suggesting changes should come "later on" and we should "have the election" first.  Otherwise, he said, "the reduction in equipment not just in Erie but in large Postal Service centers in cities like Pittsburgh will have a ripple effect."

54.    On July 30, 2020, Postal Service spokesperson David Partenheimer acknowledged in a statement to the *Washington Post* that the Postal Service's recent changes have resulted in "service impacts."[24]

---

[23] Letter from USPS General Counsel Thomas J. Marshall to Rep. Carolyn Maloney (Aug. 11, 2020), *available at* https://oversight.house.gov/sites/democrats.oversight.house.gov/files/documents/USPS%20to%20COR%2008-11-20%20re%20Election%20Prep.pdf; *see also* Pelosi Letter, *supra* note 9, at 2.

[24] Jacob Bogage, *Top Democrats Say Postmaster General Acknowledged New Policies That Workers Say Are Delaying Mail*, Wash. Post (Aug. 6, 2020), https://www.washingtonpost.com/politics/2020/08/06/top-democrats-say-postmaster-general-acknowledged-new-policies-that-workers-say-are-delaying-mail/.

55.     Congress has required the Postal Service, before it makes any "change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis," to request an "advisory opinion on the change" from the Postal Regulatory Commission. 39 U.S.C. § 3661(b).  Although every one of the above-described changes made by DeJoy will affect service on a nationwide basis, the Postal Service failed to request an advisory opinion for *any* of them.

**Defendants' Actions Have Already Caused Widespread Delays In Mail Delivery**

56.     There is ample evidence that the administration's changes to the United States Postal Service have already significantly slowed mail delivery across the country.

    a.  For example, Mark Dimondstein, President of the American Post Workers Union, which represents more than 200,000 Postal Service employees and retirees, reported in an interview with CNN "that the union has received a number of reports from postal workers and customers over the last two weeks that mail delivery has slowed."[25]

    b.  Similarly, in Portland, Oregon, Joe Cogan, president of the Portland, Oregon, chapter of the American Postal Workers' Union, reported to a local news outlet that local union members had reported "delayed mail, or mail left for delivery at a later date."[26]

    c.  In Boston, several postal workers and presidents of various branches of the APWU confirmed that mail sorting machines of the type that would be used in the election had been removed from post offices around Boston. One Boston postal union officer and postal clerk reported in an interview with WGBH News that the changes are "intentionally delaying the mail."[27]

---

[25] Veronica Stracqualursi & Jessica Dean, *New Postal Policies That Are Slowing Service May Affect 2020 Mail-in Voting, Union Leader Says*, CNN (July 31, 2020), https://www.cnn.com/2020/07/31/politics/usps-mail-in-voting-2020-election/index.html.

[26] Blair Stenvick, *Portland Postal Union Says USPS Is Actively Slowing Down Mail Service*, Portland Mercury (Aug. 14, 2020), https://www.portlandmercury.com/blogtown/2020/08/14/28734947/portland-postal-union-president-says-usps-is-removing-mail-processing-machines-and-slowing-down-mail-service.

[27] Saraya Wintersmith, *At Least a Dozen Mail Sorting Machines Have Already Been Removed in Massachusetts, Postal Union Officials Say*, WGBH News (Aug. 17, 2020), https://www.wgbh.org/news/local-news/2020/08/17/at-least-a-dozen-mail-sorting-machines-have-already-been-removed-in-massachusetts-postal-union-officials-say.

57.     Elected officials have also reported being "flooded by worried calls and emails" from constituents over significant mail delivery delays.[28]

58.     For example, on July 21, 2020, U.S. Representative Andy Kim of the Third District of New Jersey sent a letter to Postmaster General DeJoy expressing his "concern[s] about recent mail delivery delays in New Jersey's Third District and elsewhere around the country," noting that "[m]any of [his] constituents have rightly contacted [his] office to express frustration and concern about ongoing mail delivery delays, some of whom have not received their medications and first-class mail for more than three days."[29]

59.     Similarly, U.S. Representative Brendan Boyle of Pennsylvania's Second District reported that his office received approximately 345 complaints about the Postal Service in July 2020, a more than 2,000 percent increase in complaints from the prior year.[30]

60.     Several state Attorneys General have issued statements condemning the recent changes in the Postal Service and citing concerns over the delay in mail delivery.  For example, on August 17, 2020, Connecticut Attorney General William Tong tweeted that his office has "heard shocking and heartbreaking stories from people across the nation about delayed medications, absentee ballots and pay checks"[31] and recounted some of those anecdotes of impact from slower mail delivery in recent weeks:

    a.  "I [receive] prescriptions in the mail I recently renewed and, foreseeing this issue, ordered early.  They normally take one week but this time took two."

---

[28] Luke Broadwater et al., *Postal Crisis Ripples Across Nation as Election Looms*, N.Y. Times (Aug. 15, 2020), https://www.nytimes.com/2020/08/15/us/post-office-vote-by-mail.html.

[29] Letter from Congressman Andy Kim to the Hon. Louis DeJoy, Postmaster Gen. (July 21, 2020), *available at* https://kim.house.gov/sites/kim.house.gov/files/documents/USPS%20Delays%20Letter%2021%20July%2020.pdf.

[30] Broadwater et al., *supra* note 28.

[31] @AGWilliamTong, Twitter (Aug. 17, 2020, 12:36 PM), https://twitter.com/AGWilliamTong/status/1295399118303424514.

b. "My husband ordered his cholesterol medication to be delivered by mail in late July which normally takes one week to fill. When it didn't arrive on time he was out of medication."

c. "We did not receive the ballots by primary day, in fact we have yet to [receive] them, so we put aside our concerns about the virus and voted in person."

d. "Both of our ballots for the CT primary arrived late."

e. "I am disabled and retired, my disability payments are paid to a trust and over the last two months I have not [received] my check until close to two weeks after it's due. We have seen our mail which used to come by 10 A.M. arrive after 4 P.M."

f. "I waited two weeks before receiving a vital piece of pension information for my pending divorce. This had delayed the finalization process. I am waiting for finalization to qualify for a home loan."

g. "My landlord requires a paper check mailed from my bank each month, and for the first time ever I'm afraid I might be late on my rent due to these delays."

61.     Similarly, on August 17, 2020, New York Attorney General Letitia James issued a statement in response to "recent reports about President Donald Trump's efforts to interfere with [Postal Service] operations in advance of the presidential election," stating that "President Trump's actions to interfere with the operations of the U.S. Postal Service in advance of the presidential election is deeply disturbing."[32]

62.     The recent changes to the Postal Service are anticipated to have a significant and irreparable impact on nationwide voting. The Postal Service itself issued warnings to Maryland, 45 other states, and the District of Columbia that "certain deadlines for requesting and casting mail-in ballots are incongruous with the Postal Service's delivery standards. This mismatch

---

[32] Press Release, *Attorney General James Vows to Fight President Trump's Efforts to Defund U.S. Postal Service and Undermine Elections*, Letitia James N.Y. Att'y Gen. (Aug. 17, 2020), https://ag.ny.gov/press-release/2020/attorney-general-james-vows-fight-president-trumps-efforts-defund-us-postal.

creates a risk that ballots requested near the deadline under state law will not be returned by mail in time to be counted under your laws as we understand them."[33]

63.     The *Washington Post* analyzed the Postal Service's letters to the various states. That analysis indicates that as many as 159.5 million registered voters live in the 40 states that received serious warnings from the Postal Service due to a high "threat of ballot rejection because of missed delivery deadlines" in those states.[34]

64.     Further reporting by the *Washington Post* indicates that the removal of mail sorting machines could significantly hamper the sorting capacity of the Postal Service in high-traffic areas in advance of the election.  For example, due to the removal of mail sorting machines, the sorting capacity of New York City is anticipated to have been reduced by 324,000 pieces of mail per hour; Philadelphia by 310,000 pieces of mail per hour; Columbus by 327,000 pieces of mail per hour; Houston, TX, by 470,000 pieces of mail per hour; and Los Angeles by 577,000 pieces of mail per hour.[35]

65.     Examples from states that held recent primaries by mail offer insight into the likely impact of delays in mail delivery in the national election.  For example, in Florida, even without slowdowns in delivery, "18,500 mailed ballots arrived too late to be counted" in the Democratic

---

[33] *U.S. Postal Service Letters to States*, Wash. Post (last updated Aug. 14, 2020), https://www.washingtonpost.com/context/u-s-postal-service-letters-to-states/b50799f2-25ad-40ed-ba1e-9d648b1814ad/.

[34] Erin Cox et al., *Postal Service Warns 46 States Their Voters Could Be Disenfranchised by Delayed Mail-in Ballots*, Wash. Post (Aug. 14, 2020), https://www.washingtonpost.com/local/md-politics/usps-states-delayed-mail-in-ballots/2020/08/14/64bf3c3c-dcc7-11ea-8051-d5f887d73381_story.html.

[35] *Id.*

presidential primary on March 17, 2020.[36]   In California, more than 70,000 ballots were disqualified for having missed the receipt deadline.[37]

### Defendants Have Acted Intentionally to Undermine the Postal Service to Affect the Election

66.     Defendants' actions threaten to deny the right to vote to every voter who seeks to rely on the Postal Service to vote in the upcoming general election.   But notwithstanding the sweeping harm that their actions will have for voters of every political preference and affiliation, Defendants' efforts to undermine the Postal Service have a clear and unambiguous purpose: to affect the President's chance of reelection because the President believes that increased voting by mail will harm his chances of reelection and also harm other Republican candidates.

67.     The President has repeatedly made clear that he does not want voters to rely on the Postal Service to vote and stated his belief that widespread use of mail-in voting will result in his losing the upcoming presidential election.   The President has on numerous occasions accused Democrats of "rigging" the election through mail-in voting and has repeatedly claimed—without any basis—that Republicans are at a disadvantage when mail-in ballots are used and often are not sent mail-in ballots at all.

68.     On March 30, 2020, President Trump stated on the Fox News Network talk show *Fox and Friends* that increasing access to mail voting hurts Republicans. Referring to a coronavirus relief bill supported by House Democrats, President Trump stated, "[t]he things they had in there were crazy. They had levels of voting that if you ever agreed to it you'd never have a Republican elected in this country again."

---

[36] *Id.*

[37] Michael R. Blood, *California Rejected 100K Mail-in Ballots Because of Mistakes*, Associated Press (July 13, 2020), https://apnews.com/a45421048cd89938df7c882891a97db5.

69.     On April 8, 2020, President Trump tweeted: "Republicans should fight very hard when it comes to statewide voting by mail. Democrats are clamoring for it. Tremendous potential for voter fraud, and for whatever reason, doesn't work out well for Republicans."

70.     On May 24, 2020, President Trump tweeted that Democrats who support voting by mail are "trying to Rig the 2020 Election, plain and simple!"

71.     On May 28, 2020, President Trump tweeted: "MAIL-IN VOTING WILL LEAD TO MASSIVE FRAUD AND ABUSE. IT WILL ALSO LEAD TO THE END OF OUR GREAT REPUBLICAN PARTY. WE CAN NEVER LET THIS TRAGEDY BEFALL OUR NATION. BIG MAIL-IN VICTORY IN TEXAS COURT TODAY. CONGRATS!!!"

72.     On July 30, 2020, President Trump again took to Twitter to lambaste voting by mail and even suggested delaying the presidential election: "With Universal Mail-In Voting (not Absentee Voting, which is good), 2020 will be the most INACCURATE & FRAUDULENT Election in history. It will be a great embarrassment to the USA. Delay the Election until people can properly, securely and safely vote???"

73.     On August 10, 2020, President Trump stated at a White House press briefing that the Postal Service is not equipped to handle increased voting by mail, and he encouraged Americans to vote in person, suggesting, without any basis, that the risks posed by the pandemic will disappear in 90 days or less: "Our system is not equipped for it. The Post Office is not equipped for it. And people should vote, like they did in World War One and World War Two. And your numbers will be—in 90 days or less, your numbers will be very good, I think—much better—on the coronavirus or the China virus. But it's something you have to look about—look at and say, 'This is just crazy.'"

74.     The President's statement followed shortly after a meeting between President Trump and Postmaster General DeJoy in the Oval Office on or around August 5, 2020, in advance of a meeting between Postmaster General DeJoy and Democratic congressional leaders.

75.     On August 13, 2020, President Trump called into the Fox Business Network talk show *Mornings with Maria* and admitted that he is opposing the Postal Service's urgent request for $25 billion, including $3.5 billion to support mail-in voting, because of his political objections to expanding mail-in voting.  He stated on the call: "They [congressional Democrats] want $3.5 billion for something that will turn out to be fraudulent, that's election money basically. They want 3.5 trillion—billion dollars for the mail-in votes, OK, universal mail-in ballots, 3.5 trillion [billion]. They want $25 billion, billion, for the Post Office. Now they need that money in order to have the Post Office work so it can take all of these millions and millions of ballots. Now, in the meantime, they aren't getting there. By the way, those are just two items. But if they don't get those two items, that means you can't have universal mail-in voting because they're not equipped to have it."  President Trump also suggested that in states that have adopted universal mail-in voting, like California, "maybe [mail-in ballots will] go to everybody but Republicans."

76.     President Trump reiterated his views at a White House press briefing later that day, specifically accusing Democrats of election fraud: "Mail-in voting—it's going to be the greatest fraud in the history of elections. When you always talk about 'Russia, Russia, Russia,' China, Iran on voting—your biggest problem is going to be with the Democrats, not with China, Russia, and Iran. Your biggest problem is going to be with the Democrats."

77.     President Trump's handpicked Postmaster General, Louis DeJoy, is a major Republican donor.  Postmaster General DeJoy has donated hundreds of thousands of dollars to Republican candidates, committees, and PACS in 2020 and has hosted events and fundraisers for

Republican presidential candidates and presidents since 2006.  Postmaster General DeJoy has donated millions of dollars to the Republican Party and President Trump's campaign since 2016.

78.     Postmaster General DeJoy is in frequent contact with top Republican Party officials.  He served as national deputy finance chairman for the Republican National Committee and national finance chair for the 2020 Republican National Convention.

### Postmaster General DeJoy's Recent Statement

79.     On August 18, 2020 Postmaster General DeJoy issued a statement asserting that "[t]o avoid even the appearance of any impact on election mail, I am suspending [certain] initiatives until after the election is concluded."  Specifically, Postmaster General DeJoy stated that he "want[ed] to assure all Americans of the following": (1) "Retail hours at Post Offices will not change"; (2) "Mail processing equipment and blue collection boxes will remain where they are"; (3) "No mail processing facilities will be closed."; and (4) "that overtime has, and will continue to be, approved as needed."  Postmaster General DeJoy also stated that, "[i]n addition, effective Oct. 1, we will engage standby resources in all areas of our operations, including transportation, to satisfy any unforeseen demand."

80.     Postmaster General DeJoy's statement does not lessen Plaintiffs' need for immediate relief from this Court.  Some of the actions Postmaster General DeJoy commits to "suspending" are not actions Plaintiffs challenge in this lawsuit and are unlikely to affect the election (e.g., retail hours at post offices).  Other commitments are equivocal, like the Postmaster's commitment to approve overtime "as needed" and to "engage" resources "to satisfy any unforeseen demand."  Nothing in the statement commits to remedying any of the Transformative Actions already undertaken—such as the removal of collection boxes and sorting machines and the de-prioritization of election mail—that have already impacted mail delivery and will likely have a devastating impact on the ability of Americans to vote in the upcoming election, unless ordered

reversed by this Court.  Moreover, absent a court order, any and all of these commitments are subject to change at any time.

81.     The right to vote is at the very core of democracy.  Indeed, it defines it.  The Postmaster General's statement is simply not enough to dispel the need for judicial action in light of Defendants' unlawful and unconstitutional conduct.  The stakes are too high.

### CLAIMS FOR RELIEF

### COUNT I
### (*Undue Burden on the Fundamental Right to Vote in Violation of the United States Constitution*)

82.     The allegations in the complaint are incorporated as though fully set forth herein.

83.     The Transformative Actions taken by Defendants, as detailed above, impose an undue burden on voters' fundamental right to vote in violation of the United States Constitution. That burden is particularly severe in the context of the ongoing COVID-19 pandemic.

84.     Under the United States Constitution, a court considering a challenge to election-related regulations must carefully balance the character and magnitude of injury to the plaintiff's right to vote against the precise interests put forward by the government as justifications for the burden imposed by its rules, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights.  However slight the burden may appear, it must be justified by relevant and legitimate government interests sufficiently weighty to justify the limitation.

85.     Unless Plaintiffs are granted the relief requested herein, the right to vote and to have that vote count will be significantly burdened if not wholly extinguished for thousands of Plaintiffs' members—and potentially tens or hundreds of thousands of other voters—by delays in mail delivery of applications to vote by mail, blank mail-in ballots to voters, and completed ballots to state and local elections officials for the November 3, 2020, general election.

86.     Because of the high risk of exposure to the novel coronavirus during the pandemic, casting a mail-in ballot has become the safest way to vote.  Plaintiffs' members who are qualified voters are, as a result of Defendants' actions, at a significant risk of not receiving their mail-in ballots in sufficient time to mail them to their respective local election officials so that they are received prior to the relevant deadlines for those ballots to be counted.  As detailed above, Defendants have admitted as much, warning that the Postal Service will not be able to handle the expected volume of election mail in a timely manner.

87.     Even if Plaintiffs' members who timely request mail-in ballots receive and send back their ballots in a timely fashion, Defendants' actions still place these voters at risk of having their ballots delivered to local election officials after the relevant deadlines for those ballots to be counted, through no fault of the voters.

88.     Particularly against the backdrop of this unprecedented public health crisis, Defendants cannot provide any sufficiently weighty justification for taking the Transformative Actions detailed above, which will substantially delay delivery of mail-in ballots to voters and, in turn, to election officials and thereby deny the right to vote to thousands of qualified voters. Defendants' Transformative Actions do not advance any government interest sufficiently weighty to justify the resulting burdens on the right to vote, and those actions therefore violate the Constitution and must be enjoined.

### COUNT II
### (*First Amendment—Content and Viewpoint Discrimination*)

89.     The allegations in the complaint are incorporated as though fully set forth herein.

90.     The operation and regulation of the Postal Service is subject to the free-speech requirements of the First Amendment to the U.S. Constitution.  As the Supreme Court has stated, so long as the Postal Service exists, "the use of the mail is almost as much a part of free speech as

the right to use our tongues." *Lamont v. Postmaster Gen. of U.S.*, 381 U.S. 301, 305 (1965) (quoting *U.S. ex rel. Milwaukee Soc. Democratic Pub. Co. v. Burleson*, 255 U.S. 407, 437 (1921) (Holmes, J., dissenting)).

91.     Under the First Amendment, governmental regulations that place a substantial burden on constitutionally protected speech are subject to strict scrutiny, the most exacting form of judicial review.  Such regulations are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests.

92.     Content-based and speaker-based regulations—those that target speech based on its communicative content or the identity of the speaker—are similarly subject to strict scrutiny under the First Amendment.  Even government regulations that appear neutral on their face, but that are adopted because of disagreement with the speaker, subject matter, or message, are subject to strict scrutiny.

93.     Government discrimination among viewpoints—the regulation of speech based on the ideology, opinion, or perspective of the speaker—is a particularly blatant and egregious form of content discrimination.  Viewpoint-discriminatory restrictions on speech are almost always constitutionally invalid.

94.     Defendants' Transformative Actions, as described in detail above, will place a substantial burden on the constitutionally protected right of American voters to cast ballots in favor of preferred candidates.  As a result of these changes, and particularly in the context of the ongoing COVID-19 pandemic, many voters will lose the right to support the candidates of their choice and to weigh in on ballot initiatives and referenda in federal, state, and local elections.

95.     Defendants' Transformative Actions, as described in detail above, were motivated by hostility toward the use of the mail to cast a ballot—that is, to the exercise of the constitutional

right to vote and thereby express an opinion about selection of our elected officials, including the President of the United States.  Such actions, motivated as they are by hostility toward those who use the mail with respect to a particular subject and particular types of messages, are speaker-based and content-based and therefore subject to strict scrutiny.

96.    Defendants' Transformative Actions, as described in detail above, were motivated also by hostility to the specific motivating ideologies, opinions, and perspectives of certain speakers.  Defendants acted on their belief and expectation that suppressing the ability of qualified voters to cast their ballots by mail, rather than exposing themselves to risk of COVID-19 infection at polling places, would favor the President and his preferred candidates.  Such targeting of speech based on hostility to the political viewpoints of the speakers is an egregious form of content discrimination that strikes at the core of the First Amendment's guarantee of free speech.  It is *per se* unconstitutional.

97.    Defendants' actions are not narrowly tailored to further any compelling government interest.  They therefore fail strict scrutiny and are unconstitutional under the First Amendment.

98.    Defendants' actions, absent preliminary and permanent injunctive relief, will deprive Plaintiffs' members and thousands of other voters of their First Amendment rights of free speech.

## COUNT III
### (*Not in Accordance With Procedure Required By Law*)

99.    The allegations in the complaint are incorporated as though fully set forth herein.

100.    Defendants' Transformative Actions, as described in detail above, individually and collectively constitute a change or changes in the nature of postal services that will generally affect service on a nationwide or substantially nationwide basis.  Such a change may not be implemented by the Postal Service without first submitting a proposal, within a reasonable time prior to the

effective date of the proposed change, to the Postal Regulatory Commission requesting an advisory opinion on the change.  39 U.S.C. § 3661(b).

101.     39 U.S.C. § 3661 requires that the Postal Regulatory Commission, prior to issuing an opinion on a proposed change, provide an opportunity for hearing on the record under Sections 556 and 557 of Title 5 of the U.S. Code (the Administrative Procedure Act); the hearing must include input from the Postal Service, users of the mail, and an officer of the Commission who shall be required to represent the interests of the general public.  39 U.S.C. § 3661(c).  The opinion of the Commission must made be in writing and must include a certification by each Commissioner agreeing with the opinion.  *Id*.

102.     Implementation of the Transformative Actions by Defendants without compliance with 39 U.S.C. § 3661 denies Plaintiffs and all other postal users in the United States their fundamental right to a hearing on Defendants' proposed changes.  It further deprives Plaintiffs and all other postal users of the expertise of the bipartisan five-member Postal Regulatory Commission.

103.     Denial of a hearing, including the opportunity to present evidence, prior to implementation of the Transformative Actions has caused and, absent a preliminary and permanent injunction, will continue to cause irreparable harm to Plaintiffs and all other postal users.

104.     Plaintiffs are entitled to a preliminary and permanent injunction prohibiting Defendants from implementing the Transformative Actions and directing them to reverse those already implemented, unless and until Defendants have sought and obtained an opinion from the Postal Regulatory Commission pursuant to 39 U.S.C. § 3661.

### COUNT IV
### (*Ultra Vires*)

105.     The allegations in the complaint are incorporated as though fully set forth herein.

106.    Neither the Postmaster General nor the Postal Service can take any action that exceeds the scope of their constitutional or statutory authority.

107.    By statute, the Postal Service "shall provide prompt, reliable, and efficient services to patrons in all areas and shall render postal services to all communities," and "[t]he costs of establishing and maintaining the Postal Service shall not be apportioned to impair the overall value of such service to the people."  39 U.S.C § 101(a).  In addition, "[i]n determining all policies for postal services," the Postal Service is statutorily mandated to "give the highest consideration to the requirement for the most expeditious collection, transportation, and delivery of important letter mail."  39 U.S.C § 101(e).

108.    In addition, "[i]t shall be the responsibility of the Postal Service" to "(1) to maintain an efficient system of collection, sorting, and delivery of the mail nationwide;  (2) to provide types of mail service to meet the needs of different categories of mail and mail users; and (3) to establish and maintain postal facilities of such character and in such locations, that postal patrons throughout the Nation will, consistent with reasonable economies of postal operations, have ready access to essential postal services."  39 U.S.C. § 403(b).

109.    The Transformative Actions are outside the enumerated powers under 39 U.S.C. § 401 and § 404 and violated the Postal Service's duties under 39 U.S.C. § 101 and § 403.

110.    Defendants DeJoy and the Postal Service have acted *ultra vires* in exceeding their authority delegated under the Postal Service statute.

111.    The actions of Defendants Postal Service and DeJoy exceeded their statutory and constitutional powers because they are arbitrary and capricious.  Specifically, in undertaking the Transformative Actions, Defendants relied on factors that Congress did not intend them to

consider, failed to consider an important aspect of the problem, and offered no explanation for their decisions consistent with the evidence before them.

112.    Defendants DeJoy and the Postal Service have acted *ultra vires* in taking actions designed to delay and obstruct the delivery of election mail with the purpose of interfering with the outcome of the upcoming national election.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiffs ask for the following relief:

1.  Declaring that the Transformative Actions of the Defendants described herein deprive Plaintiffs and other qualified voters of their fundamental right to vote, in violation of the United States Constitution;

2.  Declaring that the Transformative Actions of the Defendants described herein violate the First Amendment to the United States Constitution;

3.  Declaring that the Transformative Actions of the Defendants described herein were taken without observance of procedures required by law because they constitute changes in the nature of postal services that will generally affect service on a nationwide or substantially nationwide basis, and therefore may not be implemented prior to their submission to the Postal Regulatory Commission for public hearings, pursuant to 39 U.S.C. § 3661(b);

4.  Declaring that the Transformative Actions of the Defendants described herein are *ultra vires* because they exceed the Postmaster General's statutory and regulatory authority;

5.  Preliminarily and permanently enjoining Defendants and their respective agents, officers, employees, and successors, and all persons acting in concert with each or any

of them or under their direction or control, from implementing and/or continuing to implement any of the Transformative Actions;

6.   Preliminarily and permanently enjoining Defendants from implementing or continuing to implement the Transformative Actions described herein and other changes that will generally affect service on a nationwide or substantially nationwide basis unless and until they and the Postal Regulatory Commission have fully complied with 39 U.S.C. § 3661;

7.   Ordering Defendants to immediately take steps to undo any Transformative Actions described herein and declared unlawful, and which have previously been implemented in whole or in part by Defendants;

8.   Awarding Plaintiffs their costs, expenses, and reasonable attorneys' fees; and

9.   Award such other, further, and different relief as the Court deems just and proper.

Dated:  August 18, 2020                              Respectfully submitted,

**LAWYERS' COMMITTEE FOR CIVIL                       ARNOLD & PORTER
RIGHTS UNDER LAW**                                       **KAYE SCHOLER LLP**

Kristen Clarke*                                      /s/ Kenneth L. Chernof
Jon M. Greenbaum*                                    Kenneth L. Chernof (Bar No. 17195)
Ezra D. Rosenberg*                                   John A. Freedman (Bar No. 20276)
Bradley S. Phillips*                                 Allon Kedem*
Ajay Saini*                                          Andrew Tutt*
Ryan Snow*                                           Daniel Jacobson*
Lawyers' Committee for                               Lindsey D. Carson*
        Civil Rights Under Law                       Stephen K. Wirth*
1500 K Street NW                                     Kaitlin Konkel (Bar No. 20001)
Washington, DC 20001                                 Graham W. White*
jgreenbaum@lawyerscommittee.org                      Leslie C. Bailey*
erosenberg@lawyerscommittee.org                      Catherine McCarthy*
bphillips@lawyerscommittee.org                       Arnold & Porter Kaye Scholer LLP
asaini@lawyerscommittee.org                          601 Massachusetts Avenue NW
rsnow@lawyerscommittee.org                           Washington, DC 20001-3743
                                                     (202) 942-5000
                                                     ken.chernof@arnoldporter.com

                                                     Douglas A. Winthrop*
                                                     Benjamin T. Halbig*
                                                     Arnold & Porter Kaye Scholer LLP
                                                     Three Embarcadero Center - 10th Floor
                                                     San Francisco, CA 94111-4024
                                                     douglas.winthrop@arnoldporter.com

*Counsel for Plaintiffs National Urban League, Common Cause, and
League of Women Voters of the United States*

* *Pro hac vice* application forthcoming

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document will be served on Defendants in accordance with Fed.

R. Civ. P. 4.

*/s/ Kenneth L. Chernof*
Kenneth L. Chernof
601 Massachusetts Ave., NW
Washington, D.C., 20001
T: (202) 942-5000
ken.chernof@arnoldporter.com