# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

NATIONAL URBAN LEAGUE, on behalf of
itself and its members; COMMON CAUSE,
on behalf of itself and its members; LEAGUE
OF WOMEN VOTERS OF THE UNITED
STATES, on behalf of itself and its members,

          Plaintiffs,

vs.

LOUIS DEJOY, in his official capacity as
Postmaster General; and the UNITED
STATES POSTAL SERVICE,

          Defendants.

No. 1:20-cv-2391

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY
INJUNCTION OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**

## TABLE OF CONTENTS

Page

INTRODUCTION ......................................................................................................... 1

LEGAL STANDARD.................................................................................................... 15

ARGUMENT ............................................................................................................... 16

I.   Plaintiffs are Likely to Succeed on the Merits and are Entitled to Partial Summary
     Judgment ............................................................................................................ 16

     A.  The Court Can Review the Transformative Actions.......................................... 16

     B.  The Postal Service's Changes Were Adopted Without Observance of
         Procedures Required by Law (Count III).......................................................... 16

     C.  The Postal Service's Changes Were Adopted in Contravention of Express
         Restrictions on Its Authority (Count IV) ......................................................... 20

     D.  The Postal Service's Changes Violate the First Amendment By Restricting
         Core Political Speech For A Partisan Political Purpose (Count II) ................................. 22

     E.  Defendants' Partial Cessation of Some of the Challenged Actions Does
         Not Moot This Case ....................................................................................... 27

II.  Defendants' Actions Have Harmed, and Will Continue to Harm, Plaintiffs and
     Their Members Irreparably ................................................................................... 29

     A.  Constitutional Injury ..................................................................................... 30

     B.  Undermining the Timely Delivery of Election Mail........................................... 30

     C.  The Deprivation of Plaintiffs' Procedural Rights Under 39 U.S.C. § 3661 ................... 32

III. The Balance of Equities and the Public Interest Favor an Injunction..................................... 32

IV.  The Court Should Enter Summary Judgment For Plaintiffs..................................... 34

V.   Relief Requested ................................................................................................. 35

CERTIFICATE OF SERVICE ....................................................................................... 37

# TABLE OF AUTHORITIES

**Page(s)**

<u>**Cases**</u>

*Am. Postal Workers Union, AFL-CIO v. U.S. Postal Serv.*,
No. CIV.A.06 726 CKK, 2007 WL 2007578 (D.D.C. July 6, 2007) ....................................16

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)................................................................................................................16

*AttorneyFirst, LLC v. Ascension Ent., Inc.*,
144 F. App'x 283 (4th Cir. 2005) ..........................................................................................34

*Awad v. Ziriax*,
670 F.3d 1111 (10th Cir. 2012) ..............................................................................................33

*Board of Cty. Comm'rs v. Umbehr*,
518 U.S. 668 (1996).........................................................................................................23–24

*Buchanan v. U.S. Postal Serv.*,
375 F. Supp. 1014 (N.D. Ala. 1974); *aff'd in relevant part*, 508 F.2d 259 (5th Cir.
1975) ........................................................................................................................................32

*Buchanan v. U.S. Postal Serv.*,
508 F.2d 259 (5th Cir. 1975) ...........................................................................................17–18

*CASA de Md. v. Dep't of Homeland Sec.*,
284 F. Supp. 3d 758 (D. Md. 2018)..........................................................................................3

*CASA de Md. v. Trump*,
414 F. Supp. 3d 760 (D. Md. 2019)..........................................................................................3

*Centro Tepeyac v. Montgomery Cnty.*,
722 F.3d 184 (4th Cir. 2013) ..................................................................................................33

*Church of Lukumi Babalu Aye, Inc. v. Hialeah*,
508 U.S. 520 (1993)................................................................................................................24

*City of Mesquite v. Aladdin's Castle, Inc.*,
455 U.S. 283 (1982)................................................................................................................29

*Combined Commc'ns Corp. v. U.S. Postal Serv.*,
891 F.2d 1221 (6th Cir. 1989) ................................................................................................16

*Connick v. Myers*,
461 U.S. 138 (1983)................................................................................................................24

*Elrod v. Burns*,
    427 U.S. 347 (1976)...........................................................................................30

*Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*,
    528 U.S. 167 (2000)...........................................................................................29

*Gellman v. Maryland*,
    538 F.2d 603 (4th Cir. 1976) ............................................................................34

*Giovani Carandola, Ltd. v. Bason*,
    303 F.3d 507 (4th Cir. 2002) ............................................................................33

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982)...........................................................................................31

*Ind v. Colo. Dep't of Corr.*,
    801 F.3d 1209 (10th Cir. 2015) .........................................................................29

*Int'l Refugee Assistance Project v. Trump*,
    241 F. Supp. 3d 539 (D. Md. 2017)......................................................................3

*Int'l Refugee Assistance Project v. Trump*,
    857 F.3d 554 (4th Cir. 2017), *as amended* (May 31, 2017; June 15, 2017), *vacated
    and remanded on other grounds sub nom. Trump v. Int'l Refugee Assistance*, 138
    S. Ct. 353 (2017)...........................................................................................33–34

*Int'l Refugee Assistance Project v. Trump*,
    883 F.3d 233 (4th Cir. 2018), *vacated on other grounds*, 138 S. Ct. 2710 (2018)..................29

*Jackson Women's Health Org. v. Currier*,
    760 F.3d 448 (5th Cir. 2014) ............................................................................33

*Jones v. U.S. Postal Serv.*,
    No. 1:20-cv-06516-VM, 2020 WL 5627002 (S.D.N.Y. Sept. 21, 2020),
    https://bit.ly/2EmhcxT ..................................................................................3, 9

*KH Outdoor, LLC v. City of Trussville*,
    458 F.3d 1261 (11th Cir. 2006) .........................................................................33

*Kravitz v. Dep't of Com.*,
    366 F. Supp. 3d 681 (D. Md. 2019).......................................................................3

*Lamont v. Postmaster Gen. of U.S.*,
    381 U.S. 301 (1965)...........................................................................................22

*Lane v. Holder*,
    703 F.3d 668 (4th Cir. 2012) ............................................................................31

*League of Women Voters of N.C. v. North Carolina*,
  769 F.3d 224 (4th Cir. 2014) ................................................................33

*League of Women Voters v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016) ..................................................................33

*Legend Night Club v. Miller*,
  637 F.3d 291 (4th Cir. 2011) ................................................................33

*McCormack v. Herzog*,
  788 F.3d 1017 (9th Cir. 2015) ..............................................................29

*U.S. ex rel. Milwaukee Soc. Democratic Pub. Co. v. Burleson*,
  255 U.S. 407 (1921)..............................................................................22

*Mittleman v. Postal Regul. Comm'n*,
  757 F.3d 300 (D.C. Cir. 2014) ..............................................................16

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*,
  915 F.3d 197 (4th Cir. 2019) ................................................................31

*NAACP v. U.S. Postal Serv.*,
  398 F. Supp. 562 (N.D. Ga. 1975)........................................................17

*Newsom ex rel. Newsom v. Albemarle Cnty. Sch. Bd.*,
  354 F.3d 249 (4th Cir. 2003) ................................................................33

*Nken v. Holder*,
  556 U.S. 418 (2009)..............................................................................32

*Obama for America v. Husted*,
  697 F.3d 423 (6th Cir. 2012) ................................................................33

*Porter v. Clarke*,
  852 F.3d 358 (4th Cir. 2017) ................................................................29

*Pughsley v. 3750 Lake Shore Drive Coop. Bldg.*,
  463 F.2d 1055 (7th Cir. 1972) ..............................................................34

*Purcell v. Gonzalez*,
  549 U.S. 1 (2006)..................................................................................33

*R.A.V. v. City of St. Paul*,
  505 U.S. 377 (1992)..............................................................................23

*Ross v. Messe*,
  818 F.2d 1132 (4th Cir. 1987) ..............................................................30

*Sears, Roebuck & Co. v. U.S. Postal Serv.*,
   844 F.3d 260 (D.C. Cir. 2016) ...........................................................................16

*Shapiro v. McManus*,
   203 F. Supp. 3d 579 (D. Md. 2016) ....................................................................22

*Sheely v. MRI Radiology Network, P.A.*,
   505 F.3d 1173 (11th Cir. 2007) ..........................................................................29

*Tashjian v. Republican Party of Conn.*,
   479 U.S. 208 (1986) ............................................................................................24

*United States v. Concentrated Phosphate Export Assn.*,
   393 U.S. 199 (1968) ............................................................................................29

*United States v. Handler*,
   383 F. Supp. 1267 (D. Md. 1974) .......................................................................22

*United States v. Oakland Cannabis Buyers' Coop.*,
   532 U.S. 483 (2001) ............................................................................................32

*United States v. U.S. Coin & Currency*,
   401 U.S. 715 (1971) ............................................................................................33

*Vieth v. Jubelirer*,
   541 U.S. 267 (2004) ............................................................................................23

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.*,
   429 U.S. 252 (1977) ............................................................................................27

*Virginian Ry. Co. v. Ry. Employees*,
   300 U.S. 515 (1937) ............................................................................................32

*Washington v. Trump*,
   No. 1:20-CV-03127-SAB, 2020 WL 5568557 (E.D. Wash. Sept. 17, 2020),
   https://bit.ly/2RTF136.........................................................................................3

*Wesberry v. Sanders*,
   376 U.S. 1 (1964) ................................................................................................22

*Williams v. Rhodes*,
   393 U.S. 23 (1968) ........................................................................................22–23

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ...........................................................................................15–16

*Yick Wo v. Hopkins*,
   118 U.S. 356 (1886) ............................................................................................22

vi

**Statutes**

39 U.S.C.
    § 101(a) ...........................................................................................................20
    § 101(e) ...........................................................................................1, 20–21, 32
    § 403(b) ......................................................................................................1, 21
    § 403(b)(3) ......................................................................................................32
    § 3661 ......................................................................................................*passim*
    § 3661(b) .................................................................................................*passim*
    § 3661(c) ...............................................................................................4, 16–17

Pub. L. 91-375, 84 Stat. 719 ...............................................................................4

Pub. L. 109-435 § 601 .........................................................................................4

Pub. L. 109-435 § 604 .........................................................................................4

**Rules & Regulations**

39 C.F.R.
    Part 121 .............................................................................................................5
    § 1.1 ..................................................................................................................4
    § 121.1 .............................................................................................................35
    § 121.1(b)(1) .....................................................................................................5
    § 121.1(c)(1) .....................................................................................................5
    § 3020.112 .......................................................................................................17

Fed. R. Civ. P. 56(a) .........................................................................................16

Fed. R. Civ. P. 65(a)(2) .....................................................................................34

**Other Authorities**

Aaron Blake, *Trump Blurts out His True Motive on Mail-in Voting*, Wash. Post (Aug. 13, 2020), https://archive.is/b3kyC ...............................................................26

*Absentee Voting*, Voting Rights Lab, https://bit.ly/2HlIKEJ .................................12

Alex Leary, *Brian Ballard Gets RNC Finance Post*, Tampa Bay Times (Apr. 3, 2017), https://bit.ly/2RTQhMU .......................................................................25

Alison Durkee, *Here Are All the Postal Service Leaders' Ties to Trump and the GOP*, Forbes (Sept. 14, 2020), https://bit.ly/33Pzosx ......................................25

Bill Whitaker, *How the Coronavirus and Politics Could Impact Voting in the 2020 General Election*, 60 Minutes (June 28, 2020), https://cbsn.ws/2ZY9nGs ...........25

11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure*
§ 2948.1 (3d ed. 2020) ...............................................................................................30

11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure*
§ 2950 (3d ed.) ..........................................................................................................34

Elena Kagan, *Private Speech, Public Purpose: The Role of Governmental Motive in*
*First Amendment Doctrine*, 63 U. Chi. L. Rev. 413 (1996) ....................................24

Ellie Kaufman et al., *Trump Says He Opposes Funding USPS Because of Mail-In*
*Voting*, CNN (Aug. 13, 2020), https://cnn.it/3mJ8H17 ............................................26

Heather C. Richardson, *Election Fears Over Mail-in Ballots Spells an End to the*
*Postal System Established in Our Constitution*, Milwaukee Indep. (Aug. 2, 2020),
https://bit.ly/3mJoopd ...............................................................................................25

Jacob Bogage, *Postal Service Will Stop Removing Mailboxes*, Wash. Post (Aug. 14,
2020), https://archive.is/dcjYU ................................................................................19

Kate Rabinowitz & Brittany R. Mayes, *At Least 84% of American Voters Can Cast*
*Ballots by Mail in the Fall*, Wash. Post (Sept. 17, 2020), https://archive.is/Vg10W ...............6

Letter from Rep. Gerald E. Connolly, Chairman, House Subcomm. on Gov't
Operations, to Louis DeJoy, Postmaster Gen. of the U.S. (Aug. 26, 2020),
https://bit.ly/3mIIkZp ...............................................................................................27

Madeleine Carlisle, *Voting By Mail? Here Are the Deadlines in Every U.S. State*,
Time (Sept. 18, 2020), https://bit.ly/35Zzpgg ..........................................................13

Miles Parks, *Postmaster General Touts Postal Service Overhaul but Promises On-*
*Time Election Mail*, NPR (Aug. 7, 2020), https://n.pr/36czeOT .............................11

*New PMG: Board Selects DeJoy for Role*, U.S. Postal Serv. (May 7, 2020),
https://bit.ly/3iVN3EK ...............................................................................................8

Nick Corasaniti & Michael Wines, *In Year of Voting by Mail, a Scramble to Beef Up*
*In-Person Voting, Too*, N.Y. Times (last updated Sept. 15, 2020),
https://archive.is/D0661 ..............................................................................................6

Off. of Inspector Gen., USPS, Late and Extra Trips at the Philadelphia, PA,
Processing and Distribution Center (May 13, 2020), https://bit.ly/300UnY8 .........7

Paul P. Murphy & Marshall Cohen, *Fact-Check: USPS Head DeJoy's Misleading*
*Testimony About Overtime Changes He Oversaw*, CNN (Aug. 24, 2020),
https://cnn.it/3hZuI8h.................................................................................................27

PRC, Advisory Op. on Post Office Structure Plan, N2012-2, (Aug. 23, 2012),
https://bit.ly/35MwpDI ..............................................................................................20

PRC, Advisory Op. on Service Changes Associated with Standard Mail Load
Leveling, N2014-1, (Mar. 26, 2014), https://bit.ly/2FCMbpZ ...............................................19

*Remarks by President Trump in Press Briefing*, White House (Aug. 13, 2020),
https://bit.ly/3mKbvv1 ...........................................................................................................26

Trip Gabriel, *This Is Democrats' Doomsday Scenario for Election Night*, N.Y. Times
(last updated Sept. 3, 2020), https://archive.is/aQHp1 ............................................................7

## INTRODUCTION

The United States stands on the verge of an unprecedented election crisis.  The United States Postal Service has abruptly changed longstanding mail-delivery policies and has materially reduced or eliminated mail collection, sorting, and delivery capacity—all on the eve of an election that, in light of a pandemic that has already killed over 200,000 people, will see unprecedented reliance on voting by mail and will strain Postal Service infrastructure.  Defendants' actions will cause the Postal Service to fail to deliver important election notices, ballot applications, unmarked ballots, and even marked ballots expeditiously to their destination.  The likely result:  hundreds of thousands of ballots will go uncounted or *uncast*.  Indeed, defendants' actions have *already* irreparably harmed Plaintiffs and their members by undermining public confidence in the Postal Service's ability to timely deliver ballots, thereby discouraging potentially millions of voters from voting by mail.  Given the pandemic, this will undoubtedly prevent some voters from voting at all.  Every day the harms grow more serious; any meaningful judicial relief must be swift.

Defendants' actions are unlawful.  *First*, Defendants failed to follow procedures required by law.  The agency's governing statute requires the Postal Service to request an advisory opinion from the Postal Regulatory Commission before instituting any "change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis," 39 U.S.C. § 3661(b), something Defendants utterly failed to do.  *Second*, Defendants violated enumerated limitations on the Postal Service's ability to change its policies by failing to "give the highest consideration to the requirement for the most expeditious collection, transportation, and delivery of important letter mail," *id.* § 101(e), and by failing to "maintain postal facilities of such character and in such locations, that postal patrons throughout the Nation will, consistent with reasonable economies of postal operations, have ready access to essential postal services," *id.* § 403(b).  *Third*, Defendants violated the First Amendment by undertaking these actions based on

1

the constitutionally impermissible motive of impeding voting by mail for partisan purposes.

There are no threshold barriers to this Court's review or to the grant of injunctive relief or the entry of partial summary judgment.

*First*, Plaintiffs have standing; indeed, Defendants' actions have already caused them and will continue to cause them *irreparable harm.* Defendants' attempt to limit electoral access through mail-in voting violates the First Amendment rights of Plaintiffs and their members, and also creates an actual, concrete, and imminent risk that voters that Plaintiffs and their members are assisting will be deprived of the right to vote in the crucial days immediately preceding the election, directly frustrating Plaintiffs' achievement of core organizational goals. Separately, Defendants have undermined public confidence in the Postal Service's ability to timely deliver ballots, impeding Plaintiffs' efforts to encourage mail voting as a way to vote safely during the pandemic, and frustrating Plaintiffs' voter mobilization efforts by discouraging others from voting altogether, interfering with Plaintiffs' ability to realize their goals. Moreover, Defendants have irreparably harmed Plaintiffs by denying their procedural right to a public hearing before any changes are made in the nature of postal services that affect the public nationwide. Finally, Plaintiffs' members have been harmed directly, too: As a result of Defendants' actions, they face an untenable choice between being disenfranchised and risking the pandemic to vote.

*Second*, Plaintiffs have a cause of action to bring their claims. This Court has equity jurisdiction over claims that the Postal Service has acted in an *ultra vires* manner or in violation of constitutional rights.

*Third*, the public interest and balance of equities (which merge in this case) favor the entry of an injunction. The Government has no interest in permitting unlawful and unconstitutional conduct. Moreover, Defendants themselves have previously represented that they intend to

prioritize election mail—meaning that, if Defendants' representations are true, the requested injunction will impose little burden on the Government, even as it will immediately secure widespread public confidence in the reliability of the Postal Service and alleviate Plaintiffs' irreparable harms.

This Court's intervention is urgently needed.  While in the last week, two courts have enjoined Defendants' conduct,[1] the Defendants will almost certainly appeal those orders, and as with other cases of significant public import (such as the Census citizenship question or the rescission of DACA) it would facilitate appellate review to have several district courts pass on these important questions.[2]  Plaintiffs are seeking partial summary judgment and more targeted relief than the existing injunctions that will directly redress the Plaintiffs' injuries; Plaintiffs do not ask the Court at this time to direct Defendants to reinstall collection boxes already removed, nor to reconstruct voting machines already taken apart, nor even to rescind any specific policy or directive.  Plaintiffs instead merely ask the Court—in light of Defendants' unlawful actions—to enter a narrow injunction enjoining the Postal Service's recent policy changes, preventing further changes that will reduce service without following required procedures, and directing the Postal Service to ~~restore~~ ensure the expeditious delivery of election mail (consistent with its historic delivery standards) in the three weeks (21 days) immediately preceding the November 3, 2020, election.  That narrowly tailored injunction will provide Defendants with the flexibility to restore the mail capacity lost through Defendants' unlawful actions, will eliminate Plaintiffs' irreparable

---

[1] *See* Decision and Order, *Jones v. U.S. Postal Serv.*, No. 1:20-cv-06516-VM, 2020 WL 5627002 (S.D.N.Y. Sept. 21, 2020), https://bit.ly/2EmhcxT; Order Granting Plaintiffs' Motion for Preliminary Injunction, *Washington v. Trump*, No. 1:20-CV-03127-SAB, 2020 WL 5568557 (E.D. Wash. Sept. 17, 2020), https://bit.ly/2RTF136.

[2] *See CASA de Md. v. Trump*, 414 F. Supp. 3d 760 (D. Md. 2019) (public charge rule); *Kravitz v. Dep't of Com.*, 366 F. Supp. 3d 681 (D. Md. 2019) (census citizenship question); *CASA de Md. v. Dep't of Homeland Sec.*, 284 F. Supp. 3d 758 (D. Md. 2018) (DACA); *Int'l Refugee Assistance Project v. Trump*, 241 F. Supp. 3d 539 (D. Md. 2017) (travel ban).

harms, and will restore public confidence in the ability of the Postal Service to handle the unprecedent surge of mailed ballots that are sure to be cast in the upcoming election.

## RULE 56(c) STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE DISPUTE

### I.   The Postal Service and Its Role in Elections

The Postal Service is one of the nation's largest and most complex business operations. On a single typical day, the Postal Service processes and delivers 471 million pieces of mail to nearly 160 million delivery points.  *See* Ex. 1, United States Postal Service, FY2019 Annual Report to Congress, at 2.  The chief executive officer of the Postal Service is the Postmaster General.  39 C.F.R. § 1.1.   Under the leadership of the Postmaster General, Postal Service headquarters establishes nationwide policies and oversees nationwide operations. Ex. 2, Declaration of Angela Curtis ("Curtis Dec.") ¶ 8.  Historically, management of field operations has been divided into seven Postal Service "areas," which, in turn, oversee Postal Service "districts."  *Id.*

In 1970, Congress enacted the Postal Reorganization Act, which established the Postal Regulatory Commission ("PRC") to regulate and provide oversight over postal operations.  Pub. L. 91-375, 84 Stat. 719, 759; *see* Postal Accountability and Enhancement Act, Pub. L. 109-435 §§ 601, 604.  By law, when there is a proposed "change in the nature of postal services [that] *will generally affect service* on a nationwide or substantially nationwide basis," the Postal Service "shall submit a proposal, within a reasonable time prior to the effective date of such proposal, to the Postal Regulatory Commission requesting an advisory opinion on the change."  39 U.S.C. § 3661(b) (emphasis added); *see* Ex. 3, Declaration of Ruth Y. Goldway ("Goldway Dec."), ¶¶ 17–23.  And before the PRC may issue an opinion, "users of the mail" have a right to a "hearing on the record under sections 556 and 557 of [the Administrative Procedure Act (APA)]."  *Id.* § 3661(c).  Under federal law, "service" is generally assessed with respect to "service standards,"

4

the Postal Service's goal timeframes for delivering the various categories of mail.  *See* 39 C.F.R. Part 121; Ex. 3, Goldway Dec., ¶ 12.  A service standard for a particular class of mail is typically expressed as a range of days.  For example, for First-Class Mail, the service standard is one to three days for delivery where "[b]oth the origin and the destination are within the contiguous 48 states."  39 C.F.R. § 121.1(c)(1).[3]

Among its service obligations, the Postal Service has long recognized the special importance of what it refers to as "Election Mail," which is "any item mailed to or from authorized election officials that enables citizens to participate in the voting process," including "ballots" and "ballot applications."  Ex. 4, Declaration of Robert Justin Glass ("Glass Dec.") ¶ 3.  The Postal Service has long deployed a number of special handling measures to ensure that all Election Mail, whether being sent by election officials to voters or vice versa, is timely delivered.  Most importantly, the Postal Service has historically expedited the processing and delivery of Election Mail, particularly ballots.  *Id.* ¶ 20.  As a result, delivery timeframes for Election Mail sent as the slower Marketing Mail have historically been comparable to the delivery times for Election Mail expressly designated as First-Class.  *Id.* ¶ 21. The Postal Service also has long prioritized placing identifiable Election Mail on outgoing trucks.  *Id.* ¶ 22.

As a result of these efforts to expedite delivery of Election Mail, in the 2018 midterm election, 95.6 percent of Election Mail met the one- to three-day service standard for First-Class mail.  *See* Ex. 5, Off. of Inspector Gen., USPS, Audit Report: Service Performance of Election and Political Mail During the 2018 Midterm and Special Elections (Nov. 4, 2019) at 1.  States and localities throughout the country have built their election systems around the Postal Service meeting this performance standard.  *See* Ex. 6, Declaration of Robert Rock ("Rock Dec.") ¶¶ 21–

---

[3] First-Class Mail is delivered in two days or less where "the drive time between the origin . . . and destination . . . is 6 hours or less."  39 C.F.R. § 121.1(b)(1).

22; Ex. 7, Supplemental Declaration of Jocelyn Benson ("Benson Dec.") ¶ 10; Ex. 8, Declaration

of Jena Griswold ("Griswold Dec.") ¶¶ 13–14, 16.  Specifically, numerous States have set their

mail ballot deadlines in reliance on the Postal Service's longstanding practice of delivering the

vast majority of Election Mail in one to three days.  Ex. 6, Rock Dec., ¶¶ 21–22; Ex. 7, Benson

Dec., ¶ 10; Ex. 8, Griswold Dec., ¶¶ 13–14, 16.  And, grassroots organizations plan their election

efforts around this longstanding service commitment by the Postal Service.  *See* Ex. 9, Declaration

of Marc Morial ("Morial Dec."), ¶¶ 7–15; Ex. 10, Declaration of Sylvia Albert ("Albert Dec."),

¶¶ 5–8, 10; Ex. 11, Declaration of Celina Stewart ("Stewart Dec."), ¶¶ 8–17.

## II.   The Importance of Mail Ballots

The 2020 election comes as the country is experiencing the worst public health crisis in a

century.  COVID-19 has made it risky and difficult for Americans, especially older Americans and

those with underlying medical conditions, to safely undertake any tasks that involve in-person

contact, including in-person voting.  As a result, record numbers of American voters chose to vote

by mail in the federal, state, and local primary elections that have occurred since March, *see* Ex.

12, Declaration of Christopher Cooper ("Cooper Dec."), ¶ 5, and election officials across the

country are bracing for a massive increase in mail voting in the November election.  Indeed, as a

result of States and localities expanding mail-in voting due to the pandemic, at least 198 million

individuals—84 percent of all American voters—will have the option to vote by mail in the

November 2020 general election, the most in U.S. history.[4]  Some experts predict that *80 million*

*votes* could be submitted by mail this fall, more than twice the number cast by mail in 2016.[5]

---

[4] Kate Rabinowitz & Brittany R. Mayes, *At Least 84% of American Voters Can Cast Ballots by Mail in the Fall*, Wash. Post (Sept. 17, 2020), https://archive.is/Vg1OW.

[5] Nick Corasaniti & Michael Wines, *In Year of Voting by Mail, a Scramble to Beef Up In-Person Voting, Too*, N.Y. Times (last updated Sept. 15, 2020), https://archive.is/D066l.

Public opinion polling shows that voters who identify as Democrats and/or who intend to vote for Democratic candidates are far more likely to vote by mail in the November election than those who identify as Republicans and/or who intend to vote for Republican candidates.[6]  And, now that mail voting has begun in several States, we can see that this is precisely what is occurring. Ex. 12, Cooper Dec., ¶¶ 14–17.  In North Carolina, for example, nearly three times more Democrats than Republicans requested mail-in ballots for the 2020 general election.  *Id.* ¶ 14.

**III.    The New Postmaster General's "Transformative" Changes In Postal Service Policy and Operations**

Defendant Louis DeJoy was appointed Postmaster General on June 15, 2020.  Almost immediately, he began implementing what he called a "transformative initiative" and his "transformative process"—a series of changes to Postal Service policies and operations.  None of these changes went through Postal Regulatory Commission review.  Ex. 3, Goldway Dec., ¶ 42. These changes included:

1.  *The No Late or Extra Trips Policy*: Historically, the postal service has allowed mail handlers to make "late" or "extra" trips to ensure that they have collected and transported all outstanding mail at any given facility.  Because mail is continuously received at postal facilities throughout the day, these late and extra trips ensure that mail is not left behind and is moved expeditiously from facility to facility.[7]  *See* Ex. 3, Goldway Dec., ¶ 30.  In early July 2020, the Postal Service put into place a policy that sharply departed from this longstanding practice.  *See* Ex. 13, Declaration of Robert Cintron ¶¶ 24–28; Ex. 14, Declaration of John Gibson ("Gibson

---

[6] Trip Gabriel, *This Is Democrats' Doomsday Scenario for Election Night*, N.Y. Times (last updated Sept. 3, 2020), https://archive.is/aQHp1.

[7] In the second half of 2019 alone, the Postal Service reported 591,140 late trips and 176,940 extra trips from processing facilities to delivery units.  Off. of Inspector Gen., USPS, Late and Extra Trips at the Philadelphia, PA, Processing and Distribution Center 1 (May 13, 2020), https://bit.ly/300UnY8.

Dec.") ¶ 14.  The new policy prohibited Postal Service employees from making late or extra trips, even at the cost of leaving mail behind. Ex. 15, USPS, Mandatory Stand-Up Talk: All Employees (July 10, 2020).

Materials accompanying the Policy's announcement stated that the resulting changes "may be difficult for employees" because "we may see mail left behind or mail on the workroom floor or docks . . . which is not typical."  *Id.*  The No Late or Extra Trips Policy was reaffirmed days later in a Postal Service PowerPoint presentation entitled "PMGs[8] expectations and plan," which stated that "plants are not to send mail late," and if the "plants are not on time they will hold the mail for the next day."  Ex. 16, USPS Presentation, PMGs Expectations and Plan.  The presentation also reiterated the new policy curtailing late trips by mail carriers, prohibiting mail carriers from leaving "any later" than "0900" (*i.e.*, 9:00 a.m.), and stating that if the delivery units "get mail late and your carriers are gone and you cannot get the mail out without [overtime] it will remain for the next day."  *Id.*[9]

2.  *The Restricted Overtime Policy*:  At the time he announced the No Late or Extra Trip Policy, DeJoy announced significant restrictions on overtime.  *See id.* ("Overtime will be eliminated."); *see also* Ex. 14, Gibson Dec., ¶ 14 ("overtime was significantly restricted at certain facilities"); Ex. 18, Declaration of Joan Levy, ¶ 11 ("[T]he Postmaster General issued directives to change certain mail processing policies. These new directives have caused many offices in Connecticut to dramatically curtail the use of overtime."); Ex. 19, Declaration of Nikki

---

[8] "PMG" stands for Postmaster General. *See New PMG: Board Selects DeJoy for Role*, U.S. Postal Serv. (May 7, 2020), https://bit.ly/3iVN3EK.

[9] This sweeping change in Postal Service operations had the desired effect.  Once implemented, the number of "late" trips dropped from an average of 4,193 per day to an average of just 1,147 and the number of "extra" trips dropped from an average of 2,260 per day to an average of just 606.  *See* Ex. 17, Declaration of Justin Grimmer ("Grimmer Dec."), ¶ 9 & Ex. 2 thereto.

Anthonasin, ¶¶ 5–13 (noting similar overtime restrictions and that "[t]o the best of my knowledge, the overtime restrictions remain in place").

3. *Removal of Sorting Machines*: On June 17, 2020, two days after DeJoy became the Postmaster General, the Postal Service sent a letter to the President of the American Postal Workers Union stating that the agency was "planning" to remove 671 sorting machines at its mail processing facilities—"over the next several months."  Ex. 20, Letter from Rickey R. Dean to Mark Dimondstein, President, APWU (June 17, 2020).  Defendants implemented this removal almost immediately, and have since confirmed that 711 sorting machines have been disconnected and/or removed.  Ex. 21, Declaration of Jason DeChambeau, ¶ 21.  Some of these reductions left local processing centers with only one machine available and no redundancy.  Ex. 22, Declaration of Kevin Couch ("Couch Dec."), ¶ 6.

4. *Elimination of Collection Boxes*: Following Postmaster General DeJoy's appointment, the Postal Service removed hundreds of blue collection boxes, the metal mailboxes on street corners where people can drop off mail for delivery.[10]

5. *Deprioritization of Election Mail*:  Under DeJoy, the Postal Service disavowed its prior practice of delivering Election Mail at First-Class speeds of one to three days regardless of the paid class of service.  For example, the Postal Service has told States and voters that rather than meet the one- to three-day standard, Election Mail will be delivered in two to five days instead. Ex. 24, Off. of Inspector Gen., USPS, Processing Readiness of Election and Political Mail During the 2020 General Elections at 1 (Aug. 31, 2020); Ex. 4, Glass Dec., ¶ 17.  And, when asked by Congress about the change in practice, the Postal Service pointedly did not confirm its historical practice of prioritizing Election Mail, responding that the Postal Service would deliver ballots

---

[10] *See* Decision and Order, *Jones v. U.S. Postal Serv.*, No. 1:20-cv-06516-VM, 2020 WL 5627002 (S.D.N.Y. Sept. 21, 2020), https://bit.ly/2EmhcxT (citing Ex. 23, Declaration of Jennifer Vo, ¶ 5).

"consistent with [its] operational standards."  Ex. 25, Letter from Louis DeJoy to Speaker Nancy Pelosi and Sen. Charles E. Schumer (Aug. 14, 2020).

**IV.    The Postal Service's Acknowledgment of a Precipitous Decline in Service, the Impact on the Election, and the Postal Service's Refusal to Reverse Certain Changes**

Almost immediately after the "transformative" changes were announced, the Postal Service experienced a precipitous, nationwide decline in service.  Beginning the week of July 11, the Postal Service's on-time service scores fell from an average of 87.90% over the prior 6 months to 80.99% (averaging over categories of mail).  Ex. 26, Declaration of Justin Regus ("Regus Dec."), ¶ 6.  *Accord* Ex. 3, Goldway Dec., ¶ 39.  This decline in service occurred throughout the entire country, and was particularly pronounced in certain urban areas.  Ex. 26, Regus Dec., ¶ 9. There is no dispute about what happened.  The evidence of the decline comes directly from the Postal Service's own documents.  Ex. 27, USPS, Service Performance Measurement: PMG Briefing (Aug. 12, 2020); Ex. 28, USPS, Congressional Briefing: Transportation & Service Performance Updates ("Congressional Briefing") (Aug. 31, 2020).

Even faced with this precipitous decline in service, the Postal Service failed to submit the transformative changes for Postal Regulatory Commission Review.  Ex. 3, Goldway Dec., ¶ 43. Instead, approximately one month into the decline in service, the Postal Service began to warn election officials of the ramifications for the election.  On July 29, 2020, the Postal Service sent an unprecedented warning letter to 46 States and the District of Columbia that failure to pay the First-Class rate for ballots will risk ballots not being delivered on time.  *See, e.g.*, Ex. 29, Letter from Thomas J. Marshall to John Thurston, Arkansas Secretary of State (July 29, 2020).[11]  The

[11] In addition, requiring First-Class postage will nearly triple the price per piece of Election Mail from 20 cents to 55 cents.  States, counties, and cities already suffering financially from the impact of the pandemic do not have the necessary resources to cover the Postal Service's sudden and unexpected demand for higher postage to ensure timely delivery of Election Mail.

Postal Service further warned that the vast majority of state deadlines "creates a risk that ballots requested near the deadline under state law will not be returned by mail in time to be counted." *Id.*

In the face of widespread complaints, DeJoy himself acknowledged the precipitous decline in service. After initially defending his "transformative process" on August 7 and saying he was "excited about the opportunities ahead,"[12] on August 13 he admitted that his "transformative initiative has had unintended consequences that impacted our overall service levels," Ex. 25, Letter from Louis DeJoy. Although the Postal Service has subsequently asserted in response to litigation that these service delays were caused by the resurgence of COVID-19 in July, Postmaster General DeJoy did not suggest this in his August 14 remarks or his congressional testimony. *See id.*; Ex. 30, Transcript of DeJoy House Testimony; Ex. 31, Transcript of DeJoy Senate Statement.

On August 18, 2020, Postmaster General DeJoy issued a statement that the U.S. Postal Service would be "suspending" certain of his "initiatives." Ex. 32, Postmaster General Louis DeJoy Statement. Though DeJoy did not specify what these "initiatives" were, he singled out four items using bullet points about which he wanted "to assure all Americans," including that "blue collection boxes will remain where they are" and overtime will be "approved as needed." *Id.* The Postmaster General notably failed to indicate that he was suspending other initiatives, and information disclosed by Defendants in other litigation and discovery reflects that those other initiatives have indeed not been reversed. For example, only seven mail sorting machines that had been disconnected, but not dismantled or removed, were confirmed to have been put back in service since DeJoy issued his August 18 statement. Ex. 33, Defendants' Objections and

---

[12] Miles Parks, *Postmaster General Touts Postal Service Overhaul but Promises On-Time Election Mail*, NPR (Aug. 7, 2020), https://n.pr/36czeOT.

Responses to Plaintiffs' First Set of Interrogatories and Requests for Production of Documents in *Washington v. Trump*, at 6. Moreover, the Postal Service's Director of Maintenance Operations has averred that "[w]hen machines are removed . . . they are disassembled for their usable parts" and that "[i]t would be impossible to undo the decommissioning and removal of some machines." Ex. 22, Couch Dec., ¶¶ 10, 12. And, the Postal Service is adamant that it will not reinstall these machines. Similarly, DeJoy testified before Congress on August 24 that he would not be reversing the No Late or Extra Trips policy. Ex. 30, Transcript of DeJoy House Testimony, at 191 (answering "No" to Rep. Porter's question, "Will you commit to reversing these changes?").

Not surprisingly, the Postal Service's on-time scores have rebounded somewhat since DeJoy was forced to reverse certain of the transformative changes. Critically, however, as of early September, the Postal Service's on-time score remained well below what it was prior to the changes implemented by DeJoy. Ex. 26, Regus Dec., ¶¶ 14–15.

## V.    The Serious Consequences of Defendants' Transformative Actions

A delay of even a single day in the delivery of ballots could disenfranchise hundreds of thousands of voters. In 31 States, ballots must be *received* (not sent) by Election Day.[13] Based on historical data of when mail ballots are cast, between 3.7 and 9.3 percent of all people who vote by mail are expected to cast their ballot on the Saturday before the election—between three and eight million individuals. *See* Ex. 34, Declaration of Eitan D. Hersh ("Hersh Dec."), ¶¶ 21–23. But in the 31 States with Election Day ballot receipt deadlines, a ballot mailed on October 31 that is delivered in four days rather than three *will not be counted at all*. Ex. 3, Goldway Dec., ¶ 40.

---

[13] *Absentee Voting*, Voting Rights Lab (last updated Sept. 21, 2020), https://bit.ly/2HlIKEJ. These 31 States are Alabama, Arizona, Arkansas, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Idaho, Indiana, Kentucky, Maine, Massachusetts, Michigan, Minnesota, Missouri, Montana, Nebraska, New Hampshire, New Mexico, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Vermont, Wisconsin, and Wyoming. *Id.* In addition, Louisiana requires mail-in ballots be received by the day *before* Election Day. *Id.*

The risks of prejudice from a single day's delay are even greater in the subset of these 31 States that have deadlines by which an individual may apply for an absentee ballot that are very shortly before Election Day. Ex. 34, Hersh Dec., ¶¶ 21–22. Some States—like Alabama, Maine, and Wisconsin—permit voters to apply to vote by mail on October 29.  If the Postal Service maintains its historical two-day average timeframe for in-state delivery of Election Mail, an October 29 ballot application deadline should pose no issue for a voter present within the State. The ballot would reach the voter on October 31 and would reach the election board by November 3.  Ex. 3, Goldway Dec., ¶ 40; Ex. 34, Hersh Dec., ¶ 22.  But a delay of even a single day at any step would disenfranchise the voter.  For the 10 States that have ballot application deadlines later than October 29, the stakes of even a single day's delay in the delivery of Election Mail are still higher.[14]

Because the "transformative" changes will impact the election and disenfranchise voters, Defendants' conduct has injured Plaintiffs.  Plaintiff National Urban League ("Urban League") is a civil rights organization dedicated to the empowerment of African Americans and others in underserved communities.  Ex. 9, Morial Dec., ¶ 4.  The recent disruptions and delays in mail delivery by the United States Postal Service have injured Urban League members, who have already had mail arrive weeks late and who "no longer trust the United States Postal Service to deliver . . . mail ballots on time or at all." Ex. 35, Declaration of Tiffany Majors, ¶¶ 46–64. The Urban League itself has also needed to redirect significant organizational resources to addressing concerns about voting by mail, including what voters should do if they never receive their mail-in ballots or receive them too late to return them by the deadline.  *Id.* ¶ 13.  This diversion of resources

---

[14] These 10 States are Delaware, Georgia, Louisiana, and Michigan (application deadline of Oct. 30); Ohio (application deadline of Oct. 31); and Connecticut, Montana, New Hampshire, South Dakota, and Wyoming (application deadline of Nov. 2). Madeleine Carlisle, *Voting By Mail? Here Are the Deadlines in Every U.S. State*, Time (Sept. 18, 2020), https://bit.ly/35Zzpgg.

has harmed the ability of the Urban League to advance its core mission through other activities, including outreach and voter registration among new voters. *Id.* ¶¶ 14–16. The Urban League has limited organizational resources and must carefully allocate these resources over a long timeline in order to ensure it can carry out its core mission. *Id.* ¶ 14. Defendants' actions mean that the Urban League has curtailed and must continue to curtail other mission-critical activities in order to educate and assist voters and communities about adjusting and responding to disruptions and delays in mail delivery and to ensure that these voters are still able to safely cast their ballots in the November 3, 2020, election. *Id.* ¶¶ 13–16.

Plaintiff Common Cause is a nonpartisan democracy organization with over 1.2 million members and supporters, 22 state offices, and a presence in all 50 States. Ex. 10, Albert Dec., ¶ 2. It has members in all 50 States and in every congressional district. *Id.* As part of its core mission, Common Cause works on a nonpartisan basis to expand and protect equal access to voting for all citizens. *Id.* ¶ 3. Common Cause has a relatively small number of employees and a limited budget and relies on its member volunteers for many of its activities. *Id.* ¶ 4. It has to make hard choices about how to use its limited resources. *Id*. As a result of the actions taken by the Postal Service, which threaten to delay delivery of mail-in ballots both to voters and to local election officials, Common Cause has had to and will continue to expend additional resources training or retraining its volunteers about the options available to voters who fear that their mail-in ballots might not arrive in time to be counted. *Id.* ¶ 5. The time and resources spent on such training is diverted from other activities Common Cause would undertake to advance its mission. *Id.* By increasing the risk that some voters will be unable to successfully cast their ballots by mail, Defendants' actions harm Common Cause's mission of reducing barriers to voting and impose additional burdens on Common Cause that take time and resources away from lobbying and advocacy efforts

on other issues, including, but not limited to, no-excuse absentee voting, ensuring the safety of in-person polling places, and expanding access to early voting. *Id.* ¶ 6. Common Cause has approximately 1.2 million members and supporters nationwide. *Id.* ¶ 9. Many of those members are individuals who regularly vote by mail, either because they choose to do so or because they are not able to vote in person. *Id.* Among those are many members who are at particular risk for health reasons during the COVID-19 pandemic and therefore especially need to avoid voting in person. *Id.* Defendants' actions are likely to deprive many of those members of their fundamental right to vote, by delaying delivery of their mail-in ballots both to them and then to local election officials. *Id.*

Plaintiff League of Women Voters of the United States (the "LWVUS") is a nonpartisan, community-based organization headquartered in Washington, D.C., that encourages informed and active participation in government and seeks to empower voters and defend democracy across the country. Ex. 11, Stewart Dec., ¶ 3. The LWVUS was depending on the use of mail to conduct a robust civic campaign. *See id.* ¶¶ 6–10. The LWVUS planned to mail out 1.7 million postcards to voters whom the organization had previously registered and whom it had engaged via a variety of outreach efforts to boost turnout in these communities for the general election. *Id.* ¶¶ 7–8. The Postal Service delays have already caused and will continue to cause the LWVUS to divert resources from priorities like the voter registration and targeted outreach campaign in order to educate voters about how to effectively cast mail ballots and utilize alternatives to mail voting. *Id.* ¶¶ 15–17. The LWVUS is a nonprofit with limited resources, and expending additional resources to address emergencies, like the delays caused by Defendants' actions, diverts resources from other priority areas, such as the LWVUS's registration and get-out-the-vote program. *Id.*

## LEGAL STANDARD

To obtain a preliminary injunction, a plaintiff "must establish [1] that he is likely to succeed

on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Summary judgment is warranted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a)—*i.e.*, there is no disputed fact that "might affect the outcome of the suit under the governing law," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## ARGUMENT

**I.  Plaintiffs are Likely to Succeed on the Merits and are Entitled to Partial Summary Judgment**

### A.  The Court Can Review the Transformative Actions

While the Postal Service is generally exempt from the Administrative Procedure Act, it is well established that courts are obligated to determine whether the Postal Service has "acted *ultra vires*—that is, whether it has 'exceeded its statutory authority.'"  *Mittleman v. Postal Regul. Comm'n*, 757 F.3d 300, 307 (D.C. Cir. 2014).  Courts have thus evaluated claims that the agency has failed to comply with the Constitution or with express provisions of its governing statute.  *See, e.g.*, *Sears, Roebuck & Co. v. U.S. Postal Serv.*, 844 F.3d 260, 265 (D.C. Cir. 2016); *Combined Commc'ns Corp. v. U.S. Postal Serv.*, 891 F.2d 1221, 1227–28 (6th Cir. 1989).  And courts have consistently held that no provision of the Postal Service statute expressly or impliedly precludes such challenges.  *See Sears*, 844 F.3d at 265; *Am. Postal Workers Union, AFL-CIO v. U.S. Postal Serv.*, No. CIV.A.06 726 CKK, 2007 WL 2007578, at \*7 (D.D.C. July 6, 2007).  This Court accordingly has an obligation to evaluate Plaintiffs' constitutional and statutory claims.

### B.  The Postal Service's Changes Were Adopted Without Observance of Procedures Required by Law (Count III)

Congress has mandated that, before implementing changes that have a nationwide impact on mail delivery, the Postal Service must provide an opportunity for public comment and seek an

opinion from the Postal Regulatory Commission, which is an independent regulatory agency that provides transparency and accountability of the Postal Service's operations.  *See* 39 U.S.C. § 3661(b)–(c).  The Postal Service failed to do so before implementing any of the transformative changes Plaintiffs challenge in this case.  The changes are therefore *ultra vires*.

"When the Postal Service determines that there should be a change in the nature of postal services [that] will generally affect service on a nationwide or substantially nationwide basis," it must "submit a proposal, within a reasonable time prior to the effective date of such proposal, to the Postal Regulatory Commission requesting an advisory opinion on the change."  *Id.* § 3661(b).  Before issuing its opinion, the Commission must provide "an opportunity for hearing on the record under sections 556 and 557 of [the Administrative Procedure Act (APA)] . . . to the Postal Service, users of the mail, and an officer of the Commission who shall be required to represent the interests of the general public."  *Id.* § 3661(c).  The Commission's Rules of Practice and Procedure further require the Postal Service to file its request "not less than 90 days before the proposed effective date of the change in the nature of postal services involved."  39 C.F.R. § 3020.112.

As the text of Section 3661(b) makes plain, the advisory opinion and public comment process is triggered when three criteria are satisfied.  "First, there must be a 'change.' This implies that a quantitative determination is necessary. There must be some meaningful impact on service."  *Buchanan v. U.S. Postal Serv.*, 508 F.2d 259, 262 (5th Cir. 1975).  "Second, the change must be 'in the nature of postal services.' This involves a qualitative examination of the manner in which postal services available to the user will be altered."  *Id.* at 262–63.  "Third, the change must affect service 'on a nationwide or substantially nationwide basis.' A broad geographical area must be involved."  *Id.* at 263; *accord NAACP v. U.S. Postal Serv.*, 398 F. Supp. 562, 565 (N.D. Ga. 1975) (quoting *Buchanan*).  Courts can and do enjoin the Postal Service's actions when these procedures

17

are not followed.  *See Buchanan*, 508 F.2d at 265–67 (holding that plaintiffs were entitled to a preliminary injunction against the Postal Service when it failed to follow the advisory opinion and public comment process prior to implementing a policy that affected how "postal facilities are relocated and altered").

All three criteria are satisfied here, as there can be no question that the Postal Service has made a "change" in "the nature of postal services" on a "substantially nationwide basis."  For one thing, Defendants have effectively admitted as much.  DeJoy himself referred to the challenged policies as "fundamental changes," and referred to the policies as "transformative" on three separate occasions during sworn testimony to the Senate Committee on Homeland Security and Governmental Affairs. Ex. 31, Transcript of DeJoy Senate Statement, at 3, 14, 17.  And the Postal Service similarly acknowledged as much when it sent detailed letters to more than 40 states— home to more than 150 million registered voters—warning that it could no longer guarantee that all ballots cast by mail would arrive in time to be counted.  *See, e.g.*, Ex. 29, Letter from Thomas J. Marshall to John Thurston, Arkansas Secretary of State (July 29, 2020).  And Ruth Goldway, the former Chair of the Postal Regulatory Commission has opined that the operational changes should have been "presented to the Commission for an advisory opinion."  Ex. 3, Goldway Dec., ¶ 42.

For another thing, the nationwide changes wrought by the challenged policies have already made themselves manifest.  According to former Commission Chair Goldway, "the Postal Service experienced a significant decline in service performance *across the country*."  Ex. 3, Goldway Dec., ¶ 39.  Indeed, since the nationwide No Late or Extra Trips Policy took effect, the Postal Service has dropped from an average of 4,193 late trips per day to an average of 1,147 late trips per day, and from an average of 2,260 extra trips per day to average of 606 extra trips per day—

reducing, on average, 4,700 trips every day and 32,900 trips per week. *See* Ex. 17, Grimmer Dec., ¶ 9 & Ex. 2 thereto. The upshot of the No Late or Extra Trips Policy in combination with Defendants' other changes is that the number of First Class pieces of mail reaching their destination "on time" fell from over 90 percent to 85 percent, a 5-percent decline in on-time performance *nationwide*. Ex. 28, Congressional Briefing, at 10; Ex. 26, Regus Dec., ¶ 6. What's more, the Postal Service has also removed collection boxes on a substantially nationwide basis, with documented instances of removal in states like New York, Pennsylvania, Oregon, and Montana.[15] In light of these changes, it should be no surprise that former Commissioner Goldway testified that "[e]ven if the Postal Service did not know that its changes were likely to impact service standards, it should still have reported to the Commission once it became clear that the changes were preventing the Postal Service from meeting its existing service standards." Ex. 3, Goldway Dec., ¶ 43.

The Postal Service's past practice confirms that the changes to postal service announced in the "operational pivot" should have gone through the § 3661 advisory opinion process. *See generally* Ex. 3, Goldway Dec., ¶¶ 17–26. For example, in 2014, the Postal Service sought an advisory opinion on a proposal to change the manner of processing and dispatching mail that qualifies for a discounted price. For certain mail entered on Fridays or Saturdays, the Postal Service proposed to change the delivery expectation or delivery service standard from three days to four days, in part due to cost considerations.[16] Similarly, in 2012, the Postal Service sought an advisory opinion under Section 3661 on a proposal to reduce the hours of operation at more than

---

[15] Jacob Bogage, *Postal Service Will Stop Removing Mailboxes*, Wash. Post (Aug. 14, 2020), https://archive.is/dcjYU.

[16] *See* PRC, Advisory Op. on Service Changes Associated with Standard Mail Load Leveling, N2014-1, at 1–2 (Mar. 26, 2014), https://bit.ly/2FCMbpZ.

13,000 post offices nationwide by six, four, or two hours per weekday, and to increase hours at approximately 73 locations. The Postal Service stated that its proposed plan was intended "to achieve cost savings with limited reductions in access and service," and included provisions for soliciting community input with respect to the changes in hourly operations at specific offices.[17] Like the changes proposed in 2014 and 2012, the changes adopted by Defendants this summer affect the speed of delivery and the operations at post offices across the country and were purportedly justified by cost considerations. The recent changes thus encompass the topics of both the 2012 and 2014 proposals, which went through the Section 3661 notice and comment process. In short, the changes directly addressed the "nature of postal services."

Put simply, Defendants' changes to the Postal Service have had an undeniably substantial impact on the delivery of mail and packages throughout the country. Section 3661(b) exists specifically to provide an opportunity for public input on such changes. Defendants violated the statutory mandate of Section 3661 by failing to submit the changes as a proposal to the Postal Regulatory Commission.

### C. The Postal Service's Changes Were Adopted in Contravention of Express Restrictions on Its Authority (Count IV)

Defendants' changes also violated express restrictions on the Postal Service's ability to change the nature of its services. By statute, the Postal Service "shall provide prompt, reliable, and efficient services to patrons in all areas and shall render postal services to all communities," and "[t]he costs of establishing and maintaining the Postal Service shall not be apportioned to impair the overall value of such service to the people." 39 U.S.C. § 101(a). In addition, "[i]n determining all policies for postal services," the Postal Service is statutorily mandated to "give the

---

[17] PRC, Advisory Op. on Post Office Structure Plan, N2012-2, at 1–2 (Aug. 23, 2012), https://bit.ly/35MwpDI.

highest consideration to the requirement for the most expeditious collection, transportation, and delivery of important letter mail." *Id.* § 101(e). Moreover, "[i]t shall be the responsibility of the Postal Service" to "(1) to maintain an efficient system of collection, sorting, and delivery of the mail nationwide;  (2) to provide types of mail service to meet the needs of different categories of mail and mail users; and (3) to establish and maintain postal facilities of such character and in such locations, that postal patrons throughout the Nation will, consistent with reasonable economies of postal operations, have ready access to essential postal services." *Id.* § 403(b).

Defendants' failed to considered *any* of these statutory directives before making the changes at issue in this case. There is no evidence anywhere that Defendants "[gave] the highest consideration to the requirement for the most expeditious collection, transportation, and delivery of important letter mail." *Id.* § 101(e). Rather, Defendants' highest consideration—by Defendants' own admission—was *cost cutting*. *See* Ex. 36, Defendants' Objections and Responses to Plaintiffs' First Set of Interrogatories and Requests for Production of Documents in *Pennsylvania v. DeJoy*, at 4, 9.

Similarly, by instituting changes that vastly slowed mail delivery and threaten to disenfranchise tens of thousands of voters, Defendants failed to fulfill the Postal Service's "responsibility" to "(1) to maintain an efficient system of collection, sorting, and delivery of the mail nationwide;  (2) to provide types of mail service to meet the needs of different categories of mail and mail users; and (3) to establish and maintain postal facilities of such character and in such locations, that postal patrons throughout the Nation will … have ready access to essential postal services." 39 U.S.C. § 403(b). Defendants' Policies *reduced* efficiency; failed to "meet the needs" of an important category of mail and mail users (*election mail* and *voters*); and failed to "maintain postal facilities" (like drop boxes) necessary to provide voters "ready access to essential postal

21

services" (namely, voting-by-mail). *Id*. Defendants' changes are directly contrary to express limitations on the Postal Service's authority, and must therefore be enjoined.

### D.   The Postal Service's Changes Violate the First Amendment By Restricting Core Political Speech For A Partisan Political Purpose (Count II)

Defendants' actions are also unconstitutional because they interfere with core political speech and were adopted with a constitutionally impermissible motive to undermine access to the political process by non-Trump voters.

There can be no doubt that limitations on mail service implicate core First Amendment values.  As the Supreme Court has explained, the ability of citizens to communicate effectively through the Postal Service "is almost as much a part of free speech as the right to use our tongues." *Lamont v. Postmaster Gen. of U.S.*, 381 U.S. 301, 305 (1965) (quoting *U.S. ex rel. Milwaukee Soc. Democratic Pub. Co. v. Burleson*, 255 U.S. 407, 437 (1921) (Holmes, J., dissenting)).  Reviewing courts—including this Court—have thus applied a "traditional First Amendment analysis" to official acts that interfere with the delivery of mail.  *United States v. Handler*, 383 F. Supp. 1267, 1276 (D. Md. 1974).

First Amendment protections apply with particular force when political speech is at issue. Because the ability to choose one's elected representatives is "preservative of all rights," *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886), "[n]o right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live," *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964).  To protect political free expression—including its core manifestation, a citizen's ability to cast a ballot for his or her preferred candidate—the First Amendment thus "works in tandem with other constitutional guarantees." *Shapiro v. McManus*, 203 F. Supp. 3d 579, 594 (D. Md. 2016).  Accordingly, it is well established that the First Amendment protects "the right of qualified voters, regardless of their political persuasion,"

not merely "to *cast* their votes," but to do so "*effectively*." *Williams v. Rhodes*, 393 U.S. 23, 30 (1968) (emphasis added).

Defendants' new policies have *already* limited voters' ability to participate effectively in the political process, and will continue to do so as long as they remain in place. And the consequences of these failures fall more heavily on one political party than another: Democrats are "much more likely" than Republicans to seek to vote by mail. Ex. 12, Declaration of Christopher Cooper, ¶ 17; *see id.* ¶ 14 (to date, "3.48x as many Democrats as Republicans" have returned absentee-by-mail ballots in North Carolina); *id.* ¶ 15 (48% more Democrats than Republicans have requested mail ballots in Florida); *id.* ¶ 16 (Maine Democrats are 3.72 times "more likely than Republicans to request mail-in ballots for the 2020 General Election").

Defendants' actions to curtail political involvement through mail-in voting thus have a heavily partisan slant. That is not a coincidence: Defendants have adopted these changes based in substantial part on their desire to erect barriers to political participation by those expected to be unfavorable to Defendant Trump and his handpicked Postmaster General. Needless to say, "[t]he government may not regulate [speech] based on hostility—or favoritism—towards the underlying message expressed." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 386 (1992). And the desire to suppress electoral participation by members of the opposing political party is especially anathema to First Amendment values. *See Vieth v. Jubelirer*, 541 U.S. 267, 314 (2004) (Kennedy, J., concurring in the judgment) (emphasizing "the First Amendment interest of not burdening or penalizing citizens because of their participation in the electoral process, their voting history, their association with a political party, or their expression of political views"). Even ostensibly content-neutral speech limitations, if adopted for such an impermissible purpose, are accordingly invalid. *See, e.g.*, *Board of Cty. Comm'rs v. Umbehr*, 518 U.S. 668, 675 (1996) (government violates the

23

First Amendment when employee's political views were "a substantial or motivating factor" in his firing); *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 225 (1986) (invalidating the state's enforcement of statute requiring closed primaries on First Amendment grounds).

To evaluate the motivation behind challenged governmental action, a court must scrutinize "the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by" the relevant decisionmakers. *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 540 (1993) (plurality opinion). Unlike challenges to *statutory* enactments, which place at issue the motives of a multi-member legislature, "cases involving executive action" present a relatively straightforward First Amendment inquiry.[18] The Supreme Court accordingly "sees the examination of motive in such cases as different in kind from—and less problematic than—the examination of the motives underlying legislation."[19]

Here, the record before the Court indicates that Defendants' actions were motivated in substantial part by the impermissible goal of decreasing electoral participation by voters thought to be unfavorable to Defendant Trump. Even before appointing Defendant DeJoy as Postmaster General in June 2020, the President made clear his view that facilitating access to mail-in voting would disadvantage his reelection efforts:

- On March 30, President Trump stated on *Fox and Friends* that increasing access to mail voting would hurt Republicans; criticized as "crazy" a bill introduced by House Democrats that would have facilitated mail-in voting; and stated that "[t]hey had levels of voting that if you ever agreed to it you'd never have a Republican elected in this country again."

- On April 8, President Trump tweeted: "Republicans should fight very hard when it comes to statewide voting by mail. Democrats are clamoring for it. Tremendous potential for voter fraud, and for whatever reason, doesn't work out well for Republicans."

---

[18] Elena Kagan, *Private Speech, Public Purpose: The Role of Governmental Motive in First Amendment Doctrine*, 63 U. Chi. L. Rev. 413, 427 n.43 (1996).

[19] *Id.* (citing *Connick v. Myers*, 461 U.S. 138, 143–46 (1983)).

24

- On May 24, President Trump tweeted that Democrats who support voting by mail are "trying to Rig the 2020 Election, plain and simple!"

- On May 28, President Trump tweeted: "MAIL-IN VOTING WILL LEAD TO MASSIVE FRAUD AND ABUSE. IT WILL ALSO LEAD TO THE END OF OUR GREAT REPUBLI- CAN PARTY.  WE CAN NEVER LET THIS TRAGEDY BEFALL OUR NATION."

On June 15, 2020, Defendant Trump appointed Defendant DeJoy to serve as Postmaster General.  DeJoy has donated millions of dollars to the Republican Party and President Trump's campaign since 2016; has donated hundreds of thousands of dollars more to Republican candidates, committees, and PACs in 2020; and, in fact, served as the finance chair for Charlotte's 2020 host Committee for the Republican National Convention up until his appointment[20] and served as one of the National Deputy Finance Chairmen for the Republican National Committee.[21] Appointment of a partisan political operative as the nation's Postmaster General is a sharp departure from the longstanding historical practice of placing civil servants with extensive postal service experience in charge of the agency.[22]

Following DeJoy's appointment, Defendant Trump's steady drumbeat of opposition to mail-in voting continued—and indeed escalated:

- On June 28, Trump campaign senior counsel Justin Clark (who is now President Trump's dep- uty campaign manager) confirmed in an interview on 60 Minutes that "[t]he president views vote by mail as a threat to his election."[23]  Twelve days later, DeJoy announced the No Late or Extra Trips Policy.

- On July 30, President Trump again took to Twitter to lambaste voting by mail and even sug- gested delaying the presidential election: "With Universal Mail-In Voting (not Absentee Vot- ing, which is good), 2020 will be the most INACCURATE & FRAUDULENT Election in

---

[20] Alison Durkee, *Here Are All the Postal Service Leaders' Ties to Trump and the GOP*, Forbes (Sept. 14, 2020), https://bit.ly/33Pzosx.

[21] Alex Leary, *Brian Ballard Gets RNC Finance Post*, Tampa Bay Times (Apr. 3, 2017), https://bit .ly/2RTQhMU.

[22] Heather C. Richardson, *Election Fears Over Mail-in Ballots Spells an End to the Postal System Established in Our Constitution*, Milwaukee Indep. (Aug. 2, 2020), https://bit.ly/3mJoopd.

[23] Bill Whitaker, *How the Coronavirus and Politics Could Impact Voting in the 2020 General Election*, 60 Minutes (June 28, 2020), https://cbsn.ws/2ZY9nGs.

history. It will be a great embarrassment to the USA. Delay the Election until people can properly, securely and safely vote???"

- On August 13, President Trump reiterated his views at a White House press briefing, specifically accusing Democrats of election fraud: "Mail-in voting—it's going to be the greatest fraud in the history of elections. When you always talk about 'Russia, Russia, Russia,' China, Iran on voting—your biggest problem is going to be with the Democrats, not with China, Russia, and Iran. Your biggest problem is going to be with the Democrats."[24]

Indeed, the President has opposed stimulus package funding for USPS precisely because it would facilitate voting by mail.[25]  On August 13, 2020, in a Fox Business Network interview, President Trump explained: "They want three and a half billion dollars for the mail-in votes. Universal mail-in ballots. They want $25 billion, billion, for the Post Office. Now they need that money in order to make the Post Office work so it can take all of these millions and millions of ballots. . . . But if they don't get those two items that means you can't have universal mail-in voting because you [sic] they're not equipped to have it."[26]

These statements—all made shortly before or contemporaneously with the period in which Defendants took steps to undermine the effectiveness of mail-in voting—strongly corroborate the common-sense conclusion that DeJoy's partisan efforts to aid the President and his party have transcended his work as a private citizen and fundamentally infected his tenure as Postmaster General.  DeJoy's evasive, inconsistent, and self-contradictory defense of his policy changes casts further doubt on the agency's stated justifications.  In testimony before Congress, for instance, DeJoy denied that he had eliminated or cut overtime; yet a July 10 internal memo directed to postal employees, which was later released in court filings, "directly led to a significant majority of

---

[24] *Remarks by President Trump in Press Briefing*, White House (Aug. 13, 2020), https://bit.ly /3mKbvv1.

[25] *See* Aaron Blake, *Trump Blurts out His True Motive on Mail-in Voting*, Wash. Post (Aug. 13, 2020), https://archive.is/b3kvC.

[26] Ellie Kaufman et al., *Trump Says He Opposes Funding USPS Because of Mail-In Voting*, CNN (Aug. 13, 2020), https://cnn.it/3mJ8H17.

overtime opportunities being eliminated and prevented."[27]  DeJoy has also been forced to retract public denials of his continuing contacts with the Trump Campaign.[28]  Finally, the Postal Service's "[d]eparture from [its] normal procedures" in making these operational changes, namely its abandonment of the Section 3661 process and appointment of a postmaster general outside the ranks of the career civil service, further suggests that "improper purposes are playing a role." *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977).

### E.   Defendants' Partial Cessation of Some of the Challenged Actions Does Not Moot This Case

Defendants' partial cessation of some of the challenged policies and actions does not deprive this Court of jurisdiction for three reasons:  (1) the "No Late or Extra Trips" Policy simply has not been rescinded *at all*; (2) Defendants' cessation of other unlawful changes has been incomplete and inadequate to ensure the protection of Plaintiffs' rights; and (3) Defendants rescinded the challenged policies in anticipation of litigation.

*First*, Defendants continue to enforce the "No Late or Extra Trips" Policy.  Defendants continue to require mail carriers and delivery trucks to leave at set times, regardless of whether the mail is actually ready, and prohibiting letter carriers from making return trips to distribution centers as necessary to complete timely mail delivery.  Ex. 30, Transcript of DeJoy House Testimony, at 191 (answering "No" to Rep. Porter's question, "Will you commit to reversing these changes?").  This policy has slowed mail delivery substantially nationwide, and is grounds for the entry of Plaintiffs' requested relief in its own right.

---

[27] Paul P. Murphy & Marshall Cohen, *Fact-Check: USPS Head DeJoy's Misleading Testimony About Overtime Changes He Oversaw*, CNN (Aug. 24, 2020), https://cnn.it/3hZuI8h.

[28] Letter from Rep. Gerald E. Connolly, Chairman, House Subcomm. on Gov't Operations, to Louis DeJoy, Postmaster Gen. of the U.S. (Aug. 26, 2020), https://bit.ly/3mIIkZp.

*Second*, Defendants' supposed cessation of other unlawful actions—including by rescinding limits on overtime, ceasing the removal of sorting machines and collections boxes, and once again prioritizing election mail consistent with historical policies—appears to be partial and incomplete, if not altogether illusory.  For instance, Defendants insist that *no* instructions limiting overtime were ever given; yet numerous postal employees have sworn, under penalty of perjury, that such a policy was indeed put into place.  Similarly, though Defendants have promised not to remove any *additional* sorting machines, Defendants will not—and cannot—replace in time for the election the hundreds of machines that have already been removed.  *See, e.g.*, Ex. 22, Couch Dec., ¶ 12 ("It would be impossible to undo the decommissioning and removal of some machines"); *id.* ¶ 14 (averring that machines that were "partially taken apart" at the time of DeJoy's August 2020 order to halt machine removal were "[left] in that partially disassembled state," rather than recommissioned); *id.* ¶ 15 (averring that machines intended for removal which "were disconnected and . . . still in place, but not in operation" at the time of DeJoy's August 2020 order required express approval to be reconnected, "to maintain the status quo").  And because much Election Mail is only treated as First Class mail to the extent there is *excess First Class capacity*, *see* Ex. 4, Glass Dec., ¶ 21, the loss of sorting capacity directly and irreparably harms Plaintiffs, because it risks disenfranchising voters by materially slowing the delivery of unmarked ballots, registration forms, and other election mail.  As Defendants' own Vice President for Retail and Post Office Operations has stated, moreover, because of its decentralized nature the Postal Service struggles to ensure that front-line managers follow published postal service policies.  Ex. 2, Curtis Dec., ¶ 29.

*Third*, Defendants only purported to cease their challenged policies after lawsuits seeking to enjoin them were filed.  The letter from Postmaster General DeJoy announcing the cessation of

Defendants' unlawful policies makes this clear.  *See* Ex. 32, Postmaster General Louis DeJoy Statement.  But a defendant's voluntary cessation of a challenged practice cannot moot a lawsuit. *See Porter v. Clarke*, 852 F.3d 358, 363 (4th Cir. 2017) ("There is . . . a well-recognized exception to the mootness doctrine holding that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.'" (quoting *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982));  *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (the "stringent" standard "for determining whether a case has been mooted by the defendant's voluntary conduct" requires "'subsequent events [that] made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" (quoting *United States v. Concentrated Phosphate Export Assn.*, 393 U.S. 199, 203 (1968)); *see also McCormack v. Herzog*, 788 F.3d 1017, 1025 (9th Cir. 2015) (rejecting mootness "when abandonment seems timed to anticipate suit"); *Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1188 (11th Cir. 2007) ("Our binding precedent says that voluntary cessation of offensive conduct will only moot litigation if it is clear that the defendant has not changed course simply to deprive the court of jurisdiction." (internal marks omitted)); *Ind v. Colo. Dep't of Corr.*, 801 F.3d 1209, 1214 (10th Cir. 2015) ("A plaintiff's claim is not rendered moot by the voluntary cessation of a challenged practice which the defendant is free to resume at any time.").  Here, nothing but Defendants' voluntary assurances prevent Defendants from reinstating the challenged practices.

## II.   Defendants' Actions Have Harmed, and Will Continue to Harm, Plaintiffs and Their Members Irreparably

"[I]rreparable harm occurs when the threatened injury impairs the court's ability to grant an effective remedy."  *Int'l Refugee Assistance Project v. Trump*, 883 F.3d 233, 270 (4th Cir. 2018), *vacated on other grounds*, 138 S. Ct. 2710 (Mem), (2018).  Defendants' actions have

*already* caused Plaintiffs irreparable harm, by undermining the reliable and efficient delivery of mail on which they and their members rely, and by introducing substantial uncertainty on the eve of a national election.  Absent an injunction that returns mail service to the status quo as it existed before these dramatic changes, Plaintiffs and their members will continue to significant suffer harms, each of which independently supports injunctive relief.  Simply put, there will be no do-over for the 2020 election; effective relief must come now or never.

### A.    Constitutional Injury

"[T]he denial of a constitutional right . . . constitutes irreparable harm."  *Ross v. Messe*, 818 F.2d 1132, 1135 (4th Cir. 1987); *see* 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2948.1 (3d ed. 2020) ("When an alleged deprivation of a constitutional right is involved . . . most courts hold that no further showing of irreparable injury is necessary."). In particular, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Elrod v. Burns*, 427 U.S. 347, 373–74 (1976). Defendants' violation of the First Amendment rights of Plaintiffs and their members—both actual and impending—accordingly constitutes independent irreparable harms.

### B.    Undermining the Timely Delivery of Election Mail

Now more than ever, Plaintiffs and their members rely on the Postal Service to ensure access to election-related mail.  As detailed above, Defendants' changes are *already* causing substantial delays in mail service.  *See* Ex. 26, Regus Dec., ¶¶ 6–8, 14–15.  These delays will have inevitable consequences for mail-in voting:  Given inflexible deadlines that require mail-in ballots to be received by Election Night, and the number of ballots that are returned the Saturday before the Election, even a single day's delay in mail delivery is certain to disenfranchise thousands upon thousands of voters.  *See* Ex. 34, Hersh Dec., ¶¶ 21–23.

Moreover, Defendants' efforts to sow distrust of the Postal Service's ability to deliver election mail will chill use of mail ballots for the election. Despite Plaintiffs' best efforts, they have been unable to combat the chaos and distrust caused by Defendants' election-eve changes. This is not simply a matter of expending extra organizational resources to countereffect the effects of Defendants' changes. The uncertainty itself stands as a deterrent to full electoral participation by a significant percentage of voters, which no amount of effort by Plaintiffs can overcome. These changes thus strike at the heart of Plaintiffs' work "to carry out its mission." *Lane v. Holder*, 703 F.3d 668, 674 (4th Cir. 2012); *see Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (where defendant's practices "have perceptibly impaired [plaintiff organization's] ability to" carry out its mission, "there can be no question that the organization has suffered injury in fact"). The upcoming election also creates an inflection point: Judicial relief after the fact cannot undo the consequences of leaving these changes in place leading up to November 3. There is thus a "limited window" to undo these changes before the 2020 election, after which no effective judicial relief will be possible. *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 217 (4th Cir. 2019).

Finally, Defendants' actions have also frustrated Plaintiffs' ability to operate effectively. For instance, recent delays in mail service due have frustrated Plaintiff Urban League's "ability to timely receive checks, paperwork, and other essential mail." Ex. 9, Morial Dec., ¶ 17. As the organization's President and CEO has explained, "[b]ecause mail delivery has slowed and become unreliable, [Urban League] has had to delay or postpone making decisions about future programs, harming its ability to carry out its mission." *Id.* Defendants' actions have thus undermined Plaintiffs' ability to function effectively in their own right.

31

**C.      The Deprivation of Plaintiffs' Procedural Rights Under 39 U.S.C. § 3661**

Defendants have also injured Plaintiffs by instituting major, nationwide changes in mail service—*without* providing statutorily required procedures or public participation.   Absent injunctive relief, mail voting for the 2020 election will be conducted under postal procedures that lack legally mandatory input from the Postal Regulatory Commission or the public; any relief granted after the election has concluded will thus come far too late to remedy this injury.  As other courts have explained—under circumstances that did *not* implicate an election of once-in-a-lifetime importance—"[t]he denial of . . . a [Section 3661] hearing, should one be required, is sufficient irreparable injury to support interlocutory injunctive relief, for it is clear that no hearing will be conducted and that the changes will continue unless enjoined."  *Buchanan v. U.S. Postal Service*, 375 F. Supp. 1014, 1022 (N.D. Ala. 1974); *aff'd in relevant part*, 508 F.2d 259, 266 (5th Cir. 1975) (district court "was correct in its determinations that plaintiffs had properly established that there was a substantial threat of irreparable injury" sufficient to warrant injunctive relief).  In light of the impending 2020 election, the same is true here *a fortiori*.

**III.    The Balance of Equities and the Public Interest Favor an Injunction**

The public interest and balance of equities—which merge in lawsuits against the government, *see Nken v. Holder*, 556 U.S. 418, 435 (2009)—also favors a preliminary injunction.  Congress has recognized that all Americans have a strong interest in "ready access to essential postal services," 39 U.S.C. § 403(b)(3), and in "the most expeditious collection, transportation, and delivery of important letter mail," *id.* § 101(e).  This "judgment of Congress, deliberately expressed in legislation," deserves special consideration in determining the public interest.  *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 497 (2001) (quoting *Virginian Ry. Co. v. Ry. Employees*, 300 U.S. 515, 551 (1937)).

"[U]pholding constitutional rights serves the public interest." *Newsom ex rel. Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003). "By definition," therefore, the public interest "favors permitting as many qualified voters to vote as possible." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) (quoting *Obama for America v. Husted*, 697 F.3d 423, 437 (6th Cir. 2012)); *see Purcell v. Gonzalez,* 549 U.S. 1, 4 (2006) (The public has a "strong interest in exercising the 'fundamental political right to vote.'" (citations omitted)).

Conversely, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). Nor does the government have any legitimate interest in enforcing unlawful polices. *See United States v. U.S. Coin & Currency*, 401 U.S. 715, 726 (1971) (Brennan, J., concurring); *Legend Night Club v. Miller*, 637 F.3d 291, 302–03 (4th Cir. 2011); *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006). And "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 n.9 (5th Cir. 2014) (quoting *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012)).

As the Fourth Circuit has explained, moreover, the government "is in no way harmed by issuance of a preliminary injunction which prevents [it] from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction." *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 191 (4th Cir. 2013) (en banc) (quoting *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002)). Similarly, "upholding constitutional rights surely serves the public interest." *Giovani Carandola*, 303 F.3d at 521. This is particularly so where the constitutional violation not only injures Plaintiffs, but "in the process permeates and ripples across entire . . . communities, and society at large." *Int'l Refugee Assistance Project v.*

33

*Trump*, 857 F.3d 554, 604 (4th Cir. 2017), *as amended* (May 31, 2017; June 15, 2017), *vacated and remanded on other grounds sub nom. Trump v. Int'l Refugee Assistance*, 138 S. Ct. 353 (Mem) (2017).

Finally, the balance of equities decisively favors the entry of a preliminary injunction here. According to Defendants' *own* representations, the injunction will impose little or no burden on them. Defendants' have represented that they intend to take extraordinary measures to facilitate voting by mail in the November 3 election, including by taking necessary and appropriate steps to ensure the expeditious delivery of election mail in the days and weeks leading up to the election. *See* Ex. 4, Glass Dec., ¶¶ 23–24; Ex. 37, Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for a Preliminary Injunction in *Jones v. U.S. Postal Serv.*, at 1 ("The United States Postal Service ('USPS') is undertaking extraordinary efforts to ensure it will timely deliver ballots and other mail related to the upcoming election."). The balance of equities and public interest thus weigh decisively in favor of the entry of a preliminary injunction that will simultaneously eliminate Plaintiffs' harms, while not unduly burdening the Defendants.

## IV.   The Court Should Enter Summary Judgment For Plaintiffs

Pursuant to Federal Rule of Civil Procedure 65(a)(2), this Court may grant final judgment and a permanent injunction for the Plaintiffs so long as the parties have "clear and unambiguous notice" of the consolidation of the merits and preliminary injunction in the notice of hearing on this motion. *Gellman v. Maryland*, 538 F.2d 603, 604 (4th Cir. 1976) (quoting *Pughsley v. 3750 Lake Shore Drive Coop. Bldg.*, 463 F.2d 1055, 1057 (7th Cir. 1972)); *AttorneyFirst, LLC v. Ascension Ent., Inc.*, 144 F. App'x 283, 287 (4th Cir. 2005) (same); 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2950 (3d ed.).

The Court should grant partial summary judgment in favor of Plaintiffs. Plaintiffs respectfully submit that there are no material issues of disputed fact regarding Counts II, III, and

IV.  The Court can therefore enter summary judgment for the Plaintiffs and issue a permanent injunction in lieu of a preliminary injunction in this case.

## V.      Relief Requested

For the foregoing reasons, the Court should enter a preliminary or permanent injunction ordering the following relief.  *First*, Defendants should be enjoined from taking actions that risk delaying the timely delivery of election mail including by changing truck, delivery, or sorting schedules; restricting overtime; removing collection boxes; removing sorting machines; deprioritizing election mail.  *Second*, Defendants should be ordered to postmark and deliver all election mail mailed in the 21 days preceding the November 3, 2020, election at least as fast or faster than the standards for First-Class Mail delivery set forth in 39 C.F.R. § 121.1.  *Third*, the Court should order Defendants to provide a copy of the order granting the injunction to all Postal Service employees in paper or electronic format.  *Fourth*, the Court should order Defendants to provide Plaintiffs' with updates regarding the status of the Defendants' implementation of the Court's order.

Dated:  September 24, 2020

Respectfully submitted,

**LAWYERS' COMMITTEE FOR CIVIL
RIGHTS UNDER LAW**

**ARNOLD & PORTER
    KAYE SCHOLER LLP**

*/s/ Kenneth L. Chernof*

Kristen Clarke**
Jon M. Greenbaum*
Ezra D. Rosenberg**
Bradley S. Phillips**
Ajay Saini**
Ryan Snow**
Lawyers' Committee for
        Civil Rights Under Law
1500 K Street NW
Washington, DC 20001
jgreenbaum@lawyerscommittee.org
erosenberg@lawyerscommittee.org
bphillips@lawyerscommittee.org
asaini@lawyerscommittee.org
rsnow@lawyerscommittee.org

Kenneth L. Chernof (Bar No. 17195)
John A. Freedman (Bar No. 20276)
Allon Kedem*
Andrew Tutt*
Daniel Jacobson**
Lindsey D. Carson*
Stephen K. Wirth*
Kaitlin Konkel (Bar No. 20001)
Graham W. White**
Leslie C. Bailey*
Catherine McCarthy*
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Avenue NW
Washington, DC 20001-3743
T: (202) 942-5000
ken.chernof@arnoldporter.com

Douglas A. Winthrop*
Benjamin T. Halbig*
Arnold & Porter Kaye Scholer LLP
Three Embarcadero Center - 10th Floor
San Francisco, CA 94111-4024
douglas.winthrop@arnoldporter.com

*Counsel for Plaintiffs National Urban League, Common Cause, and
League of Women Voters of the United States*

* *Pro hac vice*
** *Pro hac vice* application forthcoming

## CERTIFICATE OF SERVICE

I hereby certify that this document will be served on Defendants in accordance with Fed. R. Civ. P. 4.  Plaintiffs certify that a courtesy copy of this memorandum and accompanying documents will immediately be sent to the Court.

*/s/ Kenneth L. Chernof*
Kenneth L. Chernof
601 Massachusetts Avenue NW
Washington, DC 20001-3743
T: (202) 942-5000
ken.chernof@arnoldporter.com