**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

NATIONAL URBAN LEAGUE, *et al.*,

               Plaintiffs,

    v.

LOUIS DEJOY, in his official capacity as
Postmaster General, *et al.*,

               Defendants.

Civil Docket No. 1:20-cv-2391 (GLR)

**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT**

**(CORRECTED)**

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ i

TABLE OF AUTHORITIES ........................................................................................ iii

INTRODUCTION ........................................................................................................ 1

COUNTER-STATEMENT OF MATERIAL FACTS ................................................. 4

   I.    The United States Postal Service ...................................................................... 4

   II.   USPS's Handling of Election Mail ................................................................... 5

        A.  State, Local, and Individual Responsibilities for Election Mail ................. 7

        B.  USPS's Efforts to Ensure Timely Delivery of 2020 Election Mail ............ 9

             1.  USPS Outreach and Recommendations to Election Officials ........................................................................ 9

             2.  USPS's Longstanding Special Measures for Election Mail .... 12

             3.  USPS's Increased Efforts in Support of the Election ............. 14

   III.  The Challenged Policies ................................................................................. 15

        A.  Overtime .................................................................................................... 15

        B.  The Alleged "No Late or Extra Trips" Policy .......................................... 16

        C.  Alleged Removal of Mailboxes and Decommissioning of Letter Sorting Machines .................................................................................... 18

        D.  USPS's Handling of Election Mail ........................................................... 19

   IV.  USPS's Compliance with Nationwide Injunctions Entered in Seven Other Cases ............................................................................................................. 22

LEGAL STANDARD .................................................................................................. 25

ARGUMENT ............................................................................................................... 26

   I.    Plaintiffs Are Not Likely To Succeed On the Merits of Their Claims ................. 26

A.  Plaintiffs Lack Article III Standing............................................................26

B.  District Courts Lack Subject-Matter Jurisdiction Over Plaintiffs'
39 U.S.C. § 3661 Claim (Count III)............................................................30

C.  The *Ultra Vires* Doctrine Does Not Provide an Alternate Avenue for
Judicial Review of Count IV......................................................................32

D.  Plaintiffs Fail to Establish That USPS Restricted Core Political Speech
for Partisan Political Purposes (Count II) ..................................................38

II.   Plaintiffs Cannot Demonstrate Irreparable Harm ...................................40

III.  The Balance of the Equities Does Not Justify Relief ............................42

CONCLUSION....................................................................................................43

## TABLE OF AUTHORITIES

**<u>Cases</u>**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ........................................................................................... 25

*Bd. of Governors, Fed. Reserve Sys. v. MCorp Fin., Inc.*,
    502 U.S. 32 (1991) ............................................................................................. 33

*Bovard v. U.S. Post Office*,
    47 F.3d 1178 (10th Cir. 1995) ............................................................................ 31

*Buchanan v. U.S. Postal Serv.*,
    508 F.2d 259 (5th Cir. 1975) ................................................................... 33, 34, 37

*CASA de Md. V. Trump*,
    971 F.3d 220 (4th Cir. 2020) .............................................................................. 27

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ...................................................................................... 26, 28

*Direx Israel, Ltd v. Breakthrough Med. Corp.*,
    952 F.2d 802 (4th Cir. 1991) .............................................................................. 40

*Eagle Tr. Fund v. U.S. Postal Serv.*,
    365 F. Supp. 3d 57 (D.D.C. 2019) ...................................................................... 37

*ECRI v. McGraw-Hill, Inc.*,
    809 F.2d 223 (3d Cir. 1987) ............................................................................... 40

*Fair Emp't Council of Greater Wash., Inc. v. BMC Mktg. Corp.*,
    28 F.3d 1268 (D.C. Cir. 1994) ........................................................................... 27

*Foster v. Pitney Bowes Corp.*,
    549 F. App'x 982 (Fed. Cir. 2013) ..................................................................... 31

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
    561 U.S. 477 (2010) ........................................................................................... 31
*Gelman v. FEC*,
    631 F.2d 939 (D.C. Cir. 1980) ........................................................................... 35

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982) ........................................................................................... 27

*Hunt v. Wash. State Apple Advertising Comm'n,*
    432 U.S. 333(1977) .............................................................................................. 28

*In re Series 7 Broker Qualification Exam Scoring Litig.,*
    548 F.3d 110 (D.C. Cir. 2008) ........................................................................... 32

*Key Med. Supply, Inc. v. Burwell,*
    764 F.3d 955 (8th Cir. 2014) ............................................................................. 38

*Lane v. Holder,*
    703 F.3d 668 (4th Cir. 2012) ............................................................................. 27

*LeMay v. U.S. Postal Serv.,*
    450 F.3d 797 (8th Cir. 2006) ......................................................................... 30, 31

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ........................................................................................... 26

*Matal v. Tam,*
    -- U.S. --, 137 S. Ct. 1744 (2017) ...................................................................... 39

*McDermott v. Potter,*
    No. C09-0776RSL, 2009 WL 2971585 (W.D. Wash. Sept. 11, 2009) ..................... 31

*Md. Highways Contractors Ass'n, Inc.,*
    933 F.2d 1246 (4th Cir. 1991) .................................................................. 26, 27, 28

*Mittleman v. Postal Regulatory Comm'n,*
    757 F.3d 300 (D.C. Cir. 2014) ................................................................. 32, 33, 37

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land,*
    915 F.3d 197 (4th Cir. 2019) ............................................................................. 25

*Nat'l Air Traffic Controllers Ass'n AFL-CIO v. Fed. Serv. Impasses Panel,*
    437 F.3d 1256 (D.C. Cir. 2006) ......................................................................... 33

*Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.,*
    No. 18-cv-2236-RCL, 2020 WL 4039177 (D.D.C. July 17, 2020) ......................... 33

*Nken v. Holder,*
    556 U.S. 418 (2009) ........................................................................................... 25

*Nyunt v. Broad. Bd. of,*
   *Govs.*, 589 F.3d 445 (D.C. Cir. 2009) ................................................................... 33

*Pep-Wku, LLC v. U.S. Postal Serv.*,
   No. 1:20-cv-0009-GNS, 2020 WL 2090514 (W.D. Ky. Apr. 30, 2020) .................................. 31

*Rodriguez v. Hemit*,
   No. C16-778 RAJ, 2018 WL 3618260 (W.D. Wash. July 30, 2018) ....................................... 31

*Rosenberger v. Rector & Visitors of Univ. of Virginia*,
   515 U.S. 819  (1995) ................................................................................................ 39

*Sears, Roebuck & Co. v. U.S. Postal Serv.*,
   134 F. Supp. 3d 365 (D.D.C. 2015) ........................................................................ 31

*Spokeo, Inc. v. Robins*,
   136 S. Ct. 1540 (2016) .............................................................................................. 26

*Striley v. U.S. Postal Serv.*,
   No. 16-CV-07233-HRL, 2017 WL 513166 (N.D. Cal. Feb. 8, 2017) ..................................... 31

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) ..................................................................................... *passim*

*Telecomms Res. & Action Ctr. v. FCC*,
   750 F.2d 70 (D.C. Cir. 1984) .................................................................................. 32

*Thunder Basin Coal Co. v. Reich*,
   510 U.S. 200 (1994) ................................................................................................ 30

*Tucker Anthony Realty Corp. v. Schlesinger*,
   888 F.2d 969 (2d Cir. 1989) .................................................................................. 40

*United Farm Workers of Am., AFL-CIO v. Chao*,
   227 F. Supp. 2d 102 (D.D.C. 2002) ....................................................................... 35

*Virginia Hosp. Ass'n v. Baliles*,
   868 F.2d 653 (4th Cir.1989) ................................................................................... 28

*Whitmore v. Ark.*,
   495 U.S. 149 (1990) ................................................................................................ 27

*Wilson v. U.S. Postal Serv.,*
   441 F. Supp. 803 (C.D. Cal. 1977)............................................................................ 34

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) ....................................................................................................... 25

## <u>Statutes</u>

39 U.S.C. § 101(e) ............................................................................................... 37, 38

39 U.S.C. § 202...................................................................................................... 40

39 U.S.C. § 409(a) ................................................................................................ 30

39 U.S.C. § 410(a) ................................................................................................ 37

39 U.S.C. § 3661 ............................................................................................. *passim*

39 U.S.C. § 3662.............................................................................................. 30, 31

39 U.S.C. § 3662(a) .............................................................................................. 30

sections 3661(b) ................................................................................................... 33

## <u>Regulations</u>

39 C.F.R. § 121.1 ................................................................................................. 41

## INTRODUCTION

Plaintiffs' motion for preliminary injunction presents the Court with a proposed "solution" for issues that have been squarely resolved, both by USPS's own actions and its response to orders of various courts across the country in related cases.  Both before and after the filing of Plaintiffs' Complaint, USPS has repeatedly made its commitment to the timely delivery of Election Mail clear and has issued substantive operational instructions and guidance in accordance with that commitment.  With the November general election ("the Election") a only a few weeks away, and with USPS already making every effort to support the election via its operations and to comply with numerous overlapping court orders entered across the country, Plaintiffs' motion does nothing to prevent their purported injuries but risks sowing confusion and uncertainty that may disrupt USPS's operations.

Just as it has in past elections, USPS has undertaken, and will continue to undertake, significant efforts to ensure that ballots move quickly and efficiently through the mail.  Such efforts include encouraging state officials to appropriately identify and mark ballots to facilitate proper treatment of Election Mail; asking voters to mail their ballots as soon as they are able; and then tracking (where possible), monitoring, and moving the ballots as expeditiously as possible. Nothing has changed in USPS's approach to Election Mail from past years, except that USPS has put in place *even more* processes to monitor and move these ballots in response to the major increase in Election Mail volume caused by the COVID-19 pandemic. Indeed, to avoid any doubt about USPS's ability to meet its responsibilities, it has suspended a number of routine, long-standing operational activities—implemented *before* Postmaster General DeJoy's tenure— until after the Election.

However, if Plaintiffs or this Court had concerns about USPS's actions when the Complaint was filed in August, those concerns should be alleviated by ongoing court oversight to ensure compliance with USPS's stated commitments.  Indeed, Plaintiffs' motion—and their claim for that matter—has been entirely overtaken by events.  As this Court is well aware, since September 17, 2020, a dizzying series of nationwide preliminary injunctions have issued in various district courts across the country, enjoining the Postal Service from taking the same actions that Plaintiffs challenge here.  *See* Order (Oct. 9, 2020) (ECF No. 53).  To date, a total of seven, separate nationwide preliminary injunctions have been issued in related litigation.  And, as the Court has acknowledged, Defendants are not currently seeking appeal in any of those actions, *id.*, and indeed has committed in settlement agreements to maintain its policies regarding election mail throughout the election in *Johnakin v. U.S. Postal Serv.*, No. 2:20-CV-04055 (E.D. Pa.)); *Bullock v. U.S. Postal Serv.*, No. cv-20-79-GF-BMM (D. Mont.). Given these events, there is no reason for this Court to enter yet another injunction barring USPS from taking actions that it has already suspended, and which Plaintiffs have not justified in light of the changes made by USPS on its own and in response to these injunctions.[1]

The lack of irreparable harm to Plaintiffs in light of these actions is itself sufficient to deny Plaintiffs' motion.  But Plaintiffs' novel claims also fail to satisfy the remaining factors to justify the relief they seek, including a likelihood of success on the merits.  First, Plaintiffs cannot show a likelihood of success because Plaintiffs lack Article III standing.  Plaintiffs here are three organizations, National Urban League, Common Cause, and League of Women Voters of the United States. The alleged injuries are either (1) purely procedural and therefore

---

[1] Although the parties are currently engaged in settlement discussions and Defendants hoped that further briefing would be unnecessary, the parties have not yet been able to finalize an agreement.

2

insufficient to justify standing under the Supreme Court's *Summers* decision; (2) voluntary decisions made by the plaintiff organizations that do not constitute injury in fact in this Circuit; or (3) speculation about future injury caused by future mail delays that is insufficient under the Supreme Court's *Clapper* decision to demonstrate harm to either the organizations or their members.  And because USPS has now issued clarifying instructions addressing all of the purported policies that Plaintiffs challenge in the complaint, Plaintiffs cannot assert future or ongoing injury from prior actions that have since been superseded.

Even if Plaintiffs had standing, the Court still lacks jurisdiction over Plaintiffs' statutory claim.  In Count III of the complaint, Plaintiffs assert that the Postal Service failed to comply with 39 U.S.C. § 3661's requirement that certain major changes first receive an advisory opinion by the Postal Regulatory Commission (PRC).  But Congress has explicitly channeled those claims away from the district court, and toward the PRC, an independent executive branch establishment responsible for regulating the Postal Service, with review in the D.C. Circuit. Decades of precedent confirm that district courts have no jurisdiction over these claims.

Although Plaintiffs attempt to turn to *ultra vires* jurisdiction to overcome this clear statutory bar (Count IV of the complaint), such jurisdiction is unavailable here for two reasons. First, *ultra vires* review is unavailable where there is a path for judicial review, and because here there is, Plaintiffs cannot invoke this doctrine.  Second, relief under the *ultra vires* doctrine requires a clear violation of an explicit statutory command, implicating the agency's jurisdiction to take such action. But the statute Plaintiffs rely upon applies only to certain major changes, and here there never were any "changes" of service at the national level, and to the extent there were any changes at all, those changes have since been suspended.

Plaintiffs are also unlikely to succeed on their content and viewpoint discrimination constitutional claim (Count II of the complaint). This claim relies upon a distorted view of USPS policy and practice. Plaintiffs fail to demonstrate how, particularly in light of recent USPS operational instructions and guidance to ensure the timely delivery of all Election Mail, Plaintiffs have been targeted for, or are subject to, viewpoint discrimination by USPS.

Furthermore, Plaintiffs cannot establish the other prerequisites for a preliminary injunction.  Plaintiffs' purported injuries are not irreparable, but rather consist of speculative and unjustified concerns based on alleged *past* practices that have now been suspended.  And finally, the balance of the equities and the public interest do not support this Court effectively issuing an advisory opinion ordering USPS to suspend policies that have already been suspended. With a little more than two weeks until the Election, it is certainly not in the public's best interest to have USPS divert resources to consideration of another preliminary injunction, rather than to its mission to timely delivery Election Mail.

## COUNTER-STATEMENT OF MATERIAL FACTS

### I.   The United States Postal Service

USPS is a self-supporting, independent establishment of the executive branch, responsible for providing postal services throughout the United States. USPS has the authority to, among other things, designate mail routes and construct or designate post offices with the authority to carry, deliver, and regulate mail for the entire country. It is one of the nation's largest and most complex business operations. USPS employs more than 630,000 employees; operates more than 31,000 Post Offices; utilizes more than 204,000 delivery vehicles and 8,500 pieces of automated processing equipment; and typically processes and delivers more than 450 million mailpieces to nearly 160 million delivery points in a *single* day. *See* Ex. 1 (USPS FY2019 Annual Report to Congress) at 2, 7.

4

Louis DeJoy is the 75th Postmaster General and Chief Executive Officer of USPS. The Board of Governors appointed Postmaster General DeJoy on May 6, 2020. He assumed office on June 15, 2020.

## II.     USPS's Handling of Election Mail

Election Mail includes mail sent by election officials to voters (*e.g.*, voter registration materials, mail-in ballot applications, polling place notifications, blank ballots), and mail returned by voters to election officials (*e.g.*, completed ballots, completed registration or ballot applications).[2]  *Id.*  USPS regards Election Mail as having special importance.

USPS has determined that it is fully capable—both financially and operationally—of handling a surge of Election Mail in connection with the November Election.  By its analysis, even if every registered voter in the United States[3] used a mail-in ballot to cast a vote in the Election, the associated mail volume would represent only a small fraction of the total mailpieces that the USPS processes each week, on average, *id.* ¶ 42, and would pale in comparison to spikes in mail volume that the USPS handles every winter holiday season.  *Id.* ¶ 43; Declaration of Jason DeChambeau ("DeChambeau Dec.") ¶ 23.  Indeed, USPS projects (even accounting for an increased use of mail-in ballots to compensate for COVID-19-related mitigation efforts) that only two to five percent of the total mail volume in October and November 2020 will be Election

---

[2] Election Mail is distinct from "Political Mail" sent by political candidates, political action committees, and similar organizations in order to engage in advocacy.  Glass Dec. ¶ 3.

[3] Publicly available data generally indicate that there are approximately 150 million registered voters in the United States. *See, e.g.*, *Number of Voters and Voter Registration as a Share of the Voter Population*, https://www.kff.org/other/state-indicator/number-of-voters-and-voter-registration-in-thousands-as-a-share-of-the-voter-population/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D (last visited Sept. 10, 2020).

Mail. Glass Dec. ¶ 42; DeChambeau Dec. ¶ 23.  As detailed below and in USPS's declarations and public statements, USPS has been planning for the November Election for many months, and has the funds, processing capacity, and personnel to ensure that Election Mail is timely delivered.  Glass Dec. ¶¶ 42-44.[4]

Beyond these financial and operational resources, USPS will continue to employ longstanding practices to facilitate the use of Election Mail by states, and to enhance USPS's handling of Election Mail.  These include extensive outreach to state and local election officials to support effective use of postal services to facilitate the distribution and return of ballots; publishing and distributing the official Election Mail kit (which provides a comprehensive guide to services, resources, and recommendations for Election Mail) to approximately 11,500 state and local election officials; offering official Election Mail markings to improve the visibility and ensure proper handling of Election Mail; and, as the attached declarations further detail, taking extraordinary steps to ensure the timely delivery of Election Mail for the upcoming election.  *See* Glass Dec. ¶¶ 3-41.  Further, due to the unprecedented demands of the election, the Board of Governors has established a bipartisan Election Mail Committee to actively oversee USPS's support of Election Mail for the Election. *Id.* at ¶ 10.  USPS has demonstrated, both in its public representations and in practice, its commitment to continuing its longstanding practice to facilitate and expedite the timely delivery of Election Mail this year.

---

[4] *See also* Postmaster General Louis DeJoy's Opening Remarks for the USPS Board of Governors Meeting (Aug. 7, 2020) (Ex. 3) at 4 ("[T]he Postal Service has ample capacity to deliver all election mail securely and on-time in accordance with our delivery standards, and we will do so."); Testimony of Postmaster General Louis DeJoy Before the Senate Homeland Security and Governmental Affairs Committee on USPS Operations During COVID-19 and the Elections (Ex. 5) at 54 ("[W]e have plenty of cash to operate for the election.").

## A.      State, Local, and Individual Responsibilities for Election Mail

Notwithstanding USPS's longstanding commitment to the timely delivery of Election Mail, election officials and voters bear significant responsibility in the successful utilization of postal services for the Election. USPS lacks authority over the critical decisions committed by law to states and local election officials regarding their Election Mail policies and procedures. *Id.* ¶ 4.  Generally, each state determines whether, and to what extent, to allow domestic voters to cast their votes by mail.  If mail-in voting is allowed, either the legislature or state and local election officials, if so authorized, and must choose whether to send Election Mail to voters via either First-Class Mail, which is typically delivered in two to five days, or lower-cost Marketing Mail, which is typically delivered in three to ten days.  *Id.* ¶ 4; *see also* Ex. 4 (USPS Office of Inspector General (OIG) Audit Report No. 20-225-R20, "Processing Readiness of Election and Political Mail During the 2020 General Elections" (Aug. 31, 2020)).  Regardless of what class of mail election officials use to mail ballots out *to* voters, all ballots returned by mail to election officials *from* voters are First-Class Mail, unless a voter sends it using a premium service with faster delivery standards (*i.e.* Priority Mail or Priority Express Mail).  Ex. 4 at 1; Glass Dec. ¶ 4. USPS has not altered, nor will it alter, any of its existing postal services, delivery standards, or rates applicable to the delivery of Election Mail in advance of the Election.  *See, e.g.*, Ex. 5 (Transcript of Senate Homeland Security and Governmental Affairs Committee Hearing on USPS Operations During COVID-19 and the Elections (Aug. 21, 2020)) at 18 ("[W]e are not going to change any rates."); Ex. 4 (USPS Office of Inspector General (OIG) Audit Report No. 20-225-R20, "Processing Readiness of Election and Political Mail During the 2020 General Elections" (Aug. 31, 2020)) at 4 ("We have delivery standards that have been in place for many years. These standards have not changed").

State legislatures, or election officials if delegated such authority, also have the responsibility for making key decisions that directly impact mail-in voting.  Within the constraints of state and federal law, state and local election officials determine, among other things: (1) the design of Election Mail (its dimensions and the graphic and textual elements that will be displayed); (2) whether they will sufficiently mark Election Mail to enable USPS to identify and expeditiously process Election Mail for handling and delivery; (3) deadlines for voters to request and return mail-in ballots; (4) when Election Mail will be sent to voters; (5) whether Election Mail will be trackable (for example, using USPS's Intelligent Mail barcode system); and (6) whether to pre-pay postage the return postage for completed ballots from voters (versus requiring voters to affix their own postage).  Glass Dec. ¶ 4.  Individual voters are responsible for, among other things, providing current addresses to election officials; understanding mail-in voting procedures in their state and locality; and timely requesting ballots from, and returning those ballots to, election officials.

USPS's most significant operational concerns with respect to the Election are those elements controlled by the states themselves, either through legislation or state and local election officials and voters, not USPS. *Id.* ¶ 45.  Indeed, when reviewing an audit of the special and primary elections in May and June 2020, the USPS Office of Inspector General ("OIG") concluded that USPS had improved several of its practices and procedures since prior OIG audits and had appropriately adjusted its processes to facilitate the timely processing of Election Mail to meet the needs of the elections.  Ex. 4 at 3, 12. OIG identified, however, several "potential concerns" that may affect the smooth functioning of Election Mail (*i.e.* ballots mailed without tracking technology, ballot mailpiece design, Election Mail sent to voters too close to the

election, varying state postmark requirements for ballots, and out-of-date voter addresses)—none
of which are controlled by USPS.

     **B.**     **USPS's Efforts to Ensure Timely Delivery of 2020 Election Mail**

In preparation for the Election, USPS has undertaken extensive, expanded efforts to help
election officials and voters in the planning and preparation of Election Mail, strongly encourage
election officials, voters, and USPS employees to implement best practices, reinforce existing
policies and procedures for handling Election Mail with USPS employees, and prepare to process
and deliver a high volume of Election Mail.

     **1.**     **USPS Outreach and Recommendations to Election Officials**

USPS has demonstrated its commitment to provide election officials with the tools
necessary to use the U.S. Mail as a secure, efficient, and effective way to facilitate the election
process. In support of the Election, USPS has already had approximately 42,000 contacts to
confer and advise state and local election officials regarding Election Mail best practices and
recommendations, and this outreach is ongoing.  Glass Dec. ¶¶ 5-9.  Additionally, since February
2020, the outreach strategy has included distributing approximately 11,500 copies of "Kit 600,"
an official Election Mail guide; offering mailpiece design services; designating Election Mail
Coordinators to serve each locality; and publishing extensive election-related information and
guidance online.  *Id.* ¶ 6; *see also* Ex. 6 (USPS 2020 Election Mail – Kit 600).  This outreach
strategy in the run-up to the 2020 Election is consistent with USPS's outreach efforts in past
election years.  The principal distinction between this year's effort and those of previous election
years is that the volume and frequency of USPS's communications have *increased* to address
challenges stemming from the COVID-19 pandemic.  Glass Dec. ¶ 32.

In May and July 2020, following dissemination of Kit 600, the USPS General Counsel's
office sent letters to election officials to follow up and emphasize key aspects of the USPS's

process and recommendations so that they may be taken into account when educating the public on voting by mail.  Glass Dec. ¶ 7 & Glass Dec. Ex. 1.  USPS tailored the July 2020 letters to each state, identifying key provisions of each state's election laws and procedures and relevant considerations for the timely, effective use of U.S. Mail to facilitate the voting process.  *See generally* Ex. 15 (July 29, 2020 USPS Letter).  For example, in its letter to Arkansas election officials, USPS cited provisions of state election law that "are incongruous with [USPS] delivery standards" and "create[] a risk that ballots requested near the deadline under state law will not be returned by mail in time to be counted."  *Id.* at 1.  USPS implored Arkansas election officials, as it did all other state and local election officials, to "keep the Postal Service's delivery standards and recommendations in mind when making decisions as to the appropriate means used to send a piece of Election Mail to voters, and when informing voters how to successfully participate in an election" by mail.  *Id.* at 2.  None of the letters sent to state and local election officials by USPS stated that USPS intended to slow or delay delivery of Election Mail, or that USPS was otherwise altering its service standards for Election Mail. Rather, these letters aimed to ensure that election officials are fully informed, well in advance of the Election, of USPS's delivery standards, the extensive resources that USPS offers to assist election officials, and the potential risks that local ballot-request or ballot-return deadlines may pose to voters' full participation by mail in the Election.  *See* Ex. 1; *see generally* Ex. 15.  Moreover, these letters were consistent with USPS's outreach to election officials during past election cycles.  *See, e.g.*, Glass Dec. ¶ 8 & Glass Dec. Ex. Ex. 2 (Sept. 23, 2016 letter to state election officials advising them, for example, to consult with USPS Election Mail Coordinators, urge voters to return ballots one week early in order to ensure timely delivery, use the official USPS Election Mail markings, and send Election Mail by First-Class Mail).

In all of its communications regarding 2020 Election Mail, USPS has strongly, and repeatedly, recommended that election officials adopt USPS best practices, including the following[5]:

- Consult with USPS Election Mail Coordinators to better understand USPS's services, resources, recommendations and to help resolve issues should they arise, as well as mailpiece design analysts on how to ensure quality mailpiece design for Election Mail envelopes, including ballot envelopes. *See, e.g.*, Ex. 1 at 2; Ex. 15 at 2; Ex. 6 at 5; *see also* Glass Dec. ¶ 6.

- Identify Election Mail using USPS's official Election Mail logo, Green Tag 191 (which can be applied only to containers of mail enclosing ballots being sent out to voters), or by other means. *See, e.g.*, Ex. 1 at 2; Ex. 6 at 4, 5, 13, 23; Ex. 8 (USPS Election Mail – Graphic Guidelines and Logos (Pub. 631)); *see also* Glass Dec. ¶¶ 11-14.



Official USPS Election Mail Logo



Green Tag 191

- Use tracking technology, for example USPS's Intelligent Mail Barcode, for Election Mail. *See, e.g.*, Ex. 1 at 2; Ex. 6 at 7.

- Use First-Class Mail to transmit Election Mail (including blank ballots) to voters, and allow sufficient time for delivery to and from voters. *See, e.g.*, Ex. 1 at 2; Ex. 15 at 1; Ex. 7 at 10 (USPS Publication 632, explaining the USPS's different delivery standards and

---

[5] *See* Glass Dec. ¶ 32; *see also* Ex. 4 at 2 ("[t]he Postal Service has frequently communicated to state election officials the importance of" following best practices).

"recommend[ing] the use of First-Class Mail service to obtain timely delivery"); *see also* Glass Dec. ¶ 18.

- Keep USPS delivery standards in mind when informing voters how to vote by mail. *See, e.g.*, Ex. 1 at 2; Ex. 15 at 1.

Lastly, the USPS has consistently urged voters to return their completed ballots early. *See, e.g.*, Ex. 1 at 2; Glass Dec. ¶ 42 ("[T]o mitigate the impacts of any surges in Election Mail sent in the days immediately before Election Day, the Postal Service is actively encouraging voters and election officials to act early"); Ex. 9 at 1 (Statement of Postmaster General Louis DeJoy Before the House Committee on Oversight and Reform (Aug. 24, 2020) "encourag[ing] all Americans who choose to vote by mail to request their ballots early and to vote early, as a common sense best practice.").

### 2.    USPS's Longstanding Special Measures for Election Mail

For many years, USPS has taken special measures for handling Election Mail. In anticipation of the Election's increased reliance upon USPS, USPS has ramped up its efforts to ensure Election Mail is timely delivered.

First, USPS personnel have long made special efforts to physically identify and track the progress of Election Mail through USPS facilities, to ensure that Election Mail is not delayed or lost in processing or delivery. This effort is significantly aided when election officials use the official USPS Election Mail logo for all Election Mail mailpieces, affix Green Tag 191 to mail bins containing ballots being sent to voters, and check the "Election Mail" box on the postage statement form that is filled out when bulk Election Mail is entered into the USPS system. *See* Glass. Dec. ¶¶ 11-14. When a mail bin identifiable as Election Mail enters the system, USPS personnel log that container at every step of processing, so that it can be easily located if necessary. *Id.* ¶ 19. U SPS facilities also deploy end-of-day "all clears," during which in-plant

personnel use a checklist to search for all Election Mail within the facility and confirm that it is in the proper location (either already sent out for delivery or further processing, or at the front of the line for the next day). *Id.*

USPS also has several longstanding practices to expeditiously process and deliver of Election Mail, particularly ballots (whether election officials have chosen to send ballots to voters using Marketing Mail or First-Class Mail). *Id.* ¶ 20. USPS devotes excess First-Class Mail processing capacity to Election Mail sent as Marketing Mail, and thereby advances it through the processing network ahead of other marketing mail. *Id.* ¶ 21. As a result, delivery timeframes for Election Mail entered as Marketing Mail are often comparable to those of Election Mail entered as First-Class Mail. *Id.* And, when identifiable, USPS prioritizes placing ballots on outgoing trucks, whether sent using First-Class Mail or Marketing Mails. *Id.* ¶ 22.

Furthermore, USPS has a longstanding practice of postmarking (also referred to as "cancelling") all completed ballots returned by mail that are readily identifiable as ballots. *Id.* ¶ 34. A postmark is a USPS imprint applied to a mailpiece, usually by an Advanced Facer Cancellation System (AFCS) machine at a processing plant, indicating the date that the USPS accepted custody of the mailpiece, and the location the cancellation mark was applied, in order to cancel affixed postage so that it may not be reused. *Id.* ¶ 33, 35. Many mailpieces do not need to be cancelled, because they bear indicia of postage that is not at risk of being reused (*e.g.*, metered or permitted mail, or mail bearing a pre-cancelled stamp). *Id.* USPS, however, still takes measures to strive to postmark all ballots mailed by voters given the emphasis placed on postmarks by some state laws in validating the timely return of ballots. *Id.* USPS even goes so far as to cancel such ballot envelopes by hand, if necessary, to facilitate postmarking. *Id.* ¶ 34.

Based upon USPS's analysis of contemporaneous data regarding current AFCS machine capacity throughout the country, USPS has ample capacity to postmark all mailpieces readily identifiable as ballots. *Id.* USPS also plans to take extra steps for this election to identify and hand-cancel ballots that are rejected by an AFCS machine. *Id.* ¶¶ 39, 41. Further, and for the first time, USPS will use Ballot Monitors during the week preceding and through Election Day to ensure that all USPS personnel follow proper protocol for identifying and postmarking ballots. *Id.* ¶ 39.

USPS will continue these longstanding practices in support of mail-in voting for the Election. Glass Dec. ¶ 28. USPS Headquarters has not issued any direction interfering with, discouraging, or prohibiting USPS personnel from taking appropriate measures to ensure the timely delivery of Election Mail, especially ballots. Glass Dec. ¶¶ 1, 27.

### 3.    USPS's Increased Efforts in Support of the Election

In anticipation of the additional mail volume associated with the Election, USPS remains committed to and has increased its efforts to process and deliver Election Mail. For example, Postmaster General DeJoy publicly committed that, starting on October 1, 2020, USPS will engage standby resources in all areas of its operations to satisfy any unforeseen demand related to the Election. *Id.* ¶ 29; Ex. 10 (Statement of Postmaster General Louis DeJoy (Aug. 18, 2020)) at 1-2. These standby resources will include, among other things, availability of additional staffing, transportation, and mail processing capacity (through the use of idle windows). Glass Dec. ¶ 29. USPS has also expanded its Election Mail Task Force this year to include leaders of the postal unions and management associations, to ensure strong coordination throughout USPS and with state and local election officials, and to make sure any concerns can be raised and timely resolved at the highest levels of the organization. *Id.* ¶ 10. As discussed above, USPS has

also increased the volume and frequency of its communications with election officials and will, for the first time, utilize Ballot Monitors. *Id.* ¶¶ 32, 39.

## III.    The Challenged Policies

Plaintiffs' challenge five purported "transformative" changes to USPS policies, including (i) elimination of overtime pay for certain postal workers; (ii) banning late and extra trips; (iii) decommissioning letter sorting machines; (iv) removal of mail collection boxes; and (v) deprioritization of Election Mail. *See* PI Br. at 7-10.

As explained below, many of the activities that Plaintiff challenges here and in these other cases (such as an alleged elimination of overtime) were never in fact USPS policies. And as to those that were, almost all of the complained-of activities were longstanding practices of USPS. In any event, USPS has now issued clarifying instructions addressing all of the purported policies challenged in the Complaint, rendering moot any dispute over whether those policies previously existed. Ex. 16 (Clarifying Operational Instructions (Sep. 21, 2020).

### A.    Overtime

USPS's customary overtime practices, pursuant to which overtime is generally evaluated and approved by local field managers (not Headquarters personnel), have remained unchanged since Postmaster General DeJoy took office.  *See* Declaration of Angela Curtis ("Curtis Dec.") ¶¶ 12, 22-23; Declaration of Joshua Colin, Ph.D. ("Colin Dec.") ¶¶ 3-4.[6]  In maintaining the status quo leading up to the Election, Postmaster General DeJoy clarified that he never banned overtime, and continues to approve of its appropriate use.  *See, e.g.*, Ex. 14 (Transcript of House Oversight and Reform Committee on Postal Service Operational Changes Hearing (Aug. 24, 2020)).  Further, after the court in *Washington* issued a nationwide injunction on September 17,

---

[6] Because the issues here are largely the same, and in the interest of efficiency, Defendants also rely here on the declarations filed in support of Defendants' preliminary injunction briefing in *Jones*, No. 1:20-cv-06516 (S.D.N.Y.).

2020, USPS issued instructions clarifying that Postal Service Headquarters has not imposed, and will not impose, any nationwide changes of any kind that would ban or newly restrict overtime prior to Election Day.  *See* Ex. 16 ¶ 1.

### B.     The Alleged "No Late or Extra Trips" Policy

Approximately two years ago, Robert Cintron, Vice President of Logistics at USPS Headquarters, began an initiative to improve compliance with USPS's long-established delivery schedules.  Declaration of Robert Cintron ("Cintron Dec.") ¶¶ 1, 11-13, 21.  On June 16, 2020, the USPS Office of Inspector General (OIG) published a report addressing "late deliveries . . . late dispatch, extra trips, and all the time and costs" that those issues caused.  *See* Ex. 5 (Testimony of Postmaster General Louis DeJoy Before the Senate Homeland Security and Governmental Affairs Committee on USPS Operations During COVID-19 and the Elections) at 10.  In that report, OIG found that "generally, the Postal Service's processing network is not operating at optimal efficiency."  Ex. 13 (USPS OIG Audit Report No. 19XG013NO00O-R20, "U.S. Postal Service's Processing Network Optimization and Service Impacts" (June 16, 2020)) at 1.  In particular, "mail processing operations were not completed on time and mail missed its last scheduled transportation trip.  In response, management used overtime . . . and either delayed the scheduled transportation trip or called for an extra trip."  *Id.* at 2.  Among interrelated problems, "[a]bout 20 percent of total transportation trips (or four million trips) left mail processing facilities late." *Id.* After Postmaster General DeJoy took office in June 2020, Mr. Cintron discussed his initiative to improve compliance with USPS's long-established delivery schedules with the Postmaster General and other Postal executives.  Cintron Dec. ¶¶ 22-23.

Soon after joining USPS, Postmaster General DeJoy reemphasized the need to adhere to USPS's existing operational plans, including transportation schedules.  Cintron Dec. ¶ 23.  Mr. Cintron and his team then developed written guidelines (generally consistent with past practices) regarding the circumstances where the scheduling of extra transportation trips is appropriate. Cintron Dec. ¶ 24 & Ex. 2.  On July 14, 2020, the guidelines were distributed to area executives,

advising them of USPS's renewed effort to limit unplanned extra and under-utilized trips.  *Id.* ¶ 25.[7]

During the following week, compliance with transportation schedules improved, but USPS experienced a temporary decline in its service performance.  *Id.* ¶ 26.  However, after USPS addressed the decline, it observed steady improvements in service performance.  *Id.* ¶ 27; *see* Curtis Dec. ¶ 30.  On August 31, 2020, Postmaster General DeJoy provided updated information to Congress showing "the expected improvements in service. . . . across all major mail categories in the weeks prior to my testimony, and this trend has continued through August, rapidly returning to early July levels. . . . while still adhering to our existing transportation schedules.  In other words, we are improving service performance while more consistently running our trucks on time." *See* Service Performance Rebounds at Postal Service (Aug. 31, 2020) at 1, https://about.usps.com/newsroom/national-releases/2020/0831-service-performance-rebounds-at-postal-service.htm; Congressional Briefing (Aug. 31, 220) at 8 (data showing that USPS service performance has rebounded to early-July 2020 levels), https://about.usps.com/newsroom/global/pdf/0831-congressional-service-briefing.pdf ("Congressional Briefing"); Cintron Dec. ¶ 27.  *See also* Ex. 23 (FY20Q2-FY21Q1 Weekly Service Performance of Market Dominant Products through Week of Oct. 3, 2020).  Furthermore,

---

[7] USPS is aware of a memorandum dated July 10, 2020, titled "Mandatory Stand-Up Talk: All Employees," which discusses some issues relating to late and extra trips. *See* Cintron Dec. ¶ 24 n.1.  This memo was locally prepared by an Area Vice President without approval by USPS Headquarters.  *Id*.  The memo does not represent official USPS policy, in fact, it mischaracterizes USPS policy and the USPS's initiative to encourage compliance with transportation schedules.  *Id*.  As discussed in the Supplemental Declaration of Robert Cintron ("Supp. Cintron Dec"), the July 10 memorandum drew from a teleconference discussion conducted between regional and Headquarters officials, but "[s]tarting on July 11, 2020, in light of some confusion in the field about the scope of USPS policy, members of Headquarters begin to issue clarifications of USPS policy, including with [Area Vice Presidents] making clear that certain statements in the July 10, 2020 [memorandum] were not accurate statements of USPS policy."  *Id.* ¶¶ 3-4.  This included clarifying the circumstances where extra trips were permissible.  *Id.* ¶ 4.  "Late and extra trips are not and were not banned, rather they continued (albeit at a reduced level) both in July and today."  *Id*.

in the last two months, there has been a sharp decrease in late and extra trips.  *See* Congressional Briefing at 4-6 (data showing a steep decline since early July in late and extra trips); Cintron Dec. ¶ 27. USPS's performance continues to improve.  *See* USPS Service Performance Continues Upward Trend (Sept. 10, 2020), https://about.usps.com/newsroom/national-releases/2020/0910-usps-service-performance-continues-upward-trend.htm.

After the *Washington* court issued the nationwide injunction, USPS issued instructions further clarifying that the "Postmaster General has not banned the use of late or extra trips; when operationally required, late or extra trips are permitted." Ex. 16 ¶ 5.  The Clarifying Operational Instructions expressly provide that mail should not "be left behind," and "transportation, in the form of late or extra trips that are reasonably necessary to compete timely mail delivery, is not to be unreasonably restricted or prohibited. Managers are authorized to use their best business judgment to meet [USPS] service commitments."  *Id.*  The Clarifying Operational Instructions "supersede any previous guidance provided no these specific topics that could be seen as conflicting with these Instructions, whether from Headquarters or the field."  *Id.* ¶ 1.

### C.      Alleged Removal of Mailboxes and Decommissioning of Letter Sorting Machines

USPS has over 140,000 collection boxes. *See* Declaration of Jennifer Vo ("Vo Dec.") ¶ 4. USPS regularly reviews the need for and location of collection boxes in accordance with procedures set out in the Postal Operations Manual.  *Id.* ¶ 5.  Generally, a collection box is targeted for removal if it averages fewer than 25 mailpieces daily during a two week observation period. With some exceptions, USPS posts a 30-day public notice on collection boxes identified for relocation or removal before final action.  *Id.* ¶¶ 5, 8.  For the last seven years, USPS has removed an average of 3,100 collection boxes each year, many of which were relocated to more heavily trafficked areas.  *Id.* ¶¶ 8, 10. Local USPS officials are primarily responsible for testing, assessing, and identifying collection boxes for removal.  *Id.* ¶ 6.  USPS has removed approximately 1,500 boxes in 2020 pursuant to this routine process, consistent with removal rates of previous years. Postmaster General DeJoy was not involved in any decisions relating to

the removal of these boxes.  *Id.* ¶¶ 10, 19.  Rather, the removal and relocation of collection boxes (other than damaged boxes or unsecured boxes) has been suspended at least through the Election at Postmaster General DeJoy's direction.  *Id.* ¶¶ 18-19.

Similarly, USPS regularly identifies mail processing and sorting equipment in approximately 289 mail processing facilities for removal and/or replacement.  *See* Declaration of Jason DeChambeau ("DeChambeau Dec.") ¶ 7; Declaration of Kevin Couch ("Couch Dec.") ¶ 3; Cintron Dec. ¶ 5.  Based on its data analyses, USPS has been steadily reducing its letter and flat mail processing equipment for several years, to align with volume reductions in those types of mail.  DeChambeau Dec. ¶ 13.

On August 18, 2020, Postmaster General DeJoy ordered that all removals of equipment be suspended until after the Election. *See* Ex. 10 (Statement of Postmaster General Louis DeJoy (Aug. 18, 2020)) at 1; DeChambeau Dec. ¶ 22; Couch Dec. ¶¶ 13-15. Additionally, on September 21, 2020, USPS issued instructions clarifying that mail processing equipment and blue collection boxes will not be removed until after the November 2020 elections (except where collection boxes are damaged or temporarily removed for public safety). *See* Clarifying Operational Instruction ¶¶ 4, 6. With respect to mail processing, as of September 18, 2020, Headquarters has approved all requests to reconnect machines directed to the Headquarters Director of Processing Operations and has provided Regional Vice Presidents with authority to reconnect machines where doing so is necessary to add processing capacity to fulfill service commitments with regard to Election Mail. Ex. 16 ¶ 6.

**D.**      **USPS's Handling of Election Mail**

"Election Mail" is defined by USPS as any item mailed to or from authorized election officials that enables citizens to participate in the voting process.  *See* Declaration of Robert Glass ("Glass Dec.") ¶ 3.  This includes mail sent by election officials to voters (*e.g.*, voter registration materials, mail-in ballot applications, polling place notifications, blank ballots), and

mail returned by voters to election officials (*e.g.*, completed ballots, completed registration or ballot applications). *Id.* USPS regards Election Mail as having special importance.

USPS has determined that it is fully capable—both financially and operationally—of handling a surge of Election Mail in connection with the November Election. By its analysis, even if every registered voter in the United States used a mail-in ballot to cast a vote in the Election, the associated mail volume would represent only a small fraction of the total mailpieces that the USPS processes each week, on average, *id.* ¶ 42, and would pale in comparison to spikes in mail volume that the USPS handles every winter holiday season. *Id.* ¶ 43; DeChambeau Dec. ¶ 23. Indeed, USPS projects that only two to five percent of the total mail volume in October and November 2020 will be Election Mail. Glass Dec. ¶ 42; DeChambeau Dec. ¶ 23. USPS has been planning for the Election for many months, and has the funds, processing capacity, and personnel to ensure that Election Mail is timely delivered. Glass Dec. ¶¶ 42-44.

Notwithstanding USPS's longstanding commitment to the timely delivery of Election Mail, election officials and voters bear significant responsibility in the successful utilization of postal services for the Election. State and local election officials may choose whether to send Election Mail to voters via either First-Class Mail, which is typically delivered in two to five days, or lower-cost Marketing Mail, which is typically delivered in three to ten days. *Id.* ¶ 4. Regardless of what class of mail election officials use to mail ballots out *to* voters, all ballots returned by mail to election officials *from* voters are First-Class Mail, unless a voter sends it using a premium service with faster delivery standards (*i.e.* Priority Mail or Priority Express Mail). Ex. 4 (USPS Office of Inspector General (OIG) Audit Report No. 20-225-R-20, "Processing Readiness of Election and Political Mail During the 2020 General Elections" (Aug. 31, 2020)) at 1. USPS has not altered, nor will it alter, any of its existing postal services, delivery standards, or rates applicable to the delivery of Election Mail in advance of the Election. *See, e.g.*, Ex. 5 at 18.

Moreover, for many years, USPS has taken special measures for handling Election Mail. First, USPS personnel have long made special efforts to physically identify and track the progress of Election Mail through USPS facilities, to ensure that Election Mail is not delayed or lost in processing or delivery.  When a mail bin identifiable as Election Mail enters the system, USPS personnel log that container at every step of processing, so that it can be easily located if necessary.  Glass Dec. ¶ 19.  USPS facilities also deploy end-of-day "all clears," during which in-plant personnel use a checklist to search for all Election Mail within the facility and confirm that it is in the proper location (either already sent out for delivery or further processing, or at the front of the line for the next day).  *Id.*

USPS also has several longstanding practices to expeditiously process and deliver of Election Mail, particularly ballots.  *Id.* ¶ 20.  USPS devotes excess First-Class Mail processing capacity to Election Mail sent as Marketing Mail, and thereby advances it through the processing network ahead of other marketing mail.  *Id.* ¶ 21.  As a result, delivery timeframes for Election Mail entered as Marketing Mail are often comparable to those of Election Mail entered as First-Class Mail.  *Id.*  And, when identifiable, USPS prioritizes placing ballots on outgoing trucks, whether sent using First-Class Mail or Marketing Mails.  *Id.* ¶ 22.

USPS will continue these longstanding practices in support of mail-in voting for the Election.  Glass Dec. ¶ 28.  USPS Headquarters has not issued any direction interfering with, discouraging, or prohibiting USPS personnel from taking appropriate measures to ensure the timely delivery of Election Mail, especially ballots.  *Id.* ¶¶ 1, 27. In fact, USPS has issued numerous guidance documents emphasizing the Postal Service's commitment to the secure and timely delivery of Election Mail. *See* Ex. 16; Ex. 18 (Mandatory Stand-Up Talk (Sep. 24, 2020)); Ex. 19 (Additional Resources for Election Mail Mem.), Ex. 17 (Supplemental Guidance Mem. (Oct. 13, 2020)); Ex. 20 (Mandatory Stand-Up Talk (Oct. 16, 2020)).

In anticipation of the additional mail volume associated with the Election, USPS remains committed to and has increased its efforts to process and deliver Election Mail.  For example,

Postmaster General DeJoy publicly committed that, starting on October 1, 2020, USPS will engage standby resources in all areas of its operations to satisfy any unforeseen demand related to the Election.  Glass Dec. ¶ 29; Ex. 10 at 1-2.  These standby resources will include, among other things, availability of additional staffing, transportation, and mail processing capacity (through the use of idle windows).  Glass Dec. ¶ 29.

Finally, on September 21, 2020, USPS issued instructions clarifying that it will prioritize Election Mail that is entered as Marketing Mail, regardless of the paid class.  Ex. 16 ¶ 7. This includes using standardized log sheets to track Election Mail through processing; conducting daily "all clears" to ensure that all Election Mail is accounted for in the system and mail scheduled or "committed" to go out is processed accordingly; advancing Election Mail entered as Marketing Mail ahead of all other Marketing Mail and processing it expeditiously to the extent feasible so that it is generally delivered in line with the First-Class Mail Delivery standards; expanding processing windows on letter and flat sorting equipment to ensure that all Election Mail received prior to the First-Class Mail Critical Entry Time is processed the same day; and prioritizing Election Mail when loading trucks.  *Id.*

## IV.   USPS's Compliance with Nationwide Injunctions Entered in Seven Other Cases

To date, four district courts have issued a total of seven preliminary injunctions imposing a patchwork of overlapping obligations on the Postal Service.  Preliminary injunctions seeking virtually the same relief Plaintiffs seek here have issued in the following related cases: *Washington v. Trump*, No. 20-cv-3127 (E.D. Wash.) (nationwide preliminary injunction entered on September 17, 2020; clarifying order entered October 2, 2020); *Jones v. U.S. Postal Service*, No. 20-cv-6516 (S.D.N.Y.) (nationwide preliminary injunction entered September 25, 2020; clarifying order entered September 29, 2020); *Pennsylvania v. DeJoy*, No. 20-cv-4096 (E.D. Pa.) (nationwide preliminary injunction entered September 28, 2020; clarifying order entered October 13, 2020); *New York v. Trump*, No. 20-cv-2340 (D.D.C.) (nationwide preliminary injunction

entered September 28, 2020); *Vote Forward v. DeJoy*, No. 20-cv-2405 (nationwide preliminary injunction entered on September 28, 2020); *Richardson v. Trump*, No. 20-cv-2262 (D.D.C.) (nationwide preliminary injunction entered October 8, 2020); and *NAACP v. U.S. Postal Service*, No. 20-cv-2295 (D.D.C.) (nationwide preliminary injunction entered October 10, 2020).  *See* Ex. 22 (Preliminary Injunction Orders). The Postal Service has been engaged in the overwhelming task of synthesizing these injunctions, which include multiple broad provisions like those in Plaintiffs' proposed order, in order to interpret and execute them in a coherent fashion for its employees.  Because these injunctions are nationwide in scope, each and every one benefits the Plaintiffs in the present case.

On September 21, 2020, USPS issued detailed operational guidance regarding how to comply with the *Washington* injunction (Clarifying Operational Instructions), which was the first to issue. Among other things, the instructions provide:

- **Overtime:** Postal Service Headquarters has not imposed, and will not impose, any nationwide changes of any kind that would ban or newly restrict overtime prior to Election Day.  Overtime use has not been banned, nor have any caps been placed on overtime hours. Ex. 16 ¶ 1.

- **The Alleged "Leave Mail Behind" Policy:** "The Postmaster General has not banned the use of late or extra trips, when operationally required, extra or late trips are permitted," mail "should not" be left behind; and "transportation, in the form of late or extra trips that are reasonably necessary to compete timely mail delivery, is not to be unreasonably restricted or prohibited.  Managers are authorized to use their best business judgment to meet [USPS] service commitments."  Ex. 16 ¶ 5.

- **Alleged Removal of Mailboxes and Decommissioning of Letter Sorting Machines:** Mail processing equipment and blue collection boxes will not be removed until after the November 2020 elections (except where collection boxes are damaged or temporarily removed for public safety).  *See* Clarifying Operational Instruction ¶¶ 4, 6.  With respect to mail processing, as of September 18, 2020,  Headquarters has approved all requests to reconnect machines directed to the Headquarters Director of Processing Operations and has provided Regional Vice Presidents with authority to reconnect machines where doing so is necessary. Ex. 16 ¶ 6.

- **Alleged Reduction in Operating Hours:** Retail hours will not be adjusted prior to the Election, absent temporary changes due to unforeseen circumstances beyond the Postal Service's control, such as natural disasters.  Ex. 16 ¶ 3.

- **Election Mail:** USPS will prioritize Election Mail that is entered as Marketing Mail, regardless of the paid class. Ex. 16 ¶ 7. This includes using standardized log sheets to track Election Mail through processing; conducting daily "all clears" to ensure that all Election Mail is accounted for in the system and mail scheduled or "committed" to go out is processed accordingly; advancing Election Mail entered as Marketing Mail ahead of all other Marketing Mail and processing it expeditiously to the extent feasible so that it is generally delivered in line with the First-Class Mail Delivery standards; expanding processing windows on letter and flat sorting equipment to ensure that all Election Mail received prior to the First-Class Mail Critical Entry Time is processed the same day; and prioritizing Election Mail when loading trucks. *Id.*

On September 24, 2020, USPS deployed a "Mandatory Stand-Up Talk" that summarizes these Clarifying Operational Instructions to all employees. *See* Ex. 18. And on September 25, 2020, USPS issued instructions detailing significant additional resources that would be available to support the expeditious handling of Election Mail beginning October 1, 2020, and encouraging the continued extraordinary efforts to timely deliver Election Mail. *See* Ex. 19. On October 13, 2020, pursuant to the preliminary injunction in *Jones*, USPS issued Supplemental Guidance. *See* Ex. 17. And, most recently, USPS deployed another Stand-Up Talk on October 16, 2020, to clarify implementation of the late/extra trips policy. Ex. 20.

Pursuant to the nationwide injunctions in *Jones* and *Pennsylvania*, USPS is required to, and has been, submitting weekly reports providing: (1) a copy of the weekly updates USPS provides to Congress regarding performance of USPS's Market-Dominant products (*i.e.* First-Class Mail, Marketing Mail, and Periodicals); (2) separate, unmerged two-day and three to five-day weekly service reports for both pre-sort and single-piece First-Class Mail and variance reports; and (3) a summary of any and all data and information collected by USPS Headquarters regarding USPS's handling of Election Mail at the Headquarters level and compliance with USPS policies regarding Election Mail and the terms of the *Jones* injunction pertaining to Election Mail.

## LEGAL STANDARD

Injunctive relief "is an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20. When, as here, the government is opposing a motion for a preliminary injunction, the third and fourth factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).  Moreover, Plaintiffs seek an order requiring the Postal Service to take particular actions, rather than seeking merely to preserve the status quo. "Since preliminary injunctions are intended to preserve the status quo during the pendency of litigation, injunctions that 'alter rather than preserve the status quo' are particularly disfavored." *Profiles, Inc. v. Bank of Am. Corp.*, 453 F. Supp. 3d 742, 747 (D. Md. 2020) (quoting *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 216 n.8 (4th Cir. 2019)).  Accordingly, the Court should grant the requested relief only when the right to such relief is "indisputably clear." *Id.*

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A fact is material when, under the governing substantive law, it could affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.

**ARGUMENT**

**I.     PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS.**

### A.  Plaintiffs Lack Article III Standing

At the outset, Plaintiffs cannot succeed on their claims because they cannot show that they have Article III standing. Plaintiffs bear the burden of establishing standing.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). To establish standing, Plaintiffs "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). When a plaintiff seeks prospective relief, the "threatened injury must be *certainly impending* to constitute injury in fact;" "[a]llegations of *possible* future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).

Plaintiffs, organizations suing Defendants on behalf of themselves and their respective members, allege both organizational and representational theories of standing.  Plaintiffs maintain that they have been injured in four principal ways by Defendants' alleged policy changes: (1) Plaintiffs' organizational goals have been frustrated; (2) Plaintiffs have had to reallocate resources in order to educate and assist voters and communities in response to alleged changes; (3) Plaintiffs were deprived of the procedural right to a public hearing before the alleged changes were implemented; and (4) Plaintiffs' members and voters at-large will face disenfranchisement.  *See* PI Br. at 2, 13-15.  As discussed below, Plaintiffs are not likely to succeed on any of these theories.

An organization can assert standing either in its own right or as a representative of its members. *Md. Highways Contractors Ass'n, Inc.*, 933 F.2d 1246, 1250 (4th Cir. 1991). Generally, for organizational standing, the challenged conduct must "perceptibly impair[]" the

26

"organization's *activities*," with a "consequent drain on the organization's resources." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (emphasis added). An organization's abstract concern that its broad organizational purpose is frustrated by Defendants' actions is insufficient to impart standing. *Md. Highways Contractors Ass'n, Inc.*, 933 F.2d at 1250-51. "Organizational injury, properly understood, is measured against a group's ability to *operate* as an organization, not its theoretical ability to *effectuate* its objectives in its ideal world." *CASA de Md. V. Trump*, 971 F.3d 220, 239 (4th Cir. 2020). "Resource reallocations motivated by the dictates of preference, however sincere, are not cognizable organizational injuries because no action by the defendant has directly impaired the organization's ability to operate and to function." *Id.* (citing *Whitmore v. Ark.*, 495 U.S. 149, 155-56 (1990)).

Here, there is no allegation—much less evidence—indicating that any alleged USPS policy change has directly "impaired [the] ability" of any plaintiff organization from carrying on with their pre-existing activities. Plaintiffs argue that they chose to expend resources towards other programs, such as educational programs, in response to the alleged USPS policy changes. "Although a diversion of resources might harm the organization by reducing the funds available for other purposes, 'it results not from any actions taken by [the defendant], but rather from the [organization's] own budgetary choices.'" *Lane v. Holder*, 703 F.3d 668, 675 (4th Cir. 2012) (citing *Fair Emp't Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C. Cir. 1994)). To find standing for an organization that elects to redirect some of its resources in response to the actions of another party would permit any plaintiff to bootstrap standing by expending resources in response to another's actions. *See Lane*, 703 F.3d at 675. Thus, the change in programming and the resulting voluntary expenditure alleged by Plaintiffs is insufficient to establish standing.

An organization without standing in its own right may have representational standing for its members.  *Md. Highway Contractors Ass'n, Inc.*, 933 F.2d at 1250.  "An organization has representational standing when (1) its own members would have standing to sue in their own right; (2) the interests the organization seeks to protect are germane to the organization's purpose; and (3) neither the claim nor the relief sought requires the participation of individual members in the lawsuit." *Id.* (citing *Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 343(1977); *Virginia Hosp. Ass'n v. Baliles,* 868 F.2d 653, 662 (4th Cir.1989), *aff'd sub nom. Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498 (1990)). Here, plaintiff organizations' members lack standing to sue in their own right because they have not alleged sufficient injury in fact.

When a plaintiff seeks prospective relief, the "threatened injury must be certainly impending to constitute injury in fact;" "[a]llegations of possible future injury are not sufficient." *Clapper*, 568 U.S. at 409.  A "theory of standing, which relies on a highly attenuated chain of possibilities, does not satisfy" this requirement.  *Id.* at 410. Plaintiffs assert that their members have been injured because "they face an untenable choice between being disenfranchised and risking the pandemic to vote." PI Br. at 2. But none of Plaintiffs identify any individual member of a plaintiff organization who has suffered the requisite harm, as required by *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009).

Plaintiffs identify a single member of only one plaintiff organization alleged to have suffered an injury—Tiffany Majors, a member of Plaintiff National Urban League. PI Br. at 13-15, Ex. 35 (ECF No. 49-2). But Ms. Majors's declaration merely notes that she is "concerned" about the timely delivery of her requested ballot, based on alleged delays she experienced regarding certain mailings in mid-June to July of this year.  *Id.* at ¶¶ 40-57. Absent from her

28

declaration is evidence that USPS is mishandling, or certainly will mishandle, mail containing her ballot for the upcoming election. Indeed, Ms. Majors mailed her request for a mail-in ballot to election officials on September 16 and her declaration was executed less than a week later on September 22. *Id.* at ¶37. Ms. Majors does not attest to any mishandling of her mailed request. Plaintiffs do not, therefore, demonstrate that Ms. Majors, or any other specific members of their organizations for that matter, have been injured or will certainly be injured by USPS's mishandling of Election Mail for the upcoming election.

Plaintiffs leave the Court to hypothesize as to how alleged policy changes have resulted in the certain disenfranchisement of Plaintiffs' members. By any hypothetical formulation, the alleged dilemma is created only by a highly attenuated chain of possibilities which is insufficient to support representational standing, as one of their members would have to mail a ballot that arrives too late to be counted due to the delay specifically caused by the policies challenge in the Complaint.  That injury is entirely speculative.

And to the extent that Plaintiffs assert in their motion that their members have simply chosen not to participate by mail, that is an injury entirely of their own choosing, rather than a necessary requirement imposed by the Postal Service.  PI Br. at 2.  Indeed, any declaration provided to this effect fails to take account of the Postal Service's renewed public commitments to delivering election mail, the decisions since issued by multiple federal courts, as well as the additional guidance that the Postal Service has provided to its employees.

Plaintiffs also allege that they are injured because they have been purportedly denied the opportunity to comment on the Postal Services supposed changes pursuant to 39 U.S.C. § 3661. "But deprivation of a procedural right" – specifically, the right to comment on a government proposal – without some concrete interest that is affected by the deprivation – a procedural right

*in vacuo* – is insufficient to create Article III standing." *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009). Plaintiffs cannot, therefore, invoke this Court's jurisdiction based solely on a purported desire to comment on the alleged changes at issue here.

> **B.** **District Courts Lack Subject-Matter Jurisdiction Over Plaintiffs' 39 U.S.C. § 3661 Claim (Count III).**

As a threshold matter, Congress has precluded district court jurisdiction over Count III of the complaint, which sets forth Plaintiffs' section 3661 claim. *See Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207 (1994). Title 39 of the U.S. Code provides that the district courts have jurisdiction over cases against the Postal Service, "*except* as otherwise provided in this title." 39 U.S.C. § 409(a) (emphasis added); *see also LeMay v. U.S. Postal Serv.*, 450 F.3d 797, 799 (8th Cir. 2006) (district court jurisdiction over Postal Service can be preempted by other provisions, including section 3662). This case involves one of those exceptions: 39 U.S.C. § 3662, which vests exclusive jurisdiction over complaints regarding the Postal Service's compliance with certain statutory requirements—including section 3661—in the PRC.

In section 3662, Congress specified that any person "who believes the Postal Service is not operating in conformance with the requirements of various provisions, including "*this chapter* [*i.e.*, Chapter 36 of Title 39, which includes 39 U.S.C. § 3661] (or any regulations promulgated under any of those provisions) may lodge a complaint with the Postal Regulatory Commission." 39 U.S.C. § 3662(a) (emphasis added). "If the Postal Regulatory Commission finds the complaint to be justified, it shall order that the Postal Service take such action as the Commission considers appropriate in order to achieve compliance with the applicable requirements and to remedy the effects of any noncompliance." *Id.* § 3662(c). If that person is dissatisfied with the PRC's ruling, she may petition for review in the D.C. Circuit. *Id.* § 3663.

Courts have repeatedly held that 39 U.S.C. §§ 3662 and 3663 constitute the exclusive

jurisdictional remedy for complaints about postal services that fall within the statutory provisions

specifically identified in section 3662—and as discussed above, that includes a claim that the

Postal Service is not complying with section 3661. Numerous courts of appeals have so held.

*See, e.g.*, *Foster v. Pitney Bowes Corp.*, 549 F. App'x 982, 986 (Fed. Cir. 2013) (PRC has

"exclusive jurisdiction . . . over claims enumerated in § 3662"); *LeMay*, 450 F.3d at 799-800 ("In

this case, Congress removed the district courts' jurisdiction over claims regarding postal rates

and services. It did so by enacting 39 U.S.C. § 3662."); *Bovard v. U.S. Post Office*, 47 F.3d 1178

(10th Cir. 1995) (earlier version of 39 U.S.C. § 3662 "makes clear that a postal customer's

remedy for unsatisfactory service [which was identified in section 3662] lies with the Postal Rate

Commission. . . . Accordingly, the district court was without jurisdiction to review this claim.").

These courts of appeals have been joined by "countless decisions" of lower courts. *Pep-*

*Wku, LLC v. U.S. Postal Serv.*, No. 1:20-cv-0009-GNS, 2020 WL 2090514, at *3 (W.D. Ky.

Apr. 30, 2020); *see, e.g.*, *McDermott v. Potter*, No. C09-0776RSL, 2009 WL 2971585, at *3

(W.D. Wash. Sept. 11, 2009); *Rodriguez v. Hemit*, No. C16-778 RAJ, 2018 WL 3618260, at *2

(W.D. Wash. July 30, 2018); *Striley v. U.S. Postal Serv.*, No. 16-CV-07233-HRL, 2017 WL

513166, at *3 (N.D. Cal. Feb. 8, 2017); *Sears, Roebuck & Co. v. U.S. Postal Serv.*, 134 F. Supp.

3d 365, 382 (D.D.C. 2015).

This overwhelming line of precedent has developed for good reason. "Generally, when

Congress creates procedures 'designed to permit agency expertise to be brought to bear on

particular problems' those procedures 'are to be exclusive.'" *Free Enter. Fund v. Pub. Co.*

*Accounting Oversight Bd.*, 561 U.S. 477, 489 (2010) (quoting *Whitney Nat. Bank in Jefferson*

*Parish v. Bank of New Orleans & Trust Co.*, 379 U.S.411, 420 (1995)). "It is well settled that

even where Congress has not expressly stated that statutory jurisdiction is 'exclusive' . . . a statute which vests jurisdiction in a particular court cuts off original jurisdiction in other courts in all cases covered by that statute." *Telecomms Res. & Action Ctr. v. FCC*, 750 F.2d 70, 77 (D.C. Cir. 1984). This principle applies particularly in situations where there are multiple layers of review, *i.e.*, review first to an agency, and then to the federal courts of appeals. *See In re Series 7 Broker Qualification Exam Scoring Litig.*, 548 F.3d 110, 114 (D.C. Cir. 2008). Here, Congress has created just such a channeling scheme: complaints within the ambit of section 3662 go first to the Commission, an agency with deep expertise in postal matters, and then to the D.C. Circuit. *See* 39 U.S.C. §§ 3661, 3662. Under such circumstances, this court lacks subject matter jurisdiction over this claim.

> ### C.     The *Ultra Vires* Doctrine Does Not Provide an Alternate Avenue for Judicial Review of Count IV.

Plaintiffs fail to acknowledge section 3662's channeling of review to the PRC and then to the D.C. Circuit. Instead, pursuant to Count IV of the complaint, Plaintiffs seek review under this Court's very limited *ultra vires* review doctrine. But Plaintiffs cannot satisfy *ultra vires* review, for two reasons—first, *ultra vires* review is available *only* where there is no other potential remedy, and here the statute provides for the filing of a complaint to the PRC and then the D.C. Circuit. And second, *ultra vires* review is available only if the agency has failed to comply with such a clear and unequivocal statutory command that the agency has acted without any authority. There is no such error here – indeed, the vast majority of the "changes" of which Plaintiffs complain did not exist.

For claims—unlike here—where there is no other remedy, some courts have found "non-statutory review' available for certain Postal Service decisions. *Mittleman v. Postal Regul. Comm'n*, 757 F.3d 300, 305 (D.C. Cir. 2014). Such review, however, "is quite narrow,"

*Mittleman*, 757 F.3d at 307, and "is essentially a Hail Mary pass – and in court as in football, the attempt rarely succeeds." *Nyunt v. Broad. Bd. of Govs.*, 589 F.3d 445, 449 (D.C. Cir. 2009). In order to justify relief under the *ultra vires* doctrine "a plaintiff must show, *first* that the agency has acted in excess of its delegated powers and contrary to a specific prohibition, and, *second*, that barring review by the district court would wholly deprive the party of a meaningful and adequate means of vindicating its statutory rights." *Nat'l Air Traffic Controllers Ass'n AFL-CIO v. Fed. Serv. Impasses Panel*, 437 F.3d 1256, 1264 (D.C. Cir. 2006). With respect to the first prong, "[a]n agency acts *ultra vires* when it violates a 'clear and mandatory' statutory provision. A statutory provision is 'clear and mandatory' when it has only one unambiguous interpretation." *Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*, No. 18-cv-2236-RCL, 2020 WL 4039177, at *3 (D.D.C. July 17, 2020).

Plaintiffs' claim fails each requirement for *ultra vires* review. Most obviously, Plaintiffs fail at the second condition: Plaintiffs had a "meaningful and adequate means of vindicating [his] statutory rights," *Bd. of Governors, Fed. Reserve Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43 (1991)—Plaintiffs had the opportunity to file a complaint to the Postal Regulatory Commission, with judicial review in the D.C. Circuit if Plaintiffs remain unsatisfied. Plaintiffs' failure to even attempt to pursue the remedy provided by Congress is fatal to their claim.

Plaintiffs' claim also fails under the first prong of the *ultra vires* analysis, because Plaintiffs cannot show that the Postal Service has unequivocally violated sections 3661(b) or 101. Section 3661(b) requires the Postal Service to request an advisory opinion whenever it "determines that there should be a change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis." 39 U.S.C. § 3661(b). The leading case interpreting this statute is *Buchanan v. U.S. Postal Serv.*, 508 F.2d 259 (5th Cir.

1975). There, the Fifth Circuit recognized that "Congress intended 3661 to apply to only a specified class of decisions," and that "Postal management was left with broad decision-making power, subject to 3661's requirements for specified decisions." *Id.* at 262. Accordingly, three factors that must be satisfied before section 3661(b) comes into play.

"First, there must be a 'change.' This implies that a quantitative determination is necessary." *Id.* at 262. In other words, "[t]here must be some meaningful impact on service. Minor alterations which have a minimal effect on the general class of postal users do not fall within 3661." *Id.* "Second, the change must be 'in the nature of postal services.' This involves a qualitative examination of the manner in which postal services available to the user will be altered." *Id.* at 262-63. "Third, the change must affect service 'on a nationwide or substantially nationwide basis.' A broad geographical area must be involved." *Id.* at 263. In drawing these lines, courts have made a "distinction between Postal Service managerial decisions and Postal Service decisions which affect the public and give rise to an opportunity to be heard," with decisions like transferring mail processing facilities and maintaining mail trucks falling into the former category. *See, e.g.*, *Wilson v. U.S. Postal Serv.*, 441 F. Supp. 803, 806 (C.D. Cal. 1977).

None of the supposed "changes" that Plaintiffs allege meets these standards. The unofficial documents upon which Plaintiffs rely (*i.e.* the PMG Plan and the "PIVOT") are unofficial documents that do not constitute official agency policy, and the supposed "changes" they identify did not actually occur.

As discussed above, USPS never made changes to its overtime policy (including banning overtime) or to its retail operating hours, nor has it closed or consolidated any mail processing facilities. *See* Curtis Dec. ¶¶ 12, 22-23, 32-35; Colin Dec. ¶ 3. Further, it does not prohibit extra or late trips. *See* Cintron Dec. ¶¶ 23-24; Ex. 16 ¶ 5. And to the extent Plaintiffs allege that late

and extra trips *were* banned, that is certainly no longer the case, *see* Ex. 16 ¶ 5, so prospective

injunctive relief is not appropriate. Nor did USPS make any "changes" with respect to its

treatment and prioritization of Election Mail.

Tuning out the politically charged atmosphere in which Plaintiffs' claims are brought, a

clearer picture comes into view.  Plaintiffs have not, in fact, uncovered recent policy *changes*.

Rather, the complaint addresses recent *observations* of longstanding USPS policies. *See* Ex. 21

(Defs.' Response to Pls.' First Set of Interrogatories, at 12 (Interrogatory No. 5), *Washington*,

No. 20-cv-03127 (E.D. Wash.)).

Both the Postal Service and the Commission's past practices confirm that these activities

do not fall within section 3661's ambit.  "[P]ast practice . . . should be given the deference

ordinarily accorded any interpretation of a statute by the agency charged with its enforcement."

*United Farm Workers of Am., AFL-CIO v. Chao*, 227 F. Supp. 2d 102,107 n.11 (D.D.C. 2002)

(quoting *Gelman v. FEC*, 631 F.2d 939, 943 (D.C. Cir. 1980)).  The Commission has noted that a

"change in the nature of postal services broadly can be defined as changes to a customer's ability

to access essential postal services that require a visit to a postal retail facility."[8]  Its past practice

illustrates that nationwide changes that trigger 3661's review are general changes to postal

facility hours or service standards for mail delivery.  The Postal Service requires an advisory

opinion before, for example, formally changing the service standards for certain pieces of mail

(*i.e.*, eliminating overnight delivery for single-piece First-Class Mail or adding an extra day to

---

[8] Advisory Opinion Concerning the Process for Evaluating Closing Stations and Branches, Docket No. N2009-1 (Mar. 10, 2010), at 1, https://www.prc.gov/docs/67/67174/Advisory_Opinion_031010.pdf.

Standard Mail),[9] changing the hours of operations at tens of thousands of post offices or retail

operations,[10] or eliminating an entire day of mail delivery.[11]  All of these proposals constitute

formal changes in published service standards or which customer-facing operations are open.

None of them concern basic, managerial operational changes of the type at issue here.

---

[9] Advisory Opinion on Service Changes Associated With Standard Mail Load Levelling, Docket No. N2014-1 (Mar 26, 2014), at 1, 10, https://www.prc.gov/docs/89/89493/Docket%20No.%20N2014-1_Advisory%20Opinion.pdf ("This proposal entails a change to the delivery expectation or delivery service standard for . . . [certain] Standard Mail. . . . Under the Postal Service's proposal, the service standard would change [from 3 days] to 4 days"); Advisory Opinion on Mail Processing Network Rationalization Service Changes, Docket No. N2012-1 (Sept. 28, 2012), at 1 https://www.prc.gov/docs/85/85269/Advisory_Opinion_%20PDF%20_09282012.pdf  ("The [Postal Service's proposed] changes to service standards would ultimately eliminate all overnight delivery service for single-piece First-Class Mail, and delay much of current First-Class Mail 2-day delivery to 3-day delivery.  Presorted First-Class Mail and Periodicals would have to meet new mailing requirements, including new accelerated entry times, to maintain eligibility for overnight service.  Standard Mail and Package Services would be affected to a lesser extent."); Advisory Opinion Concerning a Proposed Change in the Nature of Postal Services, , at 7 Docket No. 2006-1 (Dec. 12, 2006) (proposing "changes in the application of current service standards to numerous 3-digit ZIP Code service area origin-destination pairs for different classes of mail.").

[10] Advisory Opinion on Post Office Structure Plan, Docket No. N2012-2 (Aug. 23, 2012), at 1, 3, https://www.prc.gov/docs/85/85013/N2012-2_Adv_Op_082312.pdf (proposing to reduce the hours of operations "at more than 13,0000 post offices nationwide); Advisory Opinion on Retail Access Optimization Initiative, Docket No. N2011-1 (Dec. 23, 2011), at 1, https://www.prc.gov/docs/78/78971/N2011-1_AdvisoryOP.pdf  (proposing to identify "more than 3,650 post offices, retail annexes, stations and branches for possible closing").; Advisory Opinion Concerning the Process for Evaluating Closing Stations and Branches, Docket No. N2009-1 (Mar. 10, 2010), https://www.prc.gov/docs/67/67174/Advisory_Opinion_031010.pdf (proposing a broad station and branch discontinuation plan).

[11] Advisory Opinion on Elimination of Saturday Delivery, Docket No. N2010-1 (Mar. 24, 2011), at 1, available at https://www.prc.gov/docs/72/72327/Advisory_Opinion_032411.pdf ("The Postal Service requests a Commission advisory opinion on a plan to end Saturday delivery, Saturday outgoing mail processing, and other related service changes.").

If there were any doubt as to whether these "changes" are covered by section 3661, that

doubt would be an insufficient basis for Plaintiffs' *ultra vires* claim.  Plaintiffs' claim emerges at

the intersection of two lines of doctrine: the requirement that section 3661 be narrowly

interpreted, in order to preserve USPS's "broad management power," *see Buchanan*, 508 F.2d at

263-64, and the *ultra vires* doctrine, which requires that any error be clear and unambiguous.

The basic, operational activities that Plaintiffs seek to challenge here cannot meet this set of

unequivocal requirements.  Indeed, were it otherwise, the *ultra vires* doctrine would swallow

Congress's preclusion of judicial review of these types of claims in district court.  Almost any

sort of operational or management initiatives that could have an impact on Postal Service

operations would fall within the ambit of section 3661—and require extensive hearings—exactly

the sort of ossification Congress intended to avoid.  *See id.*

Nor can Plaintiffs bring an *ultra vires* challenge to the Postal Service's general

compliance with 39 U.S.C. § 101(e). *See* PI Br. at 20-21. That provision embodies the postal

policy that "[i]n determining all policies for postal service, the Postal Service shall give the

highest consideration to the requirement for the most expeditious collection, transportation, and

delivery of important letter mail." 39 U.S.C. § 101(e). But, pursuant to 39 U.S.C. § 410(a), "the

Postal Service is exempt from review under the Administrative Procedure Act." *Mittleman*, 757

F.3d at 305. "[W]here Congress has . . . acted to preclude even APA review, it is well established

that no cause of action remains, much less some undefined 'traditional' equitable remedy." *Eagle*

*Tr. Fund v. U.S. Postal Serv.*, 365 F. Supp. 3d 57, 67 (D.D.C. 2019). Moreover, "a claim that an

agency acted *ultra vires* is a claim that the agency acted 'in excess of its delegated powers and

contrary to a specific prohibition in [an] Act,[] not that an agency's authorized action was

imprudent or that in validly exercising its judgment, the agency reached the wrong result.'" *Id.* at

67. It is the latter error that Plaintiffs complain of here. Plaintiffs are not questioning the Postal Service's general authority to make policy changes. Instead, Plaintiffs are claiming that in making those policy changes, the Postal Service did not give "highest consideration" to the enumerated factors.

Further, section 101(e) is not even susceptible to *ultra vires* review. By its terms, it generally identifies certain factors that must play into the Postal Service's *decision-making process*; it imposes no restriction on the content of any policy that is implements. It is neither a grant of, nor a limitation on, the Postal Service's authority but rather emphasizes the agency's wide discretion in setting policy. *See* 39 U.S.C. § 101(e). Such discretion cannot be squared with *ultra vires* review, which depends on a claim that there is no such doubt over the proper interpretation of a statute. *See, e.g.*, *Key Med. Supply, Inc. v. Burwell*, 764 F.3d 955, 963-64 (8th Cir. 2014) (noting, in the context of a "broad statutory authority," that plaintiff "attempts to identify clear violations of statutory authority," but has only "identified mere issues of statutory interpretation" insufficient for *ultra vires* review).

### D.     Plaintiffs Fail to Establish That USPS Restricted Core Political Speech for Partisan Political Purposes (Count II).

Plaintiffs allege that Defendants' purported actions were unconstitutional because they "interfere with core political speech and were adopted with the constitutionally impermissible motive to undermine access to the political process by non-Trump voters." PI Br. at 22. Plaintiffs begin their analysis with a false premise—that there has been a limitation placed on mail service. As discussed above, this is simply untrue.  USPS has not placed any limits on reasonable use of overtime or late/extra trips, retail hours, or delivery of Election Mail.  Rather, USPS has committed to providing service for handling of Election Mail above and beyond that which it extends to other forms of mail.  For example, Election Mail entered as Marketing Mail is

advanced for processing ahead of all other Marketing Mail.  By way of another example, mail identified as containing ballots returned by voters to election officials is postmarked and delivered, regardless of whether it is sent without sufficient postage. What Plaintiffs challenge is a creation of their own making, not the present policy of the Postal Service.

As a legal matter, Plaintiffs allegations do not past "the most . . . basic test for view point discrimination," which is "whether—within the relevant subject category—the government has singled out a subset of messages for disfavor based on the views expressed." *Matal v. Tam*, -- U.S. --, 137 S. Ct. 1744, 1766 (2017) (Kennedy, J., concurring in art and concurring in the judgment). "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819 828-29 (1995) (citations omitted). Moreover, the government must abstain from regulating speech when suppressing a specific ideology or opinion is the rationale for the restriction. *Id.*  Plaintiffs have not met their burden to establish that any action by USPS was motivated for the purpose of suppressing particular votes or that the alleged changes at issue have, in fact, had a disparate impact on voters with a particular viewpoint.

For example, Plaintiffs provide only conclusory assertions about whether and how Defendants' "new policies" have allegedly limited voters' ability to participate in the political process, with scant evidence in support thereof. *See* PI Br. at 23. Plaintiffs point to no evidence that demonstrates that USPS activity has curtailed mail-in voting, much less that they did so to target individuals who do not intend to vote for President Trump  Plaintiffs, instead, attempt to draw a line between President Trump's tweets and statements in the spring of this year, to his nomination of Postmaster General DeJoy in June, to alleged policy changes in July.  PI Br. at 24-25.  The problem with Plaintiffs' effort is that Plaintiffs again disregard the record, which

establishes that the purported changes were not new, but rather continued implementation of policies that pre-date these events. Plaintiffs also ignore that, although Postmaster General DeJoy was nominated by President Trump, the statutorily bipartisan Board of Governors made the appointment. *See* 39 U.S.C. § 202.

At bottom, the record is clear that USPS Headquarters has sent unequivocal direction to the field to prioritize the timely delivery of *all* Election Mail and has committed additional resources to support that effort wherever possible.  In light of this guidance, Plaintiffs can point to no USPS activity or policy that will result in unconstitutional viewpoint discrimination.  But even if this Court thought the allegations sufficient to establish a likelihood of success on the merits---which they are not---they certainly do not constitute evidence of viewpoint discrimination sufficient to support the grant of summary judgment in Plaintiffs' favor.

## II.    PLAINTIFFS CANNOT DEMONSTRATE IRREPARABLE HARM

Plaintiffs have also failed to show that they will suffer irreparable harm in the absence of a preliminary injunction. The moving party "must show the present threat of irreparable harm." *Direx Israel, Ltd v. Breakthrough Med. Corp.*, 952 F.2d 802, 816 (4th Cir. 1991). Moreover, the irreparable harm can be "neither remote nor speculative, but actual and imminent." *Id.* (quoting *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir. 1989); citing *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987) ("Establishing a risk of irreparable harm is not enough. A plaintiff has the burden of proving a 'clear showing of immediate irreparable injury.'")).

Conspicuously absent from Plaintiffs' argument on this point is an explanation of how it will suffer irreparable harm if *another* preliminary injunction does not issue. Virtually every item of Plaintiffs' requested relief is addressed by an existing court order of nationwide application or by USPS instructions or guidance issued in accordance with those orders. By way of illustration,

the following chart lists the requested relief set forth in Plaintiffs' proposed order (ECF No. 49-3) and the corresponding court order or USPS instructions or guidance addressing such relief.

| Plaintiffs' Requested Preliminary Injunction (PI) Relief | Corresponding Court Order or USPS Instruction/Guidance |
|---|---|
| Enjoin USPS from taking any actions that interfere with the timely delivery of Election Mail (Proposed Order (PO) at ¶ 2) | - *Washington* PI<br>- *Jones* PI<br>- Clarifying Operational Instructions<br>- Additional Resources Memorandum<br>- Supplemental Guidance Memorandum |
| Enjoin USPS from modifying truck, delivery, or sorting schedules (PO at ¶ 2) | - *Washington* PI<br>- *Jones* PI<br>- Guidance Memo to Managerial Staff per *Jones* PI<br>- *Pennsylvania* PI<br>- *New York* PI<br>- *Vote Forward* PI<br>- Clarifying Operational Instructions<br>- Supplemental Guidance Memorandum |
| Enjoin USPS from restricting overtime (PO at ¶ 2) | - *Jones* PI<br>- *Pennsylvania* PI<br>- Clarifying Operational Instructions<br>- Supplemental Guidance Memorandum |
| Enjoin USPS from removing collection boxes (PO at ¶ 2) | - Clarifying Operational Instructions |
| Enjoin USPS from removing sorting machines (PO at ¶ 2) | - *Washington* PI<br>- *New York* PI<br>- Clarifying Operational Instructions |
| Enjoin USPS from "deprioritizing election mail"  (PO at ¶ 2) | - *Jones* PI<br>- Clarifying Operational Instructions<br>- Additional Resources Memorandum<br>- Supplemental Guidance Memorandum |
| Require USPS to deliver "all Election Mail sent anywhere within the U.S. between 10/13/20 and 11/3/20 as fast as or faster than the standards for First Class Mail delivery per 39 C.F.R. § 121.1"  (PO at ¶ 3) | - *Washington* PI<br>- *New York* PI<br>- Clarifying Operational Instructions<br>- Additional Resources Memorandum |
| At least weekly reporting through 11/3/20 providing: (a) updates from USPS to Congress; (b) national, regional, and district reports regarding whether USPS is meeting applicable performance standards; (c) reports regarding "the percentage of mail delivered on time (overnight, in two days, and in three to five days)." (PO at ¶ 4) | - *Jones* PI<br>- *Pennsylvania* PI |

41

It is, therefore, hard to understand how Plaintiffs would be irreparably harmed if the proposed

order did not issue, as the requested relief has already been granted by several courts across the

country. If anything, another order, penned by another district court, may run the risk of causing

operational confusion.  And with the Election a little more than two weeks away, such confusion

may have the unintended consequence of compromising the orderly and timely handling of

Election Mail. *See generally* 2d Suppl. Dec. of R. Cintron; 3d Suppl. Dec. of R. Cintron.

Plaintiffs also complain that they have been injured by the alleged deprivation of their

procedural rights under 39 U.S.C. § 3661. PI Br. at 32. But, as discussed above, the deprivation

of a procedural right, standing alone, is not even sufficient to establish a case or controversy, let

alone to justify the extraordinary remedy of a mandatory injunction. *See Summers*, 555 U.S. at

496.

Likewise, Plaintiffs cannot demonstrate harm associated with the exercise of their First

Amendment rights because, as discussed above, no such violation has occurred.

## III.    THE BALANCE OF THE EQUITIES DOES NOT JUSTIFY RELIEF

A preliminary injunction is also not appropriate because the balance of the equities and

public interest weigh in Defendants' favor. Plaintiffs seek an injunction that would enjoin

Defendants from implementing the purported "transformational changes." PI Br. at 16. But, as

explained above, *several* courts have already issued nationwide injunctions enjoining Defendants

from implementing the purported changes, and USPS has issued instructions consistent with

those injunctions. The public interest would not be served by the Court issuing what would

effectively be an advisory opinion to comply with injunctions entered by other courts. Moreover,

while the standing orders enjoined the same practices that Plaintiffs challenge here, there is a risk

that, depending on the terms of the order, an additional injunction could subject the Postal

Service to multiple, conflicting injunctions, which would require the Postal Service to divert even more resources to complying with conflicting orders. It would not be in the public interest for this Court to issue yet another nationwide injunction to enjoin practices that USPS has already suspended or require actions by USPS it is already obligated to undertake.[12]

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for preliminary injunction or, in the alternative, partial summary judgment should be denied.

Dated: October 16, 2020

Respectfully submitted,

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

ERIC WOMACK
Assistant Branch Director
Federal Programs Branch

/s/ Alexis J. Echols
ALEXIS J. ECHOLS
JOSEPH E. BORSON
KUNTAL CHOLERA
JOHN ROBINSON
DENA M. ROTH
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005
Telephone: (202) 305-8613
E-mail: alexis.j.echols@usdoj.gov

*Attorneys for Defendants*

---

[12] If the Court is nonetheless inclined to grant injunctive relief, Defendants respectfully request that the Court delay the implementation of any order to allow the parties an opportunity to reach agreement on a proposed order.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document will be served on Plaintiffs in accordance with Fed.

R. Civ. P. 4. Defendants certify that a courtesy copy of this motion and its accompanying

documents will immediately be sent to the Court.

/s/ Alexis J. Echols
ALEXIS J. ECHOLS
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005
Telephone: (202) 305-8613
E-mail: alexis.j.echols@usdoj.gov
