IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

NATIONAL URBAN LEAGUE, et al.,          *

      Plaintiffs,                                    *

v.                                                          *          Civil Action No. GLR-20-2391

LOUIS DEJOY, in his official capacity as   *
Postmaster General, et al.,
                                                          *

      Defendants.

******

**MEMORANDUM OPINION**

THIS MATTER is before the Court on a Motion for Preliminary Injunction or, in the Alternative, Partial Summary Judgment filed by Plaintiffs National Urban League, Common Cause, and the League of Women Voters of the United States, on behalf of themselves and their members (collectively, "Plaintiffs") (ECF No. 49).[1] The Motion is ripe for disposition, and no hearing is necessary. <u>See</u> Local Rule 105.6 (D.Md. 2018). For the reasons set forth below, the Court will deny the Motion.

## I.   BACKGROUND

**A.   Factual Background**

Plaintiffs advance this lawsuit against Defendants Louis DeJoy, in his capacity as the United States Postmaster General, and the United States Postal Service ("USPS") (together with DeJoy, "Defendants"), alleging that Defendants have implemented changes

---

[1] Also pending before the Court is a Motion of Members of Congress for Leave to File an Amici Curiae Brief in Support of Plaintiffs (ECF No. 50). The Court will grant the Motion <u>nunc pro tunc</u> and has taken the enclosed Amici Curiae Brief (ECF No. 50-1), under advisement.

to USPS policies and procedures "with the purpose and intent to sabotage mail-in voting in the upcoming 2020 national elections." (Compl. ¶ 1, ECF No. 1). As Plaintiffs explain, USPS "plays a critical role in every election," and the upcoming general election will see an "unprecedented level of voting by mail." (Id. ¶¶ 35–39). Plaintiffs note that according to some experts, "80 million votes could be submitted by mail this fall, more than twice the number cast by mail in 2016." (Id. ¶ 42). Polling has indicated that "voters who identify as Democrats and/or who intend to vote for Democratic candidates are far more likely to vote by mail in the November election than those who identify as Republicans and/or who intend to vote for Republican candidates." (Pls.' Mem. Supp. Mot. Prelim. Inj. ["Motion"] at 16, ECF No. 49-1).[2]

DeJoy assumed the position of Postmaster General in June 2020, and shortly thereafter "began to implement major structural and operational changes at the Postal Service." (Compl. ¶ 45). These changes included: "The No Late or Extra Trips Policy"; "The Restricted Overtime Policy"; the "Removal of Sorting Machines"; the "Elimination of Collection Boxes"; and the "Deprioritization of Election Mail" (collectively, the "DeJoy Policy Changes"). (Motion at 16–19). With respect to the "No Late or Extra Trips Policy," Plaintiffs allege:

> DeJoy directed that "late trips" and "[e]xtra trips" to ensure timely delivery of mail "are no longer authorized or accepted." Further, the Postal Service directed postal workers to leave mail behind at distribution centers for delivery the following day if collecting it would delay letter carriers from their routes. Historically postal workers have been instructed not to leave

---

[2] Citations to page numbers refer to the pagination assigned by the Court's Case Management/Electronic Case Files ("CM/ECF") system.

> letters behind and to make multiple trips if needed to ensure
> that mail is delivered on time. The Postal Service itself
> explained that "[o]ne aspect of these changes that may be
> difficult for employees is that – temporarily – we may see mail
> left behind or mail on the workroom floor or docks . . . which
> is not typical."

(Compl. ¶ 49) (footnotes omitted). Plaintiffs describe the "Restricted Overtime Policy" as

follows:

> Postmaster General DeJoy ordered the elimination of overtime
> for Postal Service workers. Prior to the policy change,
> according to data from the American Postal Workers Union,
> almost 20 percent of all work done by Postal Service mail
> handlers, delivery drivers, and city carriers was done in
> overtime. . . . [T]he Postal Service informed employees that
> "[o]vertime will be eliminated" because the Postal Service is
> "paying too much in [overtime] and it is not cost effective."
> With the elimination of overtime, the Postal Service will have
> significantly reduced capacity to process surges in mail in the
> weeks leading up to the November election.

(Compl. ¶ 48) (footnotes omitted). Regarding the "Removal of Sorting Machines,"

Plaintiffs allege:

> Postmaster General DeJoy moved to decommission one out of
> every ten Postal Service mail sorting machines in the Postal
> Service's inventory, including one out of every seven Delivery
> Barcode Sorter (DBCS) machines. DBCS machines make up
> the bulk of the Postal Service's mail sorting operation and are
> used to sort envelope mail, such as letters, postcards, and—
> critically—ballots. Delivery Barcode Sorting machines are
> capable of sorting through 35,000 pieces of mail per hour.
> According to Postal Service planning documents issued under
> Postmaster General DeJoy's watch, the Postal Service planned
> to remove 671 mail sorting machines, including 502 DBCS
> machines, by September 30. Although White House Chief of
> Staff Mark Meadows disingenuously said in an interview on
> August 16 that the Postal Service would not decommission *any
> more* sorting machines before the November election, by the
> time he made that statement the Postal Service had *already*

> decommissioned more than 95 percent of the sorting machines
> that were scheduled to be removed, according to Postal Service
> planning documents, including a significant number of sorting
> machines from processing and distribution centers in
> Baltimore, Gaithersburg, and Capitol Heights.

(Compl. ¶ 46) (footnotes omitted). Regarding the "Elimination of Collection Boxes,"

Plaintiffs specify that "Postmaster General DeJoy ordered the removal of Postal Service

collection mailboxes throughout the country. Mailboxes have reportedly been removed in

at least four states, including New York, Pennsylvania, Oregon, and Montana." (Compl.

¶ 47) (footnotes omitted). Finally, Plaintiffs provide the following information regarding

the "Deprioritization of Election Mail":

> Postmaster General DeJoy also ended the practice of treating
> all election mail as priority mail. According to Postal Service
> delivery standards, First-Class Mail is typically delivered in 2
> to 5 days, while Marketing Mail is delivered within 3 to 10
> days. Before Postmaster General DeJoy assumed the position
> of Postmaster General, it had been the practice of the Postal
> Service to prioritize the delivery of all election mail to meet
> First-Class delivery times no matter what class of mail was
> used to send it. According to a 2019 report from the Postal
> Service Office of Inspector General, 95.6 percent of 2018
> election mail was delivered within a 1-to-3-day service
> standard, which is functionally equivalent to the faster First-
> Class mail standard. The Postal Service informed
> congressional leaders on August 11, 2020, that it was ending
> the practice of prioritizing all election mail and to prepare for
> "slower delivery times" and an "increase[d] . . . risk that voters
> will not receive their ballots in time to return them by mail."

(Compl. ¶ 52) (footnotes omitted). At no point did USPS submit the DeJoy Policy Changes

to the Postal Regulatory Commission for review. (Motion at 10).[3]

---

[3] The statute governing USPS provides that "[w]hen the Postal Service determines
that there should be a change in the nature of postal services which will generally affect

4

The DeJoy Policy Changes "had the cumulative effect of delaying mail delivery in general and specifically impeding access to mail ballots." (Compl. ¶ 45). Indeed, USPS documentation and witness testimony demonstrate that "[a]lmost immediately after the 'transformative' changes were announced, the Postal Service experienced a precipitous, nationwide decline in service. Beginning the week of July 11, the Postal Service's on-time service scores fell from an average of 87.90% over the prior 6 months to 80.99% (averaging over categories of mail)." (Motion at 19). Plaintiffs explain the potential impact of election mail delays in their Motion:

> A delay of even a single day in the delivery of ballots could disenfranchise hundreds of thousands of voters. In 31 States, ballots must be <u>received</u> (not sent) by Election Day. Based on historical data of when mail ballots are cast, between 3.7 and 9.3 percent of all people who vote by mail are expected to cast their ballot on the Saturday before the election—between three and eight million individuals. But in the 31 States with Election Day ballot receipt deadlines, a ballot mailed on October 31 that is delivered in four days rather than three <u>will not be counted at all</u>.

(<u>Id.</u> at 21) (citations omitted).

Plaintiffs further allege that Defendants' actions were motivated by partisan bias. For example, Plaintiffs cite to a tweet by President Trump in which he stated, "Republicans should fight very hard when it comes to statewide voting by mail. Democrats are clamoring for it. Tremendous potential for voter fraud, and for whatever reason, doesn't work out well for Republicans." (Compl. ¶ 69). Another tweet by President Trump stated, "MAIL-IN

---

service on a nationwide or substantially nationwide basis, it shall submit a proposal, within a reasonable time prior to the effective date of such proposal, to the Postal Regulatory Commission requesting an advisory opinion on the change." 39 U.S.C. § 3661(b).

VOTING WILL LEAD TO MASSIVE FRAUD AND ABUSE. IT WILL ALSO LEAD TO THE END OF OUR GREAT REPUBLICAN PARTY." (Id. ¶ 71). Plaintiffs note that DeJoy was "handpicked" by President Trump and has "donated hundreds of thousands of dollars to Republican candidates, committees, and PACS in 2020[.]" (Id. ¶ 77).

On August 18, 2020, DeJoy issued a statement purporting to roll back several of the DeJoy Policy Changes. (Id. ¶ 79). Plaintiffs assert that DeJoy's statement failed to remedy certain critical changes "that have already impacted mail delivery and will likely have a devastating impact on the ability of Americans to vote in the upcoming election[.]" (Id. ¶ 80). Despite this, "the Postal Service's on-time scores have rebounded somewhat since DeJoy was forced to reverse certain of the transformative changes." (Motion at 21). Plaintiffs note, however, that "as of early September, the Postal Service's on-time score remained well below what it was prior to the changes implemented by DeJoy." (Id.).

## B.    **Procedural Background**

Plaintiffs filed the Complaint in this matter on August 18, 2020. (ECF No. 1). The four-count Complaint alleges that: Defendants imposed an undue burden on the fundamental right to vote in violation of the United States Constitution (Count I); Defendants violated the First Amendment of the United States Constitution by engaging in content and viewpoint discrimination (Count II); Defendants implemented the DeJoy Policy Changes not in accordance with procedure required by law (Count III); and that Defendants DeJoy and USPS have acted ultra vires in exceeding their statutory authority (Count IV). (Compl. ¶¶ 82–112). Plaintiffs seek declaratory judgment, injunctive relief, and attorneys' fees and costs. (Id. at 34–35).

On September 25, 2020, Plaintiffs filed a Motion for Preliminary Injunction or, in the Alternative, Partial Summary Judgment. (ECF No. 49). In the Motion, Plaintiffs seek the following injunctive relief:

> [1] Defendants should be enjoined from taking actions that risk delaying the timely delivery of election mail including by changing truck, delivery, or sorting schedules; restricting overtime; removing collection boxes; removing sorting machines; [or] deprioritizing election mail.
>
> [2] Defendants should be ordered to postmark and deliver all election mail mailed in the 21 days preceding the November 3, 2020, election at least as fast or faster than the standards for First-Class Mail delivery set forth in 39 C.F.R. § 121.1.
>
> [3] [T]he Court should order Defendants to provide a copy of the order granting the injunction to all Postal Service employees in paper or electronic format.
>
> [4] [T]he Court should order Defendants to provide Plaintiffs' with updates regarding the status of the Defendants' implementation of the Court's order.

(Motion at 44). Defendants filed a Response to Plaintiffs' Motion on October 16, 2020. (ECF No. 56).[4] Plaintiffs filed a Reply in support of their Motion on October 21, 2020. (ECF No. 65). On October 22, 2020, the Court directed Defendants to file a surreply. (ECF No. 66). Plaintiffs then filed a Notice of Supplemental Evidence in Support of their Motion on October 25, 2020. (ECF No. 72). Defendants filed their Surreply on October 26, 2020. (ECF No. 73). Defendants then filed a Notice of Supplemental Authority on October 27,

---

[4] Defendants' Corrected Response, which they submitted after the Clerk determined that Defendants had improperly attached exhibits to their Response, was filed on October 19, 2020. (ECF No. 59).

2020. (ECF No. 74). Plaintiffs filed a Response to Defendants' Notice of Supplemental Authority on October 28, 2020. (ECF No. 75).

## C.    **Related Litigation**

Before and during the pendency of this action, a host of other plaintiffs across the country have filed and litigated similar actions seeking to enjoin the DeJoy Policy Changes. See Washington v. Trump, No. 20-cv-3127 (E.D.Wash.); Jones v. U.S. Postal Serv., No. 20-cv-6516 (S.D.N.Y.); Richardson v. Trump, No. 20-cv-2262 (D.D.C.); NAACP v. U.S. Postal Serv., No. 20-cv-2295 (D.D.C.); New York v. Trump, No. 20-cv-2340 (D.D.C.); Johnakin v. U.S. Postal Serv., No. 20-cv-4055 (E.D.Pa.); Pennsylvania v. DeJoy, No. 20-cv-4096 (E.D.Pa.); Vote Forward v. DeJoy, No. 20-cv-2405 (D.D.C.) (collectively, the "Related Actions"). Like this action, these eight Related Actions, all of which were filed on or around the same date as Plaintiffs' lawsuit, seek permanent and injunctive relief relating to the DeJoy Policy Changes, which will purportedly impact USPS's ability to facilitate mail-in voting during the 2020 election.

Unlike in this action, plaintiffs in several of the Related Actions promptly filed motions for preliminary injunction and requested expedited briefing schedules. As a result, Plaintiffs' Motion here has become ripe after courts in seven of the Related Actions have granted preliminary injunctions to the plaintiffs in those cases.[5] In the one outstanding

_____

[5] See Washington v. Trump, No. 20-cv-3127 (E.D.Wash.) (filed Aug. 18, 2020; mot. prelim. inj. filed Sept. 9, 2020; prelim. inj. entered Sept. 17, 2020); Jones v. U.S. Postal Serv., No. 20-cv-6516 (S.D.N.Y.) (filed Aug. 17, 2020; mot. prelim. inj. filed Sept. 2, 2020; prelim. inj. entered Sept. 25, 2020); Pennsylvania v. DeJoy, No. 20-cv-4096 (E.D.Pa.) (filed Aug. 21, 2020; mot. prelim. inj. filed Sept. 2, 2020; prelim. inj. entered Sept. 28, 2020); New York v. Trump, No. 20-cv-2340 (D.D.C.) (filed Aug. 25, 2020; mot. prelim.

Related Action, the parties stayed the action after they entered into a settlement agreement in which Defendants agreed to comply with the Order issued in Pennsylvania v. DeJoy, No. 20-cv-4096 (E.D.Pa.). See Joint Stip. Stay Case In Light of Sett. Agmt., Johnakin v. U.S. Postal Serv., No. 20-cv-4055 (E.D.Pa. Oct. 8, 2020). None of those decisions are currently being appealed and USPS has "committed in settlement agreements to maintain its policies regarding election mail throughout the election[.]" (Defs.' Resp. Mot. Prelim. Inj. Alt. Partial Summ. J. ["Response"] at 9, ECF No. 59).

Collectively, the seven preliminary injunctions impose substantial requirements on USPS to ensure it timely delivers election mail. For instance, in Washington v. Trump, the United States District Court for the Eastern District of Washington issued an order enjoining USPS from, inter alia: (1) "continued implementation or enforcement of policy changes announced in July 2020 that have slowed mail delivery"; (2) "deviating from the USPS's long-standing policy of treating election mail in accordance with First Class Mail delivery standards"; or (3) "taking any actions in violation of the commitments made in the 'Postmaster General Louis DeJoy Statement,' dated August 18, 2020, such as removal or decommissioning of any mail sorting machines, reducing hours at post offices, or closing mail processing facilities[.]" See Order, Washington v. Trump, No. 20-cv-3127, slip op. at 12 (E.D.Wash. Sept. 17, 2020) (the "Washington Order").

---

inj. filed Sept. 2, 2020; prelim. inj. entered Sept. 27, 2020); Vote Forward v. DeJoy, No. 20-cv-2405 (D.D.C.) (filed Aug. 28, 2020; mot. prelim. inj. filed Sept. 8, 2020; prelim. inj. entered Sept. 28, 2020); Richardson v. Trump, No. 20-cv-2262 (D.D.C.) (filed Aug. 17, 2020; mot. prelim. inj. filed Aug. 20, 2020; prelim. inj. entered Oct. 8, 2020); NAACP v. U.S. Postal Serv., No. 20-cv-2295 (D.D.C.) (filed Aug. 20, 2020; mot. prelim. inj. filed Sept. 1, 2020; prelim. inj. entered Oct. 10, 2020).

In Jones v. United States Postal Service, the United States District Court for the Southern District of New York has required that USPS, inter alia: (1) "to the extent that excess capacity permits, treat all Election Mail as First-Class Mail or Priority Mail Express"; (2) "authorize, and instruct, overtime to be used for the time period beginning October 26, 2020 and continuing through November 6, 2020 to ensure the timely delivery of Election Mail"; (3) "submit . . . a list of steps necessary to restore First-Class Mail and Marketing Mail on-time delivery scores to the highest score each respective class of mail has received in 2020. . . and . . . make a good faith effort to fully implement the listed steps"; (4) "provide . . . a weekly update that includes . . . all data and information collected regarding USPS's handling of Election Mail and compliance with the USPS policies regarding Election Mail, USPS recommended practices regarding Election Mail, and the terms of this Order specifically pertaining to Election Mail"; and (5) "submit to the Court and Plaintiffs a proposed memorandum to all USPS managerial staff" that, inter alia, identifies and explains all USPS policy requirements and recommended practices concerning the treatment of Election Mail, and further certify that all USPS managerial staff have read and reviewed the memorandum. See Order, Jones v. U.S. Postal Serv., No. 20-cv-6516, slip op. at 83–87 (S.D.N.Y. Sept. 21, 2020) (the "Jones Order"), as amended by Order, Jones v. U.S. Postal Serv., No. 20-cv-6516, slip op. at 23 (S.D.N.Y. Sept. 29, 2020).

In Pennsylvania v. DeJoy, the United States District Court for the Eastern District of Pennsylvania adopted the Order in Jones and imposed additional requirements on USPS. For instance, "unless and until the Postal Service presents [the DeJoy Policy Changes] to

the Postal Regulatory Commission and obtains an advisory opinion after a public hearing

is held pursuant to 39 U.S.C. [§] 3661(b) and 39 U.S.C. [§] 3661(c)," the court enjoined

USPS from, <u>inter alia</u>: (1) "continued implementation or enforcement of operational

changes announced in July 2020 reflected in the July 10, 2020 'Mandatory Stand-Up Talk:

All Employees'"; (2) "continued implementation or enforcement of the Guidelines

regarding transportation sent by Robert Cintron to Area Vice Presidents and other agency

representatives on July 11, 2020 and July 14, 2020"; and (3) the continued implementation

of new USPS policies concerning overtime, late and extra truck trips, and carrier start and

stop times that began during the time period of June 15, 2020 until September 16, 2020.

<u>See</u> Order, <u>Pennsylvania v. DeJoy</u>, No. 20-cv-4096, slip op. at 1–2 (E.D.Pa. Sept. 28, 2020)

(the "<u>Pennsylvania</u> Order"). The court subsequently clarified its order to state that, <u>inter</u>

<u>alia</u>:

> Defendants shall be deemed in compliance if they commit to
> and enforce the following . . . Transportation, in the form of
> late and extra trips is authorized and shall be used where
> reasonably necessary to meet service standards and service
> performance targets. . . . Extra transportation resources are
> authorized and shall be used to ensure that Election Mail
> reaches its intended destination in a timely manner. . . . Extra
> delivery and collection trips are authorized and shall be used to
> ensure, to the best of the Postal Service's ability, that
> completed ballots entered on Election Day reach the
> appropriate election official by the state's designated
> deadline. . . . Overtime, including penalty overtime, is
> authorized and shall be used to support all additional resources
> necessary to ensure that Election Mail is prioritized and
> delivered on time.

Order, <u>Pennsylvania v. DeJoy</u>, No. 20-cv-4096, slip op. at 1–2 (E.D.Pa. Oct. 9, 2020) (the

"<u>Pennsylvania</u> Order II"). These are just three of the seven preliminary injunctions in place

precluding USPS from implementing the DeJoy Policy Changes, but they demonstrate the breadth of the restrictions and requirements that have been placed on Defendants through the Related Actions.

## D.   <u>Plaintiffs' Reply and Subsequent Filings</u>

The Court is compelled to separately discuss Plaintiffs' Reply and the parties' subsequent filings, all of which post-date the injunctive relief ordered in the Related Actions and set forth in part above, and which contain the parties' characterizations of the extent to which those orders adequately and fully address the relief sought by Plaintiffs in this action. Plaintiffs' Reply is particularly worthy of discussion because in it, Plaintiffs appear to shift the scope of the relief they seek through their Motion.

In their Reply, Plaintiffs assert the following regarding the deficiencies in the existing preliminary injunctions as they relate to Plaintiffs' request for relief:

> Defendants' unlawful conduct is [not] entirely or sufficiently addressed by the injunctions issued in other cases. None of those injunctions has required Defendants to restore service performance to the status quo ante levels; enjoined Defendants' "Cintron Guidelines," which greatly restrict late and extra trips; or required restoration of sorting capacity. Defendants' operational changes in these critical areas, which no existing injunction addresses, continue to severely and negatively affect mail delivery.

(Pls.' Reply Supp. Mot. Prelim. Inj. Alt. Partial Summ. J. ["Reply"] at 1, ECF No. 65)

(citations omitted).[6] Later in the Reply, Plaintiffs characterize the specific relief they are seeking slightly differently:

---

[6] Plaintiffs reference to the "Cintron Guidelines" appears to refer to written guidelines developed by Robert Cintron, USPS Vice President of Logistics. (Motion at 16–17; Motion Ex. 13 ["Cintron Decl."] ¶ 24, ECF No. 49-15).

> The proposed order also directs the USPS to immediately reverse the Transformational changes that remain in place. It specifically requires the USPS to restore on-time performance to the service levels achieved earlier in 2020, before Defendant DeJoy took office. And it requires the USPS to provide daily reporting on its performance, including the specific actions it is taking to restore service.

(Id. at 18). As set forth in more detail below, these requests appear to differ from the relief Plaintiffs seek through their original Motion.

Plaintiffs then filed a Notice of Supplemental Evidence on October 25, 2020. In it, they provide evidence of a "continued deterioration in performance levels on a nationwide basis." (Pls.' Notice Suppl. Evid. Supp. Mot. Prelim. Inj. Alt. Partial Summ. J. ["Notice"] at 1, ECF No. 72). Citing evidence from one of the Related Actions, Plaintiffs further allege that "performance levels remain below the levels before Defendant DeJoy took office and Defendants had failed to rescind the Cintron Guidelines." (Id. at 3). Plaintiffs assert that Defendants' filings in the Related Actions have made clear "that they have the resources, knowledge, and ability to restore the status quo ante, including restoring on-time performance to the service levels achieved prior to Defendant DeJoy taking office." (Id. at 3–4). Plaintiffs then cite a list of "[e]xtraordinary [m]easures" that Defendants have authorized but not required their local offices to undertake pursuant to the injunction entered in New York v. Trump, arguing that "[m]andating implementation of these measures . . . likely would result in USPS restoring the status quo ante, such that performance levels (at least for ballot delivery) would approach or exceed the on-time delivery levels prevalent before Defendant DeJoy took office." (Id. at 4–5) (citing Status Report Ex. E, New York v. Trump, No. 20-cv-2340, ECF No. 64-1 at 22–24 (D.D.C. Oct.

23, 2020)). They therefore urge this Court to require the Defendants to restore on-time performance to status quo ante levels. (Id. at 5).

Because Plaintiffs appeared to seek novel relief in their Reply, the Court ordered Defendants to file a surreply regarding Plaintiffs' Motion to better understand the narrowed set of issues the Court determined were at the core of this dispute. (ECF No. 66). As set forth in more detail below, Defendants' Surreply and Notice of Supplemental Authority (ECF Nos. 73, 74) address the need for the novel relief sought in Plaintiffs' Reply and Notice of Supplemental Evidence.

## II.   DISCUSSION

### A.   **Standard of Review**

To obtain a preliminary injunction, a plaintiff "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008). Where the federal government is the opposing party, the balance of equities and public interest factors merge. See Nken v. Holder, 556 U.S. 418, 435 (2009). Plaintiffs in this matter seek an order requiring USPS to take particular actions, rather than seeking merely to preserve the status quo. "Since preliminary injunctions are intended to preserve the status quo during the pendency of litigation, injunctions that 'alter rather than preserve the status quo' are particularly disfavored." Profiles, Inc. v. Bank of Am. Corp., 453 F.Supp.3d 742, 747 (D.Md. 2020) (quoting Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, 915

F.3d 197, 216 n.8 (4th Cir. 2019)). In such cases, courts should grant the requested relief only when the right to such relief is "indisputably clear." Id.

**B.     Analysis**

Courts evaluating motions for preliminary injunctions in the Related Actions have set forth exhaustive analyses of the merits of the claims advanced by the plaintiffs in those actions, which largely subsume the claims advanced by Plaintiffs here. The Court adopts the analysis set forth by the United States District Court for the District of Columbia in determining that: (a) like the National Association for the Advancement of Colored People ("NAACP") in the D.C. action, Plaintiffs in this action are likely to be able to establish Article III standing; (b) Plaintiffs will likely succeed in establishing that USPS failed to comply with 39 U.S.C. § 3661(b), which requires USPS to submit changes that "will generally affect service on a nationwide or substantially nationwide basis" to the Postal Regulatory Commission for an advisory opinion before implementing those policies; (c) this Court likely has subject matter jurisdiction over Plaintiffs' § 3661 claim; (d) Plaintiffs' § 3661(b) claim is likely reviewable by this Court pursuant to the ultra vires doctrine; and (e) the balance of equities and public interest favor an injunction. See NAACP v. U.S. Postal Serv., No. 20-cv-2295, 2020 WL 5995032, at *4–11, 13 (D.D.C. Oct. 10, 2020).

The Court separately adopts the analysis set forth by the United States District Court for the Southern District of New York in determining that Plaintiffs are likely to establish that the DeJoy Policy Changes violated the First Amendment. See Jones v. U.S. Postal Serv., No. 20-cv-6516, 2020 WL 5627002, at *23–26 (S.D.N.Y. Sept. 21, 2020). To the extent that Plaintiffs' claim in this matter diverges from the plaintiffs in Jones due to

Plaintiffs' allegations of viewpoint discrimination, the Court further finds that Plaintiffs here are likely to establish that Defendants have engaged in impermissible viewpoint discrimination in violation of the First Amendment. In particular, the Court views the confluence of (1) DeJoy's prolific support of the Republican party; (2) President Trump's tweets concerning the detrimental impact of large quantities of mail-in voting on the Republican party, along with the objective data supporting that conclusion; and (3) the temporal proximity between DeJoy becoming Postmaster General and implementing policies that would tend to interfere with mail-in voting, as compelling circumstantial evidence that the DeJoy Policy Changes were intended to suppress mail-in voting based on hostility toward the Democratic party. See R.A.V. v. City of St. Paul, 505 U.S. 377, 386 (1992) ("The government may not regulate [speech] based on hostility—or favoritism—towards the underlying message expressed.").

It is therefore left to the Court to determine whether Plaintiffs in this action have established that they are "likely to suffer irreparable harm in the absence of preliminary relief[.]" Winter, 555 U.S. at 20. At bottom, the Court finds that Plaintiffs have not succeeded in making that showing and for that reason will deny Plaintiffs' Motion.

"[I]rreparable harm occurs when the threatened injury impairs the court's ability to grant an effective remedy." Int'l Refugee Assistance Project v. Trump, 883 F.3d 233, 270 (4th Cir. 2018), vacated on other grounds, 138 S.Ct. 2710 (2018). "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373–74 (1976). However, the moving party "must show the present threat of irreparable harm." Direx Israel, Ltd. v. Breakthrough

16

Med. Corp., 952 F.2d 802, 816 (4th Cir. 1991) (emphasis added). The harm can be "neither remote nor speculative, but actual and imminent." Id. at 812 (quoting Tucker Anthony Realty Corp. v. Schlesinger, 888 F.2d 969, 975 (2d Cir. 1989)).

This case presents an unusual set of facts. As set forth above, Defendants are already subject to seven separate preliminary injunctions and one settlement agreement relating to the DeJoy Policy Changes. The combined scope of those injunctions is broad and appears to encompass substantially all of the relief Plaintiffs sought in their original Motion. For example, Plaintiffs seek an order enjoining Defendants "from taking actions that risk delaying the timely delivery of election mail including by changing truck, delivery, or sorting schedules; restricting overtime; removing collection boxes; removing sorting machines; [or] deprioritizing election mail." (Motion at 44). In the Washington case, the court enjoined Defendants from the "continued implementation or enforcement of policy changes announced in July 2020 that have slowed mail delivery[.]" Washington Order at 12. The order further forbade Defendants from "taking any actions in violation of the commitments made in the 'Postmaster General Louis DeJoy Statement,' dated August 18, 2020, such as removal or decommissioning of any mail sorting machines, reducing hours at post offices, or closing mail processing facilities[.]" Id. Likewise, the court in Pennsylvania v. DeJoy enjoined Defendants from the "continued implementation" of a series of operational changes that encompassed substantially all of the changes set forth by Plaintiffs in the language quoted above. See Pennsylvania Order at 1–2.

Plaintiffs also requested that the Court require Defendants to "postmark and deliver all election mail mailed in the 21 days preceding the November 3, 2020, election at least

as fast or faster than the standards for First-Class Mail delivery[.]" (Motion at 44). In the Washington case, the court enjoined Defendants from "deviating from the USPS's long-standing policy of treating election mail in accordance with First Class Mail delivery standards[.]" Washington Order at 12. Similarly, the order in Jones required that Defendants, "to the extent that excess capacity permits, treat all Election Mail as First-Class Mail or Priority Mail Express." Jones Order at 83.

Plaintiffs next requested that the Court order Defendants to provide a copy of any preliminary injunction order issued in this case to all USPS employees and provide Plaintiffs with ongoing updates regarding their implementation of the Court's order. The injunctions entered in all of the Related Actions have contained provisions to this effect, and the regular updates regarding Defendants' implementation of those injunctions are a matter of public record and therefore available for Plaintiffs to review. See, e.g., Jones Order at 85–87 (requiring Defendants to "provide . . . a weekly update that includes . . . all data and information collected regarding . . . compliance with . . . the terms of this Order specifically pertaining to Election Mail[,]" and further requiring that Defendants submit to the court a proposed memorandum to staff explaining the order and certifying that all managerial staff had reviewed the memorandum). Accordingly, there are no apparent distinctions between the relief sought in Plaintiffs' Motion and the injunctive relief already granted in the Related Actions.

Through their Reply and Notice of Supplemental Evidence, and without amending their original Motion, Plaintiffs appear to shift the relief they seek to certain items they allege fall outside the scope of the existing injunctions. (Compare Motion at 44, with Reply

18

at 1, 18).[7] In their Reply, Plaintiffs specify the following deficiencies in the existing injunctions as they relate to Defendants' ability to timely deliver election mail: "None of those injunctions has required Defendants to restore service performance to the status quo ante levels; enjoined Defendants' 'Cintron Guidelines,' which greatly restrict late and extra trips; or required restoration of sorting capacity." (Reply at 1). The Court considers these items in turn.

First, Plaintiffs seek an order requiring Defendants to restore service performance to the status quo ante levels, by which they mean "the status quo that prevailed before DeJoy took office." (Reply at 3). In the Proposed Order accompanying their Reply, Plaintiffs specify that such an order would require Defendants to "restore on time performance for first class mail to at least 93.88%, the highest on-time delivery score achieved in 2020." (Proposed Order at 3, ECF No. 65-2).

---

[7] Parties are generally not permitted to change the relief they seek in a reply brief. See Seneca Ins. Co. v. Shipping Boxes I, LLC, 30 F.Supp.3d 506, 512 (E.D.Va. 2014) (declining consideration of arguments raised for the first time in reply because opposing party did not have a full opportunity to respond); see also United States v. Murillo, No. 94-81261, 2015 WL 1780724, at *3 n.3 (E.D.Mich. Apr. 20, 2015) ("This well-settled rule generally is invoked where a party raises a new argument in support of the party's motion in its reply brief; however, the rule clearly also applies where a party completely changes in its reply brief the relief that it originally sought in its motion. In either context, the opposing party has not had an opportunity to respond to the movant's request." (quoting Harris v. Lenawee Cnty., No. 07-11932, 2007 WL 4247639, at *1 (E.D.Mich. Dec. 4, 2007))). Plaintiffs should instead have amended their Motion, which would have given Defendants the opportunity to respond to the new relief sought by Plaintiffs.

The Court is sympathetic, however, to the fact that Plaintiffs are seeking relief subject to significant time constraints and may have viewed the prospect of "resetting" the briefing as untenable. As a result, the Court granted Defendants the opportunity to file a surreply in order to respond to the novel relief sought by Plaintiffs. Thus, the Court will evaluate the relief sought by Plaintiffs in their Reply on the merits.

As an initial matter, the Court does not view this as a practicable or enforceable request. The Court could no sooner order Defendants to restore on-time performance to 93.88%—on a time scale of less than two weeks—than it could order a baseball player to achieve a .300 batting average over his next several games. USPS's on-time performance score is an holistic metric that reflects the result of a combination of a host of factors, some internal to and controllable by USPS, and some external and outside of USPS's control. The Court cannot require a party to meet a metric it can only partially control.

To the extent the matter is controllable by Defendants, however, it is already the subject of an order in a Related Action. In response to similar concerns from the plaintiffs in the Jones case, the Court ordered the following:

> No later than October 1, 2020, USPS shall submit to the Court a list of steps necessary to restore First-Class Mail and Marketing Mail on-time delivery scores to the highest score each respective class of mail has received in 2020, which are 93.88 percent for First-Class Mail and 93.69 percent for Marketing Mail, and shall thereafter make a good faith effort to fully implement the listed steps.

Order, Jones v. U.S. Postal Serv., No. 20-cv-6516, slip op. at 3 (S.D.N.Y. Sept. 25, 2020) (the "Jones Order II"). This order, which is already in place and which includes ongoing requirements that Defendants regularly and publicly certify and describe their compliance, squarely addresses the first element of relief sought by Plaintiffs in their Reply.

Second, Plaintiffs seek an order "enjoin[ing] Defendants' 'Cintron Guidelines,' which greatly restrict late and extra trips[.]" (Reply at 1). Although Plaintiffs never expressly reference the "Cintron Guidelines" in their Motion or, indeed, the Complaint, the Cintron Guidelines appear to refer to written guidelines developed by Robert Cintron,

20

USPS Vice President of Logistics. (Motion at 16–17; Cintron Decl. ¶ 24). The guidelines were prepared "to provide guidance to managers or supervisors with questions regarding whether running late or extra trips would improve or hinder service performance." (Defs.' Surreply Supp. Defs.' Resp. Pls.' Mot. Prelim. Inj. Alt. Partial Summ. J. ["Surreply"] at 9, ECF No. 73).

To the extent the Cintron Guidelines "greatly restrict late and extra trips[,]" as Plaintiffs allege, any such policies have been directly addressed by numerous orders in the Related Actions. See, e.g., Pennsylvania Order at 1–2 (prohibiting the continued implementation of "the Guidelines regarding transportation sent by Robert Cintron to Area Vice Presidents and other agency representatives on July 11, 2020 and July 14, 2020" and of any new USPS policies concerning late and extra trips). In its clarifying order, the Pennsylvania court added that "[t]ransportation, in the form of late and extra trips is authorized and shall be used where reasonably necessary to meet service standards and service performance targets." Pennsylvania Order II at 1.

Pursuant to the orders in the Pennsylvania case, USPS also gave another "Stand-Up Talk" to all employees in which it clarified that "[l]ate and extra trips . . . should be used when they would facilitate the expeditious delivery of Election Mail" and that "[t]ransportation, in the form of late and extra trips is authorized and shall be used where reasonably necessary to meet service standards and service performance targets. The Postal Service shall use extra trips to meet service commitments when feasible." (Surreply at 11–12). To ensure there was no confusion following the Stand-Up Talk, Cintron e-mailed Area Vice Presidents and Managers of Operations Support—the same individuals who had

received the initial Cintron Guidelines—to reiterate that "[a]t all times, including during this election season, delayed trips and extra trips should be used as necessary to meet service performance standards and to ensure the timely delivery of election mail." (Surreply at 12).

Even more recently, the court in NAACP v. United States Postal Service required that Defendants issue a notice to the same group of individuals who received the initial Cintron Guidelines stating in no uncertain terms that "[t]he guidelines issued on July 14, 2020, by USPS Vice President of Logistics, Robert Cintron, regarding the use of late and extra trips are rescinded[.]" Minute Order, NAACP v. U.S. Postal Serv., No. 20-cv-2295 (D.D.C. Oct. 27, 2020). In light of these orders, the Court agrees with Defendants that it "need not require[] USPS to rescind the Cintron Guidelines to address the gravamen of Plaintiffs' concern—that the guidelines might interfere with the timely delivery of Election Mail." (Surreply at 10).

Third, Plaintiffs seek an order requiring USPS to restore all "sorting machines that have been disconnected (but not disassembled and removed) since May 1, 2020." (Proposed Order at 2). Plaintiffs have explained that the loss of sorting machines "risks disenfranchising voters by materially slowing the delivery of unmarked ballots, registration forms, and other election mail." (Motion at 37). Once again, however, existing court orders meaningfully remedy any harm this relief would tend to address. For example, in the Washington case, the court ordered that "[i]f any . . . postal facility will be unable to process election mail for the November 2020 election in accordance with First Class delivery standards because of the Postal Service's recent removal and decommissioning of

equipment, such equipment will be replaced, reassembled, or reconnected[.]" <u>Washington</u> Order at 12. That language was echoed by the court in the <u>New York</u> case. <u>See</u> Order, <u>New York v. Trump</u>, No. 20-cv-2340, slip op. at 5 (D.D.C. Oct. 22, 2020).

Defendants represent that in the wake of these orders, "(1) no additional mail processing machines have been removed from service . . . ; (2) . . . 137 mail processing machines have been returned to service; and (3) there are no outstanding requests from facility heads to reconnect mail processing machines, nor have any such requests been denied." (Surreply at 17). Plaintiffs argue that the existing orders are insufficient because they only require Defendants to restore sorting machines "only to the extent necessary to ensure the Postal Service can comply with its prior policy of delivering election mail in accordance with First Class delivery standards[.]" (Reply at 7 n.1) (internal quotation marks and citation omitted). The timely delivery of election mail, however, is precisely the alleged irreparable harm at issue in this dispute.

Plaintiffs seek an injunction that "alter[s] rather than preserve[s] the status quo." <u>Profiles, Inc.</u>, 453 F.Supp.3d at 747 (quoting <u>Mountain Valley Pipeline, LLC</u>, 915 F.3d at 216 n.8). Such injunctions "are particularly disfavored" and require the right of relief to be "indisputably clear." <u>Id.</u> In light of the evidence proffered by Defendants, and in the absence of any clear explanation from Plaintiffs regarding why the current injunctions imposed on Defendants are insufficient to address the harm caused by decommissioned sorting machines, the Court cannot conclude that it is "indisputably clear" that the absence of additional sorting machines is likely to cause irreparable harm to Plaintiffs.

Finally, to the extent that Plaintiffs truly view any remaining deficiencies in USPS's ability or intent to timely deliver Election Mail as perils to our democracy, they have litigated this case in a manner inconsistent with that concern. Unlike the plaintiffs in every one of the Related Actions, Plaintiffs here waited over five weeks from the time they filed their Complaint to file their Motion for Preliminary Injunction. Also unlike the plaintiffs in the Related Actions, Plaintiffs in this case made no effort to move this Court for an expedited briefing schedule on their Motion. As a result, Plaintiffs did not file their Reply until less than two weeks before Election Day. In their Reply, Plaintiffs appeared to seek new relief from this Court, requiring the Court to grant Defendants time to file a surreply. Any Order by this Court that created substantive new obligations for USPS—an Order that could realistically have come no earlier than a week prior to Election Day—would have done more to sew confusion than to increase the ability for Plaintiffs to safely participate in the election. Put simply, not only have Plaintiffs failed to demonstrate how the existing injunctions imposed on Defendants do not cover the relief Plaintiffs seek in their Motion or Reply, they have also failed to convince this Court that implementing any substantive change at this late stage of the election would actually decrease the chance that Plaintiffs are disenfranchised in this election. As a result, Plaintiffs have failed to demonstrate that they are likely to suffer irreparable harm in the absence of preliminary relief.

## III.    CONCLUSION

For the foregoing reasons, the Court will deny Plaintiffs' Motion for Preliminary Injunction (ECF No. 49).[8] A separate Order follows.

Entered this 29th day of October, 2020.

                                                   _____

                                                   /s/

                                                George L. Russell, III
                                                United States District Judge

---

[8] The Court declines at this stage to rule on Plaintiffs' Partial Motion for Summary Judgment. Accordingly, the Court will direct Defendants to respond to Plaintiffs' Complaint within thirty days of the Order accompanying this Opinion.